AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
#### Southern District of New York

|  |  |  |
|---|---|---|
| MICHAEL WARD,<br>d/b/a BRAINTEASER PUBLICATIONS | ) ) ) ) | **13 CV 7851** |
| _Plaintiff(s)_ | ) ) | |
| v. | ) ) | Civil Action No. |
| BARNES & NOBLE, INC.,<br>STERLING PUBLISHING CO., INC.,<br>FRANCIS HEANEY, AND<br>PATRICK BLINDAUER. | ) ) ) ) | |
| _Defendant(s)_ | ) | |

## SUMMONS IN A CIVIL ACTION

To: _(Defendant's name and address)_  Barnes & Noble, Inc.,122 Fifth Avenue, New York, NY 10011
Sterling Publishing Co., Inc., 387 Park Avenue South, New York, NY 10016
Patrick Blindauer, Employee of Sterling
Francis Heany, Employee of Sterling

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:      Barry E. Janay, Esq.
Law Office of Barry E. Janay
90 Broad Street, 25th Flr.
New York, NY 10004
Tel. 917-756-8501

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

RUBY J. KRAJICK

CLERK OF COURT

Date:  NOV 0 5 2013

_____
_Signature of Clerk or Deputy Clerk_

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
Southern District of New York   13 CV 7851

| | |
|---|---|
| MICHAEL WARD,<br>d/b/a BRAINTEASER PUBLICATIONS | )<br>)<br>)<br>) |
| _____<br>*Plaintiff(s)* | )<br>) |
| v. | )<br>) |
| BARNES & NOBLE, INC.,<br>STERLING PUBLISHING CO., INC.,<br>FRANCIS HEANEY, AND<br>PATRICK BLINDAUER.<br>_____<br>*Defendant(s)* | )<br>)<br>)<br>)<br>)<br>) |

Civil Action No.

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  Barnes & Noble, Inc.,122 Fifth Avenue, New York, NY 10011
Sterling Publishing Co., Inc., 387 Park Avenue South, New York, NY 10016
Patrick Blindauer, Employee of Sterling.
Francis Heany, Employee of Sterling

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   Barry E. Janay, Esq.
Law Office of Barry E. Janay
90 Broad Street, 25th Flr.
New York, NY 10004
Tel. 917-756-8501

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

RUBY J. KRAJICK

CLERK OF COURT

Date:   NOV 0 5 2013    _____
*Signature of Clerk or Deputy Clerk*

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK
————————————————————————X

MICHAEL WARD,                                                    CIVIL ACTION NO.
d/b/a BRAINTEASER PUBLICATIONS.

      Plaintiff

      -against-                                                **COMPLAINT**

                                              **Jury Trial Demanded**

BARNES & NOBLE, INC.,
STERLING PUBLISHING CO., INC.,
FRANCIS HEANEY, AND
PATRICK BLINDAUER.

      Defendants
————————————————————————X

      Plaintiff, Michael Ward, by his attorney, Barry E. Janay, Esq., complains of the Defendants as follows:

## PARTIES

      1.     Plaintiff Michael Ward is a citizen of New Zealand, residing at 12 Cecil Street, St. Andrews, Hamilton, 3200, New Zealand (hereinafter "Ward").

      2.     Defendant Barnes & Noble, Inc. is a Delaware corporation with a headquarters located at 122 Fifth Avenue, New York, NY 10011 (hereinafter "B&N").

      3.     Defendant Sterling Publishing Co., Inc., is a Delaware corporation with headquarters located at 387 Park Avenue South, New York, NY 10016 (hereinafter "Sterling").

      4.     Defendant Francis Heaney is, upon information and belief, an individual resident of the State of New York (hereinafter "Heaney") and an employee of Sterling.

      5.     Defendant Patrick Blindauer is, upon information and belief, an individual resident of the State of New York (hereinafter "Blindauer") and an employee of Sterling.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction in this case under the Copyright Act and the Lanham Act, 17 U.S.C. § 101 et seq., and 15 U.S.C. § 1051 et seq., respectively, pursuant to 28 U.S.C. §§ 1338(a) and (b) and 1331, and the doctrine of pendent jurisdiction. Venue is proper in this case under 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2).

## NATURE OF THE CASE

7.      This is a complaint for copyright infringement in violation of the U.S. Copyright Act, 17 U.S.C. § 101 et seq., trade dress infringement in violation of the Lanham Act, 15 U.S.C. § 1051 et seq., and 15 U.S.C. § 1125(a) in particular, unfair competition in violation of the Lanham Trademark Act (15 U.S.C.A. §§ 1051 et seq.)., and unjust enrichment,.

## INFRINGING ACTS

8.      Plaintiff Michael Ward is a famous and distinguished book author and publisher, who created and developed a highly successful series of puzzle books colloquially known as the "Scratch-Hangman" series.

9.      Upon information and belief, Defendant B&N is the largest book retailer in the United States, operating mainly through its Barnes & Noble Booksellers chain of bookstores headquartered at 122 Fifth Avenue, in addition to its 675 stores (as of April 27, 2013) in all 50 U.S. states in and 686 college bookstores across the country, they are the majority owner of co-defendant Sterling Publishing Co., Inc.

10.     Upon information and belief, Defendant Sterling is a publisher of nonfiction titles, with more than 5,000 titles in print. Founded in 1949, it publishes a wide range of nonfiction and illustrated titles in categories which include art, biography/autobiography, body/mind/spirit, crafts, culinary, do-it-yourself, gardening, gift, history, holiday, juvenile, lifestyle, literature, photography, puzzles & games, reference, science & nature, sports, and travel. Sterling also publishes books for a number of brands, including AARP, Hasbro, USA TODAY and Hearst

Magazines. Sterling is a wholly owned subsidiary of Barnes & Noble, who acquired them in 2003.

11.    Upon information and belief, Defendants Heaney and Blindauder were at all times in pertinent to the issues related to this case, and are believed to be still employees of Defendant Sterling.

12.    Prior to the events discussed below, Plaintiff came up with the concept and created the unique style of the "Scratch-Hangman" series of books.

13.    On or about October 14, 2004, the Plaintiff approached Sterling for the purpose of publishing and distributing his "Scratch-Hangman" series of books in the United States and elsewhere. Sterling and Ward subsequently came to terms and entered into agreements substantially in the same forms as Exhibits A & B appended hereto (Exhibit A 2004 Sample showing the first License Agreement between Ward and Sterling) and subsequently Sterling and Ward entered into forty (40) additional agreements  (Exhibit B – January 22, 2013 Sample showing the last License Agreement) (collectively the "Agreements")[1], the Agreements *inter alia* granted to Sterling the right to register copyrights to the works as well as granting sole publishing and distribution rights.

14.    Sterling had issued approximately forty (40) titles of the popular "Scratch-Hangman" series in Plaintiff's name between September 2005 and August 2013. Sterling started to publish the said series themselves from approximately October 2010, as shown from the publication dates listed on the works, and in 2013 Sterling then ramped up publication of the "Scratch-Hangman" series, producing five (5) more titles themselves, thereby saturating the market with nine (9) "Scratch-Hangman" titles, whereas a typical issue would be four (4) titles per annum.[2]

---

[1] Defendant Sterling and Plaintiff entered into approximately forty (40) similar agreements, so Exhibits A & B are included as representative of the other approximately thirty-eight (38) separate agreements.
[2] A review of the timeline shows that Sterling intentionally increased their number of the "Scratch-Hangman" titles once they determined to stop the publications of the Plaintiff's titles.

The publication dates are as follows:-

Trivia Hangman – Francis Heaney – October, 2010.

Hollywood Hangman – Patrick Blindauer – November, 2011.

Geography Hangman – Jack Ketch/Sterling – February, 2013.

Science Hangman – Jack Ketch/Sterling – February, 2013.

Spelling Bee Hangman – Jack Ketch/Sterling – February, 2013.

Future publications proposed by Sterling:-

Prime Time Hangman – Jack Ketch/Sterling – latter part of 2013

Underwater Hangman – Jack Ketch/Sterling – latter part of 2013

(See Exhibit D)

Said publications are infringing of Plaintiff's "Scratch-Hangman" series of books. Said publications are visually nearly identical to that of Plaintiff's works and contain nearly identical concepts, depictions, and contents.  Exhibit E appended hereto contains a listing of the 40 titles belonging to Plaintiff.  Exhibit D appended hereto contains the 7 titles belonging to Sterling.

15.   Even though defendant Sterling had replaced Plaintiff's "Scratch-Hangman" titles with their own publications under pseudonyms, as well as in the names of their employees Heaney and Blindauer, Defendant Sterling then decided to offer resuming publishing Plaintiff's series in his name provided he sign a release Exhibit E- (Release sent over by Sterling to Ward).  Plaintiff never agreed to sign the release.

16.   Plaintiff never authorized or licensed the defendants to publish the "Scratch-Hangman" series under any other names than his own or outside of the terms of the License Agreement (Exhibit A).

17.   Notwithstanding the fact that Defendants were not authorized to make any commercial use of his "Scratch-Hangman" series outside of the License Agreements, the Defendants willfully began publishing near identical works to that of the "Scratch-Hangman"

series under names of its employees, or fictitious pen names, thereby depriving Plaintiff of all revenues and profits he would be due under the License Agreement or if he had published the works on his own.

18.     Defendants' books, which are nearly identical to or confusingly similar to the Plaintiff's "Scratch-Hangman" series, have become highly successful as a result of the goodwill created by Plaintiff's creation and development of the "Scratch-Hangman" series. These unique puzzle books have sold over 2 million copies to date.[3]

19.     Plaintiff was never alerted by the Defendants to the separate publication of the Scratch-Hangman series under different pen names, and never agreed to such publication nor has Plaintiff ever received any compensation for it.

20.     Immediately upon discovering the unauthorized use of his publications by Defendants, Plaintiff notified them of their illegal use. Defendants have nonetheless continued to market, promote and sell copies of the "Scratch-Hangman" series including those that were not authorized by Plaintiff.

21.     Plaintiff relies for his livelihood on the "Scratch-Hangman" series for compensation. To the extent that people can purchase the "Scratch-Hangman" series of books from the Defendant without Plaintiff receiving any compensation whatsoever has caused actual and substantial damages.

22.     To the extent that Defendants sell the said "Scratch-Hangman" series without compensating the Plaintiff, and without Plaintiff's authorization or consent, the defendants have illegally profited at Plaintiff's expense and have caused Plaintiff a substantial loss.

---

[3] A New York Times article dated May 18, 2009 interviewing Peter Gordon, the Editorial Director at Sterling, alluded to Plaintiff's "Scratch-Hangman" series, and stated that he realized that this unique style of puzzle book was going to be a huge seller, and indicated that they had already sold a million copies so far. (Exhibit F -- NY Times Article).

## FIRST CLAIM FOR RELIEF
### (Copyright Infringement)

23.     The allegations of paragraphs 1 through 22 above are hereby re-alleged and repeated with the same force and effect as if fully set forth at this point.

24.     By their conduct as alleged herein, the Defendants have unlawfully published, sold, distributed, and offered for sale and distribution in this District as well as throughout all other retail channels that the Defendants do business, unauthorized "Scratch-Hangman" series books the rights to which belong to the Plaintiff.  Such publication, sale, and distribution has been done by the Defendants without consent or authority given by the Plaintiff.

25.     The Defendants are liable for infringement of the Plaintiffs' copyrights and the Plaintiffs' exclusive rights under copyright in violation of the Copyright Act, 17 U.S.C. § 101, et seq.

26.     Each sale and distribution of the "Scratch-Hangman" series constitutes a separate and distinct act of infringement in violation of Plaintiff's right in the said series of books.

27.     The foregoing acts of infringement perpetrated by the Defendants have been willful, intentional, and purposeful, in disregard of and with indifference to the rights of the Plaintiff.

28.     As a direct and proximate result of the infringements of the Plaintiff's exclusive rights under copyright in said "Scratch-Hangman" series, Plaintiff is entitled to his actual damages and disgorgement of the Defendants' profits in amounts which are not currently ascertainable but are intended to be proven at trial.

29.     Alternatively,  the Plaintiff is entitled to statutory damages with respect to each of the said acts of infringement by the Defendants, or such other amounts as may be proper under 17 U.S.C. § 504(c).   Moreover, the Plaintiff is entitled to statutory damages for willful violations as against the Defendants.

30.     The Plaintiffs are further entitled to their attorneys' fees and costs pursuant to 17 U.S.C. § 505.

31.     The Defendants' conduct is causing and, unless enjoined and restrained by this Court, will continue to cause the Plaintiffs great and irreparable injury that cannot fully be compensated or measured in money.

32.     The Plaintiffs have no adequate remedy at law.

33.     Pursuant to 17 U.S.C. § 502, the Plaintiff is entitled to preliminary and permanent injunctions prohibiting further infringements of the Plaintiff's copyright and exclusive rights as well as exemplary and punitive damages as allowable under existing law.

34.     The Plaintiff is further entitled to impoundment and destruction or other reasonable disposition of all (i) copies found to have been made or used in violation of the Plaintiff's exclusive rights, and (ii) all other articles or electronic equipment used for the infringing copying or reproduction of the Plaintiff's said performance.

## SECOND CLAIM FOR RELIEF
### (Trade Dress Infringement in violation of 15 U.S.C. § 1125(a))

35.     The Plaintiff incorporates the allegations of paragraphs 1 through 34 of this complaint.

36.     Plaintiff's trade dress is distinctive and unique in the industry.

37.     Plaintiff's trade dress is non-functional.  Rather, its consistent appearance across Plaintiff's several "Scratch-Hangman" series of titles serves to identify the source of each book as being associated with that of Plaintiff.

38.     Plaintiff's trade dress is widely recognized by consumers as being associated with Plaintiff and has developed a secondary meaning in the marketplace.

39.     By making unauthorized use, in interstate commerce, of a similar trade dress, Defendant is likely to cause confusion, mistake, or deceiving the consumers as to the affiliation or

connection of Defendants with Plaintiff and as to the sponsorship or approval of Defendants

activities with respect to the "Scratch-Hangman" series.  Such unauthorized use also improperly

appropriates to Defendants the valuable trade dress rights of Plaintiff.

40.     Defendants acts have caused and will continue to cause irreparable injury to

Plaintiff.  Plaintiff has no adequate remedy at law and is thus entitled to an injunction along with

damages in an amount to be determined at trial.

## THIRD CLAIM FOR RELIEF

### (Unfair Competition under New York Common Law)

41.     The allegations of paragraphs 1 through 40 above are hereby re-alleged and repeated

with the same force and effect as if fully set forth herein.

42.     Plaintiff's trade dress is distinct and unique in the industry.

43.     Plaintiff's trade dress is widely recognized by consumers as being associated with

Plaintiff and has developed a secondary meaning in the marketplace.

44.     Defendants have deceptively published their own "Scratch-Hangman" series thereby

improperly trading on Plaintiff's goodwill and valuable rights in and to the trade dress.  Consumers are

mistakenly led to believe that Plaintiff is the source of Defendants almost identical "Scratch-

Hangman" series or are led to believe that said "Scratch-Hangman" series is being produced,

distributed, and sold under the endorsement, license, or authorization of Plaintiff which is not true.

45.     Upon information and belief, Defendants committed the above alleged acts willfully, in

bad faith and in conscious disregard of Plaintiff's rights, and Plaintiff is therefore entitled to exemplary

and punitive damages pursuant to the common law of the State of New York in an amount sufficient to

punish, deter, and make an example out of the Defendants.

46.     By the acts described above, Defendants have engaged in unfair competition in

violation of the common law of the State of New York.

47.     Defendants have caused and will continue to cause irreparable injury to Plaintiff. Plaintiff has no adequate remedy at law and is thus entitled to an injunction along with damages in an amount to be determined at trial.

## FOURTH CLAIM FOR RELIEF
### (Unjust Enrichment)

48. The allegations of paragraphs 1 through 47 above are hereby re-alleged and repeated with the same force and effect as if fully set forth at this point.

49. Plaintiff licensed the "Scratch-Hangman" books at issue to Defendant in expectation of being compensated according to the terms of said sample License Agreements (Exhibits A & B).

50. Defendant Sterling Publishers acknowledged the ownership rights of Plaintiff in the sample License Agreements (Exhibits A & B) and nonetheless distributed, and offered for sale and distribution in this District, as well as throughout all of the Defendants retail channels and outlets, as well as in overseas countries, unauthorized copies of the "Scratch-Hangman" series or confusingly similar works, the rights to which belong to the Plaintiff and said publication, sale, and distribution has been done without the consent or authority from the Plaintiff.

51. It would be unconscionable to allow the Defendants to receive the benefit and profits from the sale of the "Scratch-Hangman" series.

52. The Defendants are liable to the Plaintiff for their unjust enrichment from the sale of the "Scratch-Hangman" publications and works.

53. The acts of the Defendants as aforesaid were carried out in such manner as to entitle the Plaintiff to exemplary and punitive damages.

WHEREFORE Plaintiff demands judgment as follows:

a. On the FIRST CLAIM FOR RELIEF against the Defendants jointly and severally for the Plaintiff's actual damages in an amount to be determined at trial plus exemplary damages, plus equitable relief consisting of preliminary and permanent injunctions prohibiting further infringements of the Plaintiff's copyrights and exclusive rights and impoundment and destruction or other reasonable disposition of all (i) copies found to have been made or used in violation of the Plaintiff's exclusive rights, and (ii) all other articles or electronic equipment used for the infringing copying or reproduction of the Plaintiff's said performance plus reasonable attorneys' fees and costs.  Or in the alternative for statutory damages as called for in the statute plus reasonable attorneys fees and costs,

b. On the SECOND CLAIM FOR RELIEF against the Defendants jointly and severally for the Plaintiff's actual damages in an amount to be determined at trial plus exemplary damages, plus equitable relief consisting of preliminary and permanent injunctions prohibiting further infringements of the Plaintiff's copyright and exclusive rights and impoundment and destruction or other reasonable disposition of all (i) copies found to have been made or used in violation of the Plaintiff's exclusive rights, and (ii) all other articles or electronic equipment used for the infringing copying or reproduction of the Plaintiff's said performance plus reasonable attorneys fees and costs.  Or in the alternative for statutory damages as called for in the statue plus reasonable attorneys fees and costs.

c. On the THIRD CLAIM FOR RELIEF against the Defendants jointly and severally for the Plaintiff's actual damages in an amount to be determined at trial plus exemplary damages, plus equitable relief consisting of preliminary and permanent injunctions prohibiting further infringements of the Plaintiff's copyright and exclusive rights and impoundment and destruction or other reasonable disposition of all (i) copies found to have been made or used in violation of the Plaintiff's exclusive rights, and (ii) all other articles or electronic equipment used for the infringing copying or reproduction of the Plaintiff's said performance plus reasonable attorneys fees and costs.

d. On the FOURTH CLAIM FOR RELIEF against the Defendants jointly and severally for the Plaintiff's actual damages in an amount to be determined at trial plus exemplary damages in an amount to be proven at trial plus all costs.

DATED:      New York, New York
            October 28, 2013

            By _____
            Barry E. Janay, Esq.
            Law Office of Barry E. Janay
            *Attorneys for Plaintiff*
            90 Broad Street, 25th Flr.
            New York, NY 10004
            Tel. 917-756-8501
            Fax 855-374-2884

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

_____ X

MICHAEL WARD,
d/b/a BRAINTEASER PUBLICATIONS.

      Plaintiff,

      -against-

BARNES & NOBLE, INC.,
STERLING PUBLISHING CO., INC.,
FRANCIS HEANEY, AND
PATRICK BLINDAUER.

      Defendants.

_____ X

CIVIL ACTION NO.

**COMPLAINT**

**Jury Trial Demanded**

REQUEST FOR JURY TRIAL

Plaintiff requests a trial of this case by a jury.

DATED:    New York, New York
          October 28, 2013

          By_____
          Barry E. Janay, Esq.
          Law Office of Barry E. Janay
          *Attorneys for Plaintiff*
          90 Broad Street, 25th Flr.
          New York, NY 10004
          Tel. 917-756-8501
          Fax  855-374-2884

# EXHIBIT A

*EXHIBIT A*

## PUBLISHING AGREEMENT FOR "SCRATCH & SOLVE UNDERWATER HANGMAN"

*EXECUTION COPY*

[PP ISBN: 978-1-4549-0704-6]

This agreement ("Agreement"), effective as of **August 5, 2013**, is made and entered into by and between STERLING PUBLISHING CO., INC. ("Publisher"), with offices at 387 Park Avenue South, New York, NY 10016, and MICHAEL WARD ("Ward"), located at 12 Cecil Street, Bryant Park, Hamilton, New Zealand 3200, the author of a work (as further described below) tentatively entitled: "SCRATCH & SOLVE UNDERWATER HANGMAN" (the "Work").

In consideration of the following covenants, the parties hereby mutually agree as follows:

1.  **Grant of Rights; Term; Territory; Description.** Ward grants and assigns to Publisher, during the full term of copyright and any renewals thereof, the sole and exclusive right to produce, manufacture, print, publish, distribute, market, and sell the Work, in whole or in part, in any and all editions, versions and formats, together with the sole and exclusive right to license such rights in and to the Work (including the subsidiary rights set forth in Section 4 below), in any and all languages throughout the world (the "Territory"). All rights not expressly granted herein are hereby reserved by Ward. The Work shall be described as follows: sufficient list of words and phrases to fill 96 pages. It is understood and agreed that Publisher shall provide materials and content for the Work.

2.  **Copyright.** (a) Each copy of the Work published pursuant to this Agreement shall include a copyright notice in Ward's name in accordance with United States Copyright Law and the provisions of the Universal Copyright Convention.
    (b)  Ward shall take all steps necessary to protect the copyright, its renewals and all rights pertaining to the Work. Ward, its heirs, executors, administrators, successors and assigns shall render such cooperation and assistance as Publisher may reasonably request to protect the rights granted hereunder, including, but not limited to, delivering to Publisher appropriate transfers of copyright and other documents, in legally recordable form, with respect to all or any portion of the Work or any edition thereof. In addition, Ward shall promptly notify Publisher of any arrangement it makes for the publication of the Work, in whole or in part, by any person other than Publisher, as to any rights reserved to Ward hereunder.
    (c)  Publisher shall use its commercially reasonable efforts to see that every license granted by Publisher to publish, reproduce or otherwise use the Work, in whole or in part, shall contain a specific requirement that the licensee shall print a proper copyright notice in each edition of the Work published by such licensee. Publisher's failure to carry out the obligations in this subparagraph shall not be deemed to be a breach of this Agreement.
    (d)  If during the existence of this Agreement the copyright, or any other right in or to the Work, is infringed or violated, Publisher may, at its own cost and expense, take such legal action, in Ward's name if necessary, as may be required to restrain such infringement and seek damages therefor. Publisher shall not be liable to Ward for Publisher's failure to take such legal steps. If Publisher does not bring such an action, Ward may do so in Ward's own name and at Ward's own cost and expense. Money damages recovered for any infringement shall be applied first toward the repayment of the expense of bringing and maintaining the applicable action, and thereafter the balance shall be divided equally between Ward and Publisher.

3.  Advance. *Intentionally deleted.*

4.  **Royalties; Subsidiary Rights.** (a) In full consideration for the rights granted to Publisher hereunder, and for Ward's promises, warranties and representations, Publisher agrees to pay to Ward the following royalties based on all copies of the Work sold by Publisher in the Territory and paid for, less returns:
    i.  For regular hardcover trade editions, on sales made at discounts up to 51% off the list price, 10% based on the suggested retail list price on the first 10,000 copies sold, 12.5% on the next 15,000 copies sold and 15% on all copies sold thereafter; and on sales made at discounts of 52% or more off the list price, 10% of the net amount received by Publisher on all copies sold.
    ii.  For regular paperback trade editions, on sales made at discounts up to 51% off the list price, 6% based on the suggested retail list price on the first 12,500 copies sold and 7.5% on all copies sold thereafter; and on sales made at discounts of 52% or more off the list price, 5% of the net amount received by Publisher on all copies sold.
    iii.  For all copies sold outside North America, one-half of the stipulated royalties.
    iv.  For all sales of the Work to display marketing, school book fairs, and customized editions, one half of the stipulated royalties.
    v.  For all copies sold for premium use* or as special editions*, 5% of the net amount received by Publisher.
    vi.  For all copies of an omnibus edition sold by Publisher that contains the Work or an abridgement of it, that proportion of 5% of the net amount received by Publisher on all copies sold, as the Work bears to all other literary properties contained in such omnibus edition.
    vii.  For all copies sold of an Electronic Edition of the Work, 25% of the net amount received by Publisher. "Electronic Edition" means the Work, in whole or in part, whether sequential or non-sequential, including any or all text, artwork or other material contained in the Work, in any electronic and digital format, either with or without enhancements, additional elements (including, but not limited to, sounds, audio, video, images and graphics) and/or technical features (i.e., interactive aspect, ancillary software application, etc.), either alone or in conjunction with other works, to create an electronic book and/or a fully integrated derivative work (including, but not limited to, enhanced electronic versions, interactive multimedia editions, digital products and interactive applications). Electronic Editions are distributed, transmitted, made available and/or readable via the Internet (including, but not limited to, as digital downloads and cloud-based), electronic media, wireless execution, optical disks, videocassette, electronic devices (including, without limitation, any and all electronic readers and portable, hand-held, wireless, wifi, mobile and comparable devices), computers and other similar formats, platforms and methods. It is understood by the parties that: (1) any Electronic Edition shall utilize industry standard and commercially reasonable copyright protection; and (2) any and all formats, elements, features, software, devices, media, methods, executions, aspects, platforms and hardware (collectively, the "Technology") referenced above in this Section include any and all Technology whether now known or hereafter created or developed.
    viii.  If Publisher creates a kit or gift set using the Work plus additional components, the prevailing royalty shall be calculated on the percentage that the Work cost represents of the total cost of the actual package ("total cost" is defined as packaging and all components).
    ix.  If Publisher sells a special edition of the Work at cost or at a discount greater than 60% to Barnes & Noble in bulk quantities, non-returnable, then the royalties shall be calculated and paid as if the discount was 60%. Regular sales to Barnes & Noble will be at the full

Page 1 of 5.

stipulated royalties.

(b)  Publisher shall have the right to sell, lease, license, and otherwise dispose of the following rights in and to the Work to third parties. The net proceeds thereof, after deducting all direct expenses (including, but not limited to, the cost of film if not otherwise paid for, agent's commissions and local taxes) incurred by Publisher shall be shared and paid (less the amount of any portion of the Advance then unearned) at the time of the next accounting as follows:

| Right | Percentage to be paid to Ward |
|---|---|
| First Serial (prior to initial publication of the Work): serialization, digest, abridgment, condensation, excerpt | 50% |
| Second Serial (after initial publication of the Work): serialization, digest, abridgment, condensation, excerpt | 50% |
| Paperback Reprint | 50% |
| Hardcover Reprint | 50% |
| Book Club | 50% |
| Textbook edition, Large Type edition, Picture Book edition | 50% |
| Syndication | 50% |
| Premium, Direct mail, Coupon advertising | 50% |
| Anthology and other selection reprint, in whole or in part: in complete, condensed, adapted or abridged versions | 50% |
| Electronic Editions (as defined above) | 50% |
| Foreign publication in the English language | 50% |
| Publication in any language other than English | 50% |
| Display Rights | 50% |
| Audio Recordings | 50% |
| Lyric Rights | 50% |
| Dramatic, Motion Picture, Television, Radio rights | 50% |
| Merchandise, Commercial adaptations, Tie-Ins | 50% |
| All other rights not expressly specified above | 50% |

(c)  No royalties shall be paid for copies of the Work sold to or furnished gratis to Ward, or furnished to third parties for review, advertising, marketing, sample or like purposes, or for copies that are defective, unsalable, sold at a loss or destroyed; for the avoidance of doubt, the foregoing shall include downloadable copies of any Electronic Edition of the Work, as determined by Publisher. In addition, no royalties or revenue share shall be paid for licensing publication of the Work without any fee, in Braille (or similar tactile symbols) or by mechanical audio recordings or visual recordings solely for the blind and other physically handicapped persons, or for publishing or permitting others to publish or broadcast/transmit by radio and television or on-line selections from the Work for publicity and promotion purposes only, in a manner which in Publisher's opinion would benefit its sale.

5.  **Warranties; Representations; Indemnities.** (a) Ward warrants and represents that: (i) Ward is the sole author and proprietor of the Work, has full power to enter into this Agreement, and is the sole owner of all rights granted herein to Publisher and such rights are not subject to any prior agreement, lien or encumbrance that may interfere with the free exercise of any right of Publisher hereunder; (ii) Ward has not entered into nor become bound by any contract, agreement or understanding with any third party with respect to the Work in the Territory other than this Agreement; (iii) there are no claims or litigation pending, outstanding or threatened which may adversely affect or may in any way prejudice Publisher's exclusive rights in and to the Work or the copyright of any part thereof or any of the rights or licenses herein granted or conveyed; (iv) the Work contains no obscene, libelous or any other unlawful matter, and in no way infringes upon any copyright or trademark or violates any personal or privacy right or any other right of any party/person; (v) the Work and Ward's performance hereunder will comply with any and all applicable laws, rules and regulations; and (v) Ward shall be solely liable under the terms of this Agreement regardless of the appointment of any third party (for example, any co-writer) engaged by Ward and/or any agreement entered into by Ward with any third party in connection with the Work, and Ward shall be solely responsible and liable for any and all acts or omissions of any third party of Ward. *It is understood and agreed that Publisher shall be under no obligation to make an independent investigation to determine whether the foregoing warranties and representations are true and correct, and any independent investigation by or for Publisher, or its failure to investigate, shall not constitute a defense to Ward in any action based upon a breach of any of the foregoing warranties or representations.* **The warranties and representations set forth above do not extend to any material in the Work solely furnished by Publisher.**

(b)  Ward shall indemnify and hold harmless Publisher, its parent, subsidiaries, affiliates, employees, representatives, officers, directors, and agents, and the employees' representatives, officers, directors and agents of its subsidiaries and affiliates (collectively, the "Indemnitees") against any suit, claim, demand, proceeding, prosecution, recovery, or penalty and any expense, including attorney's fees and litigation expenses arising out of any and all manner of third party claims, demands, actions and proceedings or any other damages any Indemnitee may sustain by reason of breach of any of Ward's warranties or representations set forth in this Agreement, and Ward agrees (at Ward's own cost and expense) to defend any such claim, demand, action or proceeding that may be brought against Publisher and/or the Indemnitees, provided that Publisher shall promptly notify Ward with respect thereto. Any settlement intended to bind Publisher shall not be final without Publisher's prior written consent in its sole discretion. If Ward shall fail to retain counsel and to undertake the defense as above provided, then Publisher is hereby granted the right to make such defense thereto as Publisher may deem appropriate, and the reasonable expenses, costs, and counsel fees thereof, shall be paid by Ward; provided, however, that Ward shall not be responsible for any settlement entered into without Ward's written consent, not to be unreasonably withheld or delayed. Nothing herein shall prevent Publisher from defending any action or proceeding, at its own expense through its own counsel, notwithstanding that the defense may have been undertaken by Ward. During the pending of any such suit, proceeding, claim or demand, Publisher may withhold payments due to Ward under this or any other agreement to the extent reasonably necessary to conduct the defense thereof and to satisfy any liability therein; provided, however, that if no lawsuit shall be commenced within twelve (12) months of any action or demand, Publisher shall release all such payments previously withheld in connection thereto.

(c)  Publisher shall have the right to extend Ward's warranties and indemnifications contained herein to third parties (such as, purchasers of subsidiary rights granted to Publisher herein) and Ward shall be liable therein to the same extent as if the warranties and indemnifications were originally made to such third parties. If, in Publisher's reasonable opinion, the Work is obscene, libelous or otherwise

EXECUTION COPY

infringes upon the right of any person, Publisher shall so notify Ward in writing in advance of publication and call upon Ward to excise the injurious matter within a reasonable time. This Section 5 shall survive the expiration or termination of this Agreement.

6.  Delivery. (a) Publisher acknowledges and agrees that, as of execution hereof, Publisher has accepted the Work hereunder. "Artwork" means all photographs, artwork, illustrations, images, drawings, charts, maps and designs set forth in Section 1 above or which (in Publisher's opinion) are necessary parts of the Work.

(b)  If Ward or Publisher has incorporated in the Work any copyrighted material, or any other material requiring permission (including, but not limited to, any writings, Artwork, songs and/or other material either previously published or not), Publisher shall procure, at Publisher's sole expense, written permission for Publisher to exploit any and all rights granted to it hereunder (including, without limitation, to reprint such material in the Work in the Territory and for all subsequent editions including, but not limited to, reprints and book clubs).

(c)  *Intentionally deleted.*

(d)  Publisher shall not be responsible for any loss or damage to any property of Ward submitted hereunder and Publisher shall have the right to dispose of such property and any and all materials for and proofs of the Work as Publisher shall determine. It is understood and acknowledged by Ward that any and all terms with respect to the character, condition and time of receipt of any and all materials referenced in this Section 6 are of the essence of this Agreement. It is understood that following any termination hereunder, Ward shall have no right, title or interest in or to the Work (including, without limitation, any content supplied by Publisher or any third party contained therein) in any respect. Nothing contained herein shall be deemed to impose upon Publisher any duty of independent investigation, or relieve Ward of any of the obligations, representations or warranties of Ward assumed hereunder.

7.  Editing; Publication. (a) Publisher shall have the right to make all decisions concerning editing and revising the text and Artwork of the Work; and the manners of design, publication, production, marketing, distribution, advertising and publicity of the Work. Publisher shall publish the Work in such style, at such price and under such title and imprint as it may deem advisable. Publisher shall be authorized to exercise the usual editorial privileges in the course of preparing the Work for composition and to make the Work conform to its standard style of punctuation, spelling, capitalization and usage. Should Publisher decide to publish an index as part of the Work, Publisher shall have the right to do so at Publisher's sole cost.

(b)  If Publisher supplies Ward with galley or page proofs for checking, then Ward shall promptly read, revise, correct and return them with Ward's corrections within fourteen (14) days of Ward's receipt thereof. If Ward fails to return such corrected galley proofs within such 14-day period, Publisher shall have the right to publish the Work(s) in the condition in which it was submitted to Ward by Publisher. The cost of alterations in the galley or page proofs required by Ward, other than corrections of Publisher's or printer's errors, in excess of ten percent (10%) of the original cost of composition, shall be charged against the earnings of Ward hereunder provided, however, that Publisher shall, upon request, promptly furnish to Ward an itemized statement of such additional expenses, and shall make available at Publisher's office the corrected proof for inspection by Ward.

(c)  If the Work is not published within three (3) years of execution hereof, then Ward may demand in writing that publication must commence within six (6) months of the date of such written demand. If Publisher does not commence publication of the Work within such six-month period, this Agreement shall then terminate and all rights to the Work, but only with respect to the materials in the Work provided by Ward hereunder, shall revert to Ward. In such event, the only damages recoverable by Ward shall be limited to any sums paid or payable by Publisher hereunder up to the date of termination. No other damages, actions or proceedings (either legal or equitable) including, but not limited to, specific performance, shall be claimed, instituted or maintained by Ward against Publisher.

8.  Revisions. If Publisher determines after publication that revisions to the Work are desirable, Publisher shall notify Ward in writing and Ward shall make such revisions. Ward shall have three (3) months following receipt of such notice to deliver a satisfactory revision of the Work to Publisher. If Ward fails to supply Publisher with a satisfactory revision within such three-month period, Publisher may engage another party to make such revision, in which event Publisher may charge against Ward's royalty account all expenses incurred. It is agreed that for purposes of royalty computation, any such revised edition shall be considered a new work, and the same scale of royalties shall apply to it as applied to the original edition hereunder.

9.  Promotion. Ward grants to Publisher the right to use and exploit Ward's name, approved photograph, likeness and biographical data in connection with the promotion, exploitation, publicity, advertising and sale of the Work and all other rights hereunder; any such photograph, likeness or biographical data provided by Ward to Publisher shall be deemed pre-approved. Should Publisher schedule a promotional and/or publicity tour, Ward shall ensure that Ward will be available for such promotional and publicity tour on behalf of the Work for a period of up to two (2) weeks on or around the time of publication of Publisher's edition of the Work, at Publisher's request and reasonable expense, at times and places to be arranged by Publisher at Publisher's sole discretion. Ward shall provide Publisher with a schedule of Ward's prior commitments for the period of the proposed tour and will keep Publisher apprised of any additional engagements which may arise during that period. If Ward is unable to complete any scheduled appearance(s) for the Work, then Publisher may request that Ward make up any missed scheduled appearance(s). Ward acknowledges that Publisher may giveaway free copies/downloads of the Work, and authorize free quotation of excerpts consisting of up to twenty percent (20%) of the Work as it may determine in its sole discretion for its promotion and sale of the Work, with the exception of Publisher's promotion of the Work on electronic search engines or "look inside the book" programs located on select websites including, without limitation, www.bn.com and www.google.com, in which case Publisher will use its best judgment as to the extent of content it will make available. Ward agrees that no press release may be issued, public statements made, or information of any kind disclosed concerning this Agreement or the transactions contemplated herein without the prior written approval and agreement of Publisher.

10.  Accountings. Publisher shall render to Ward (or to such representative as Ward may designate in writing), in April and October of each year, statements of sales and earnings of the Work during the six (6) month period ending the preceding December 31 and June 30, respectively. Such statements shall be accompanied by payment of amounts due and payable to Ward. However, Publisher shall have the right to withhold a reasonable reserve for returns against royalty earnings, not to exceed twenty-five percent (25%) during any royalty period. The reserve for any royalty period shall be liquidated after each six-month period. Whenever earnings in any six-month period fall below US$25.00, no accountings shall be made until the next settlement date after earnings have aggregated that amount, but Publisher shall nevertheless render an interim statement of the amount due to Ward. If Ward receives an overpayment of royalties or other sums from Publisher, or is otherwise indebted to Publisher, then Publisher may deduct the amount thereof from any further royalties or other sums

otherwise due from Publisher to Ward hereunder or under any other agreement between the parties; the foregoing shall not apply to any unearned advances specified by the parties as only applying to a work other than the Work. Upon written request to Publisher and during reasonable business hours, but no more than once per calendar year, Ward or a duly authorized representative may examine Publisher's records that relate to the Work only. Such examination shall be at the sole cost of Ward unless errors of accounting amounting to five percent (5%) or more of the total sum paid to Ward during the period covered by such request shall be found to Ward's disadvantage, in which case the cost shall be borne by Publisher. Ward acknowledges that Ward shall have no more than two (2) years after receiving any statement or royalty payment to examine such records of Publisher.

11.  **Ward's Copies.** Publisher shall furnish Ward with 10 copies of the Work when published, free of charge.

12.  **Remainders.** If Publisher at any time has unsold, returned, damaged or defective copies of the Work on hand which, in Publisher's judgment, could not be sold on usual terms within a reasonable time, then Publisher may sell copies of the Work at the best price obtainable and Publisher shall pay to Ward five percent (5%) of the amount received, less manufacturing for any such copies sold, provided, however, that in no case shall the amount paid exceed the difference between the net amount received by Publisher and the cost of manufacture. Publisher will use commercially reasonable efforts to notify Ward if it decides to remainder copies. In such event, Ward shall have two (2) weeks following the date of such notice in which to purchase all or any portion of said copies at the best price Publisher could expect to be offered by a third party. It is understood that Publisher cannot guarantee such prior notice and any failure to so notify Ward shall not be deemed a breach of this Agreement.

13.  **Reversion of Rights.** At any time after ten (10) years from the date of first publication of the Work, if there is no edition of the Work available for sale in the Territory (regular, reprint, electronic or other), no contract in existence for the publication of any edition or for use of the Work in any manner, no unsatisfied indebtedness of Ward to Publisher (for purposes of this Section, an unearned advance shall not be deemed indebtedness of Ward), and no earnings have been payable to Ward hereunder during two (2) successive accounting periods, then Ward may demand the reversion of all rights hereby granted to Publisher. If Ward shall make such demand, then Publisher shall have one (1) year during which it may arrange for reprinting or other use of the Work in which case this Agreement shall continue in full force and effect. If at the expiration of such one-year period Publisher shall not have made any such arrangement, then all rights hereby granted to Publisher, but only with respect to the materials in the Work provided by Ward hereunder, shall revert to Ward, subject to any outstanding licenses provided, however, that Publisher shall have the right, subject to payment to Ward of applicable royalties thereon, to sell all copies of the Work which have already been printed or are in the process of being printed as of the date of such reversion.

14.  **Non-Competition.** Ward shall not, during the term hereof (without Publisher's prior written consent), (i) write, print or publish, or cause to be written, printed or published, any revised, corrected, enlarged or abridged version of the Work (including, without limitation, any work substantially similar to the Work), or in any way assist or be involved in the creation of any such version or in any book or publication of a character that would directly compete with its sale; or (ii) exercise or dispose of any reserved rights in such a way as substantially to destroy, detract from or impair the value of any rights granted herein to Publisher.

15.  **Notices.** All notices, statements and any other documents provided by either party under and/or in connection with this Agreement must be in writing, delivered to the other party only by personal delivery, reputable delivery service (e.g., FedEx) or US registered or certified mail (return receipt requested), and sent to the respective addresses set forth on page 1 hereof or such other addresses as the parties may from time to time designate by written notice given in the manner provided herein. *Notwithstanding the foregoing, the parties agree that Publisher may send any statement due to Ward hereunder via email and email shall be sufficient for any approval of any party set forth herein.*

16.  **Assignment.** This Agreement shall be binding upon and inure to the benefit of the parties and their heirs, executors, assigns, administrators and successors, and any personal representatives of Ward. Ward shall not sell or assign Ward's rights and/or obligations under this Agreement without Publisher's prior written consent provided that without such consent it may assign any net sums due it hereunder.

17.  **Force Majeure.** Neither party shall be liable for any default or delay in the performance of its obligations hereunder to the extent that such default or delay is caused, directly or indirectly, by circumstances beyond such party's reasonable control, including but, not limited to, shortages of or governmental restrictions on essential materials and supplies, acts of war, strikes, and/or other conditions beyond the party's control; provided that upon the occurrence of any such default or delay, the applicable performance date shall be deemed extended for a period equal to each such default or delay. Each party shall give the other immediate notice at the start and end of any such default or delay affecting its performance.

18.  **Status of Parties.** The parties shall be deemed to have the status of independent contractors, and nothing in this Agreement shall be deemed to place the parties in the relationship of employer-employee, principal-agent, partners or joint venturers. Neither party has the authority to bind the other nor to incur any obligation on behalf of the other party or to represent itself as the other's agent or in any way that might result in confusion as to the fact that the parties are separate and distinct entities.

19.  **Severability.** If any provision of this Agreement is determined by a court to be unenforceable, the parties will deem such provision to be modified to the extent necessary to allow it to be enforced to the extent permitted by law, or if it cannot be modified, such provision will be severed and deleted from this Agreement, and the remainder of this Agreement will continue in full force and effect.

20.  **Governing Law.** The validity, construction, and enforceability of this Agreement shall be governed by the laws of the State of New York (without reference to the choice of law provisions thereof) applicable to contracts entered into and performed entirely within that state. Any court of competent jurisdiction sitting within the State of New York, New York County will be the exclusive jurisdiction and venue for any dispute, action, suit or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby. The parties hereto unconditionally and irrevocably agree and consent to the exclusive jurisdiction and venue of any such court and waive any argument or objection that such venue is not appropriate or convenient and further agree not to commence any such dispute, action, suit or proceeding except in any such court.

21.  **Entire Agreement.** This Agreement contains the entire understanding and agreement between the parties and supersedes all previous oral or written representations or agreements with respect to the subject matter hereof. No modification of or change to this Agreement shall be binding unless in writing and signed by all parties hereto. There are no representations, warranties, promises, covenants or understandings of the parties other than those expressly set forth herein. Any and all riders or endorsement attached to this Agreement and signed or initialed by the parties hereto shall have the same force and effect as if incorporated into the numbered terms and provisions of this Agreement. No contrary or inconsistent terms or conditions in delivery memos, invoices, letters or other documents will be binding on Publisher unless expressly agreed to in writing by Publisher. The section headings and captions herein are for convenience only and not to be considered in construing this Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement the day and year first above written.

STERLING PUBLISHING CO., INC.                MICHAEL WARD


By: _____          _____
    Theresa Thompson
    Executive Vice President                Email: mwpublishing@xtra.co.nz

# EXHIBIT B

EXECUTION COPY

[PP ISBNs: 978-1-4549-0938-5, 978-1-4549-0939-2]

This agreement ("Agreement"), effective as of January 22, 2013, is made and entered into by and between STERLING PUBLISHING CO., INC. ("Publisher"), with offices at 387 Park Avenue South, New York, NY 10016, and MICHAEL WARD ("Author"), located at 12 Cecil Street, Bryant Park, Hamilton, New Zealand 3200, the author of two (2) works (as further described below) tentatively entitled: "SCRATCH & SOLVE HANGMAN OF LEISURE" ("Book #1") and "SCRATCH & SOLVE TOUGH HANGMAN OF LEISURE" ("Book #2") (each, a "Work" and collectively, the "Works").

In consideration of the following covenants, the parties hereby mutually agree as follows:

1.   Grant of Rights; Term; Territory; Description. (a) Author grants and assigns to Publisher, during the full term of copyright and any renewals thereof, the sole and exclusive right to produce, manufacture, print, publish, distribute, market, and sell each Work, in whole or in part, in any and all editions, versions and formats, together with the sole and exclusive right to license such rights in and to each Work (including the subsidiary rights set forth in Section 4 below), in any and all languages throughout the world (the "Territory"). All rights not expressly granted herein are hereby reserved by Author.
     (b)   Book #1 shall be described as follows: sufficient list of words and phrases to fill 96 pages. Book #2 shall be described as follows: sufficient list of words and phrases to fill 96 pages.

2.   Copyright. (a) Publisher is hereby expressly authorized and agrees to register a claim to copyright any Work in Author's name with the U.S. Copyright Office. Each copy of each Work published pursuant to this Agreement shall include a copyright notice in such name(s) in accordance with United States Copyright Law and the provisions of the Universal Copyright Convention.
     (b)   Author shall take all steps necessary to protect the copyright, its renewals and all rights pertaining to each Work. Author, its heirs, executors, administrators, successors and assigns shall render such cooperation and assistance as Publisher may reasonably request to protect the rights granted hereunder, including, but not limited to, delivering to Publisher appropriate transfers of copyright and other documents, in legally recordable form, with respect to all or any portion of any Work or any edition thereof. In addition, Author shall promptly notify Publisher of any arrangement it makes for the publication of any Work, in whole or in part, by any person other than Publisher, as to any rights reserved to Author hereunder.
     (c)   Publisher shall use its commercially reasonable efforts to see that every license granted by Publisher to publish, reproduce or otherwise use any Work, in whole or in part, shall contain a specific requirement that the licensee shall print a proper copyright notice in each edition of such Work published by such licensee. Publisher's failure to carry out the obligations in this subparagraph shall not be deemed to be a breach of this Agreement.
     (d)   If during the existence of this Agreement the copyright, or any other right in or to any Work, is infringed or violated, Publisher may, at its own cost and expense, take such legal action, in Author's name if necessary, as may be required to restrain such infringement and seek damages therefor and any money damages recovered therefrom shall belong to Publisher alone. Publisher shall not be liable to Author for Publisher's failure to take such legal steps. If Publisher does not bring such an action, Author may do so in Author's own name and at Author's own cost and expense and any money damages recovered therefrom shall belong to Author alone. Money damages recovered for any infringement shall be applied first toward the repayment of the expense of bringing and maintaining the applicable action, and thereafter the balance shall be divided equally between Author and Publisher.

3.   Advance. Publisher shall pay to Author, as an advance against all monies due and owing to Author under this Agreement, US$6,000 (the "Advance"), allocated US$3,000 to Book #1 and US$3,000 to Book #2, as follows:
     i.     US$3,000     payable within thirty (30) days of execution of this Agreement (allocated $1,500 to each Work);
     ii.    US$1,500     payable upon Publisher's initial publication of Book #1; and
     iii.   US$1,500     payable upon Publisher's initial publication of Book #2.
*It is understood and agreed that for accounting purposes the Works covered by this Agreement shall not be grouped together or jointly accounted, and no royalties or subsidiary rights proceeds for an individual Work shall be payable to Author hereunder until amounts equal to the total portion of the Advance, paid or payable, allocated to such individual Work have been earned out.*

4.   Royalties; Subsidiary Rights. (a) In full consideration for the rights granted to Publisher hereunder, and for Author's promises, warranties and representations, Publisher agrees to pay to Author the following royalties based on all copies of each Work sold by Publisher in the Territory and paid for, less returns:
     i.     For regular hard-cover trade editions, on sales made at discounts up to 51% of the list price, 10% based on the suggested retail list price on the first 10,000 copies sold, 12.5% on the next 15,000 copies sold and 15% on all copies sold thereafter; and on sales made at discounts of 52% or more off the list price, 10% of the net amount received by Publisher on all copies sold.
     ii.    For paperback editions, on sales made at discounts up to 51% off the list price, 6% based on the suggested retail list price on the first 12,500 copies sold and 7.5% on all copies sold thereafter; and on sales made at discounts of 52% or more off the list price, 5% of the net amount received by Publisher on all copies sold.
     iii.   For all copies of any Work sold outside North America, one-half of the stipulated royalties.
     iv.    For all sales of each Work to display marketing, school book fairs, and customized editions, one half of the stipulated royalties.
     v.     For all copies of each Work sold for premium use or as special editions, 5% of the net amount received by Publisher.
     vi.    For all copies of an omnibus edition sold by Publisher that contains any Work or an abridgement thereof, that proportion of 5% of the net amount received by Publisher, as such Work or the portion thereof bears to all literary properties contained in such omnibus edition.
     vii.   For all copies sold of an Electronic Edition of any Work, 25% of the net amount received by Publisher. "Electronic Edition" means any Work, in whole or in part, whether sequential or non-sequential, including any or all text, artwork and/or other material contained in such Work, in any electronic and digital format, either with or without enhancements, additional elements (including, but not limited to, sounds, video, images and graphics) and/or technical features (i.e., interactive aspect, ancillary software application, etc.), either

alone or in conjunction with other works, to create an electronic book and/or a fully integrated derivative work (including, but not limited to, enhanced electronic versions, interactive multimedia editions, digital products and electronic applications). Electronic Editions are distributed, transmitted, made available and/or readable via the Internet (including, but not limited to, as digital downloads and cloud-based), electronic media, wireless executions, optical disks, videocassette, electronic devices (including, without limitation, any and all electronic readers and portable, hand-held, wireless, wifi, mobile and comparable devices), computers and other similar formats, platforms and methods. It is understood by the parties that: (1) any Electronic Edition shall utilize industry standard and commercially reasonable copyright protection; and (2) any and all formats, elements, features, software, devices, media, methods, executions, aspects, platforms and hardware (collectively, the "Technology") referenced above in this Section include any and all Technology whether now known or hereafter created or developed.

viii. If Publisher creates a kit or gift set using any Work plus additional components, the prevailing royalty shall be calculated on the percentage that such Work cost represents of the total cost of the actual package ("total cost" is defined as packaging and all components).

ix. If Publisher sells a special edition of any Work at cost or at a discount greater than 60% to Barnes & Noble in bulk quantities, non-returnable, the royalties shall be calculated and paid as if the discount was 60%. Regular sales to Barnes & Noble will be at the full stipulated royalties.

(b) Publisher shall have the right to sell, lease, license, and otherwise dispose of the following rights in and to each Work to third parties. The net proceeds thereof, after deducting all direct expenses (including, but not limited to, the cost of film if not otherwise paid for, agent's commissions and local taxes) incurred by Publisher shall be shared and paid (less the amount of any portion of the Advance then unearned) at the time of the next accounting as follows:

| Right | Percentage to be paid to Author |
|---|---|
| First Serial (prior to initial publication of the applicable Work): serialization, digest, abridgment, condensation, excerpt | 50% |
| Second Serial (after initial publication of applicable Work): serialization, digest, abridgment, condensation, excerpt | 50% |
| Paperback Reprint | 50% |
| Hardcover Reprint | 50% |
| Book Club | 50% |
| Textbook edition, Large Type edition, Picture Book edition | 50% |
| Syndication | 50% |
| Premium, Direct mail, Coupon advertising | 50% |
| Anthology and other selection reprint, in whole or in part: in complete, condensed, adapted or abridged versions | 50% |
| Electronic Editions (as defined above; including Audiovisual) | 50% |
| Foreign publication in the English language | 50% |
| Publication in any language other than English | 50% |
| Display | 50% |
| Audio Recordings | 50% |
| Lyric | 50% |
| Dramatic, Motion Picture, Television, Radio | 50% |
| Merchandise, Commercial adaptations, Tie-Ins | 50% |
| All other rights not expressly specified above | 50% |

(c) No royalties shall be paid for copies of any Work sold to or furnished gratis to Author, or furnished to third parties for review, advertising, marketing, sample or like purposes, or for copies that are defective, unsalable, sold at a loss or destroyed; for the avoidance of doubt, the foregoing shall include downloadable copies of any Electronic Edition of any Work, as determined by Publisher. In addition, no royalties or revenue share shall be paid for licensing publication of any Work without any fee, in Braille (or similar tactile symbols) or by mechanical audio recordings or visual recordings solely for the blind and other physically handicapped persons, or for publishing or permitting others to publish or broadcast/transmit by radio and television or on-line selections from any Work for publicity and promotion purposes only, in a manner which in Publisher's opinion would benefit its sale.

5.   Warranties; Representations; Indemnities. (a) Author warrants and represents that: (i) each Work as submitted is original; (ii) Author is the sole author, writer, creator and sole proprietor of each Work, has full power to enter into this Agreement, and is the sole owner of all rights granted herein to Publisher and such rights are not subject to any prior agreement, lien or encumbrance that may interfere with the free exercise of any right of Publisher hereunder; (iii) no Work has heretofore been published, in whole or in part, in book form or otherwise and Author has not entered into nor become bound by any contract, agreement or understanding with any third party with respect to any Work in the Territory other than this Agreement; (iv) there are no claims or litigation pending, outstanding or threatened which may adversely affect or may in any way prejudice Publisher's exclusive rights in and to any Work or the copyright of any part thereof or any of the rights or licenses herein granted or conveyed; (v) no Work, in whole or in part, is in the public domain; (vi) no Work contains any writings or other matter previously published (either by Author or by any other party) for which Author has not obtained satisfactory written permission from the owners for inclusion in any Work throughout the Territory, and Author shall deliver copies of these written permissions to Publisher; (vii) no Work contains obscene, libelous or any other unlawful matter, and no Work in any way infringes upon any copyright or trademark or violates any personal or privacy right or any other right of any party/person; (viii) the use, with reasonable care and skill, of any recipe, instruction, material, advice or formula contained in any Work will not result in injury, and Author will include in each Work appropriate warnings and safety precautions concerning any particular hazards that may be involved in the use of any such recipe, instruction, material, advice or formula; (ix) each Work and Author's performance hereunder will comply with any and all applicable laws, rules and regulations; and (x) Author shall be solely liable under the terms of this Agreement regardless of the appointment of any third party (for example, any co-writer) engaged by Author and/or any agreement entered into by Author with any third party in connection with any Work, and Author shall be solely responsible and liable for any and all acts or omissions of any third party of Author. *It is understood and agreed that Publisher shall be under no obligation to make an independent investigation to determine whether the foregoing warranties and representations are true and correct, and any independent investigation by or for Publisher, or its failure to investigate, shall not constitute a defense to Author in any action based upon a breach of any of the foregoing warranties or representations.*

(b)  Author shall indemnify and hold harmless Publisher, its parent, subsidiaries, affiliates, employees, representatives, officers, directors, and agents, and the employees' representatives, officers, directors and agents of its subsidiaries and affiliates (collectively, the "Indemnitees") against any suit, claim, demand, proceeding, prosecution, recovery, or penalty and any expense, including attorney's fees and litigation expenses arising out of any and all manner of third party claims, demands, actions and proceedings that may be asserted or instituted against any Indemnitee on the grounds that any Work violates any copyright, trademark or any other proprietary right of any person, or that any Work contains any matter that is libelous or scandalous or invades any person's right to privacy or other personal right, or any other damages any Indemnitee may sustain by reason of breach of any of Author's warranties or representations set forth in this Agreement, and Author agrees (at Author's own cost and expense) to defend any such claim, demand, action or proceeding that may be brought against Publisher and/or the Indemnitees, provided that Publisher shall promptly notify Author with respect thereto. Any settlement intended to bind Publisher shall not be final without Publisher's prior written consent in its sole discretion. If Author shall fail to retain counsel and to undertake the defense as above provided, then Publisher is hereby granted the right to make such defense thereto as Publisher may deem appropriate, and the reasonable expenses, costs, and counsel fees thereof, shall be paid by Author; provided, however, that Author shall not be responsible for any settlement entered into without Author's written consent, not to be unreasonably withheld or delayed. Nothing herein shall prevent Publisher from defending any action or proceeding, at its own expense through its own counsel, notwithstanding that the defense may have been undertaken by Author. During the pending of any such suit, proceeding, claim or demand, Publisher may withhold payments due to Author under this or any other agreement to the extent reasonably necessary to conduct the defense thereof and to satisfy any liability therein; provided, however, that if no lawsuit shall be commenced within twelve (12) months of any claim or demand, Publisher shall release all such payments previously withheld in connection thereto.

(c)  Publisher shall have the right to extend Author's warranties and indemnifications contained herein to third parties (such as, purchasers of subsidiary rights granted to Publisher herein) and Author shall be liable therein to the same extent as if the warranties and indemnifications were originally made to such third parties. If, in Publisher's reasonable opinion, any Work is obscene, libelous or otherwise infringes upon the right of any person, Publisher shall so notify Author in writing in advance of publication and call upon Author to excise the injurious matter within a reasonable time. Should Author refuse to do so or fail to do so within a reasonable time, Publisher shall be under no obligation to publish such Work and may terminate this Agreement, in whole or with respect to such Work only, as Publisher shall determine, by written notice to Author. Upon receipt of any such termination notice, Author shall immediately repay to Publisher any and all money previously paid by Publisher hereunder in total or for such Work only, as applicable, and there shall be no further claims, liabilities or obligations between the parties concerning this Agreement or such Work only, as applicable. This Section 5 shall survive the expiration or termination of this Agreement.

6.  **Delivery of Work.** (a) In conformance and accordance with Section 1(b) above, Author shall deliver to Publisher, (i) the final complete manuscript of Book #1 in digital form on or before April 1, 2013, that is acceptable and satisfactory to Publisher in content and form, and (ii) the final complete manuscript of Book #2 in digital form on or before April 1, 2013, that is acceptable and satisfactory to Publisher in content and form. No later than the delivery of any Work to Publisher, Author shall deliver to Publisher, at its own expense, in high-resolution files in digital format, all photographs, artwork, illustrations, images, drawings, charts, maps and designs (collectively, the "Artwork") set forth in Section 1(b) above or which (in Publisher's opinion) are necessary parts of such Work.

(b)  If Author has incorporated in any Work any copyrighted material, or any other material requiring permission (including, but not limited to, any writings, Artwork, songs and/or other material either previously published or not), Author shall procure, at Author's sole expense, written permission for Publisher to exploit any and all rights granted to it hereunder (including, without limitation, to reprint such material in such Work in the Territory and for all subsequent editions including, but not limited to, reprints and book clubs), and shall deliver such permissions to Publisher at the time of delivery of the complete and final applicable Work. If Author fails to supply any or all of the permissions required under this Section, then Publisher may obtain it/them and charge the expense thereof to Author and/or against Author's royalty account, as Publisher shall determine; provided, however, that if Publisher cannot procure any such permission, Publisher shall have the right to terminate this Agreement in accordance with subsection (e) below.

(c)  Author acknowledges and agrees that the payment of the Advance, or any portion thereof, to Author pursuant to Section 3 above shall not constitute acceptance of any Work, or any part thereof, by Publisher. If any Work is delivered to Publisher on or before the delivery date(s) for such Work set forth in subsection (a) above and in accordance with this Section 6, but Publisher determines, in its sole discretion, that such Work is editorially and/or legally unacceptable and shall not be suitable for commercial publication, then Publisher shall notify Author of such unacceptability within seventy-five (75) days of Publisher's receipt of such Work from Author and provide to Author written editorial comments. Author shall have sixty (60) days following receipt of such notice and comments from Publisher to revise such Work in accordance with such comments and/or cure any legal deficiency. Author understands and agrees that it is Author's sole responsibility to render each Work acceptable to Publisher and any assistance, encouragement and/or critical comments provided by Publisher will not obligate Publisher to accept any Work and/or further assist Author to make any Work acceptable to Publisher. If Author refuses to make any changes that are advised by Publisher or any Work remains unacceptable to Publisher, in its sole discretion, after the revision process set forth above, then Publisher will have no obligation to publish such Work and shall have the right to reject such Work and terminate this Agreement with respect to such Work by written notice to Author. Upon receipt of such notice, Author will repay in full any and all portions of the Advance and any other sums paid to Author by Publisher for and/or in connection with such Work by no later than three (3) months from the date of such notice. Until such full repayment by Author to Publisher, all rights granted to Publisher hereunder shall remain in full force and effect and except with Publisher's prior written consent, Author shall not submit such Work (including any substantially similar work) or grant any rights with respect to such Work to any other person or entity. Upon Publisher's receipt of such full repayment by Author, this Agreement shall terminate with respect to such Work only and there shall be no further claims, liabilities or obligations between the parties with respect to such Work only. Nothing contained in this Agreement shall be deemed to impose upon Publisher any duty of independent investigation, or relieve Author of any of the obligations, representations or warranties of Author assumed hereunder.

(d)  If Author delivers a manuscript of any Work that is not clean and legible, Publisher may have such manuscript retyped or duplicated and charge Author (directly and/or against any Author royalty account) for any related expense. If Author fails to deliver any of the materials required to be delivered under this Section 6, Publisher may cause such material(s) to be made and charge Author (directly and/or against any Author royalty account) for any related expense; provided, however, that if Publisher cannot procure any such materials, Publisher shall have the right to terminate this Agreement in total or with respect to the applicable Work only, as Publisher shall determine, in accordance with subsection (e) below. Publisher shall not be responsible for any loss or damage to any property of Author submitted hereunder and Publisher shall have the right to dispose of such property and any and all materials for and proofs of the Work as Publisher shall determine.

(e)  It is understood and acknowledged by Author that any and all terms with respect to the character, condition and time of receipt of any and all materials referenced in this Section 6 are of the essence of this Agreement. If Author fails to deliver a final and complete manuscript of any Work by the delivery date(s) for such Work set forth in subsection (a) above, or is otherwise in default under this Section 6 (except for any default under subsection (c) which shall be governed by the terms of subsection (c)), then Publisher may terminate this Agreement in total or with respect to such Work only, as Publisher shall determine, at any time thereafter upon fourteen (14) days written notice to Author provided that Author does not cure such delivery failure and/or other default within such 14-day period. Upon receipt of such termination notice, any and all sums paid to Author under this Agreement in total or for such Work only, as applicable, shall immediately be repaid in full to Publisher. Until Publisher receives such full repayment by Author, all rights granted to Publisher hereunder shall remain in full force and effect and except with Publisher's prior written consent, Author shall not submit any Work (including any substantially similar work) or grant any rights with respect to any Work to any other person or entity. Upon Publisher's receipt of such full repayment, this Agreement in total or for such Work only, as applicable, shall terminate and there shall be no further claims, liabilities or obligations between the parties with respect to the applicable Work or this Agreement, as applicable.

7.   **Editing; Publication.** (a) Publisher shall have the right to make all decisions concerning editing and revising the text and Artwork of any Work; and the manners of design, publication, production, marketing, distribution, advertising and publicity of any Work. Publisher shall publish each Work in such style, at such price and under such title and imprint as it may deem advisable. Publisher shall be authorized to exercise the usual editorial privileges in the course of preparing any Work for composition and to make any manuscript conform to its standard style of punctuation, spelling, capitalization and usage. Should Publisher decide to publish an index as part of any Work, Publisher shall have the right to charge the costs thereof against any sums accruing to Author.

(b)  If Publisher supplies Author with galley or page proofs for checking, then Author shall promptly read, revise, correct and return them with Author's corrections within fourteen (14) days of Author's receipt thereof. If Author fails to return such corrected galley proofs within such 14-day period, Publisher shall have the right to publish the applicable Work in the condition in which it was submitted to Author by Publisher. The cost of alterations in the galley or page proofs required by Author, other than corrections of Publisher's or printer's errors, in excess of ten percent (10%) of the original cost of composition, shall be charged against Author's earnings hereunder provided, however, that Publisher shall, upon request, promptly furnish to Author an itemized statement of such additional expenses, and shall make available at Publisher's office the corrected proof for inspection by Author.

(c)  If any Work is not published within two (2) years of Publisher's acceptance of such complete and satisfactory Work pursuant to Section 6 above, then Author may demand that publication must commence within six (6) months of the date of such notice. If Publisher does not commence publication of such Work within such six-month period, this Agreement shall then terminate with respect to such Work only and all rights to such Work shall revert to Author. In such event, the only damages recoverable by Author shall be limited to any portion of the Advance paid or payable by Publisher for such Work up to the date of termination. No other damages, actions or proceedings (either legal or equitable) including, but not limited to, specific performance, shall be claimed, instituted or maintained by Author against Publisher.

8.   **Revisions.** If Publisher determines after publication that revisions to any Work are desirable, Publisher shall notify Author in writing and Author shall make such revisions. Author shall have three (3) months following receipt of such notice to deliver a satisfactory revision of such Work to Publisher. If Author fails to supply Publisher with a satisfactory revision within such three-month period, Publisher may engage another party to make such revision, in which event Publisher may charge against Author's royalty account all expenses incurred. It is agreed that for the purposes of royalty computation, any such revised edition shall be considered a new work, and the same scale of royalties shall apply to it as applied to the original edition of such Work hereunder.

9.   **Promotion.** Author grants to Publisher the right to use and exploit Author's name, approved likeness and approved biographical data in connection with the promotion, exploitation, publicity, advertising and sale of any Work and all other rights hereunder. Any likeness or biographical data provided by Author to Publisher shall be deemed pre-approved. Should Publisher schedule a promotional and/or publicity tour for any Work, Author shall ensure that Author will be available for such promotional and publicity tour for a period of up to two (2) weeks on or around the time of publication of Publisher's edition of such Work, at Publisher's request and reasonable expense, at times and places to be arranged by Publisher at Publisher's sole discretion. Author shall provide Publisher with a schedule of Author's prior commitments for the period of any proposed tour and will keep Publisher apprised of any additional engagements which may arise during that period. If Author is unable to complete any scheduled appearance(s) for any Work, then Publisher may request that Author make up any missed scheduled appearance(s). Author acknowledges that Publisher may giveaway free copies/downloads of each Work, and authorize free quotation of excerpts consisting of up to twenty percent (20%) of each Work as it may determine in its sole discretion for its promotion and sale of any Work, with the exception of Publisher's promotion of any Work on electronic search engines or "look inside the book" programs located on select websites including, without limitation, www.bn.com and www.google.com, in which case Publisher will use its best judgment as to the extent of content it will make available. Author agrees that no press release may be issued, public statements made, or information of any kind disclosed concerning this Agreement or the transactions contemplated herein without the prior written approval and agreement of Publisher.

10.  **Accountings.** Publisher shall render to Author (or to such representative as Author may designate in writing), in April and October of each year, statements of sales and earnings of any Work during the six (6) month period ending the preceding December 31 and June 30, respectively. Such statements shall be accompanied by payment of amounts due and payable to Author. However, Publisher shall have the right to withhold a reasonable reserve for returns against royalty earnings, not to exceed twenty-five percent (25%) during any royalty period. The reserve for any royalty period shall be liquidated after each six-month period. Whenever earnings in any six-month period fall below US$25.00, no accountings shall be made until the next settlement date after earnings have aggregated that amount, but Publisher shall nevertheless render an interim statement of the amount due to Author. If Author receives an overpayment of royalties or other sums from Publisher, or is otherwise indebted to Publisher, then Publisher may deduct the amount thereof from any further royalties or other sums otherwise due from Publisher to Author hereunder or under any other agreement between the parties. The foregoing shall not apply to any unearned advances specified by the parties as only applying to a work other than the Works. Upon written request to Publisher and during reasonable business hours, Author or a duly authorized representative may examine Publisher's records that relate to any Work only. Such examination shall be at the sole cost of Author unless errors of accounting amounting to five percent (5%) or more of the total sum paid to Author during the period covered by such request shall be found to Author's disadvantage, in which case the cost shall be borne by Publisher.

Author acknowledges that Author shall have no more than two (2) years after receiving any statement or royalty payment to examine such records of Publisher.

11. **Author's Copies.** Publisher shall furnish Author with 24 copies of each Work when published, free of charge. Additional copies of any Work may be purchased by Author at a discount of 40% off the list price, free of royalty, on a non-returnable basis only, subject to Publisher's inventory availability and requirements, and provided that Author is responsible for all freight charges. Publisher will bill Author and Author agrees to make payment within sixty (60) days of the invoice date. Author may resell such copies to individuals only, and may not sell to libraries, schools, bookstores, booksellers, book wholesalers, retail stores, organization or any other entity.

12. **Remainders.** If Publisher at any time has unsold, returned, damaged or defective copies of such Work on hand which, in Publisher's judgment, could not be sold on usual terms within a reasonable time, then Publisher may sell copies of such Work at the best price obtainable and Publisher shall pay to Author five percent (5%) of the amount received, less manufacturing for any such copies sold, provided, however, that in no case shall the amount paid exceed the difference between the net amount received by Publisher and the cost of manufacture. Publisher will use commercially reasonable efforts to notify Author if it decides to remainder copies of any Work. In such event, Author shall have two (2) weeks following the date of such notice in which to purchase all or any portion of said copies at the best price Publisher could expect to be offered by a third party. It is understood that Publisher cannot guarantee such prior notice and any failure to so notify Author shall not be deemed a breach of this Agreement.

13. **Reversion of Rights.** At any time after two (2) years from the date of first publication of any Work, if there is no edition of such Work available for sale in the Territory (regular, reprint, electronic or other), no contract in existence for the publication of any edition or for use of such Work in any manner, no unsatisfied indebtedness of Author to Publisher (for purposes of this Section, an unearned advance shall not be deemed indebtedness of Author), and no earnings for such Work have been payable to Author hereunder during two (2) successive accounting periods, then Author may demand the reversion of all rights for such Work only hereby granted to Publisher. If Author shall make such demand, then Publisher shall have six (6) months during which it may arrange for reprinting or other use of such Work in which case this Agreement shall continue in full force and effect. If at the expiration of such six-month period Publisher shall not have made any such arrangement, then all rights for such Work only hereby granted to Publisher shall revert to Author, subject to any outstanding licenses provided, however, that Publisher shall have the right, subject to payment to Author of Applicable royalties thereon, to sell all copies of such Work which have already been printed or are in the process of being printed as of the date of such reversion. For the avoidance of doubt, following any reversion pursuant to this Section, the Agreement shall remain in full force and effect for any other Work hereunder. The existence of a print on demand edition only of any Work shall not constitute such Work being available for sale.

14. **Non-Competition.** Author shall not, during the term hereof (without Publisher's prior written consent), (i) write, print or publish, or cause to be written, printed or published, any revised, corrected, enlarged or abridged version of such Work (including, without limitation, any work substantially similar to such Work), or in any way assist or be involved in the creation of any such version or in any book or publication of a character that would directly compete with its sale; or (ii) exercise or dispose of any reserved rights in such a way as substantially to destroy, detract from or impair the value of any rights granted herein to Publisher.

15. **Notices.** All notices, statements and any other documents provided by either party under and/or in connection with this Agreement must be in writing, delivered to the other party only by personal delivery, reputable delivery service (e.g., FedEx) or US registered or certified mail (return receipt requested), and sent to the respective addresses set forth on page 1 hereof or such other addresses as the parties may from time to time designate by written notice given in the manner provided herein. *Notwithstanding the foregoing, the parties agree that Publisher may send any statement due to Author hereunder via email and email shall be sufficient for any approval of any party set forth herein.*

16. **Assignment.** This Agreement shall be binding upon and inure to the benefit of the parties and their heirs, executors, assigns, administrators and successors, and any personal representatives of Author. Author shall not sell or assign Author's rights under this Agreement without Publisher's prior written consent.

17. **Force Majeure.** Neither party shall be liable for any default or delay in the performance of its obligations hereunder to the extent that such default or delay is caused, directly or indirectly, by circumstances beyond such party's reasonable control, including but, not limited to, shortages of or governmental restrictions on essential materials and supplies, acts of war, strikes, and/or other conditions beyond the party's control; provided that upon the occurrence of any such default or delay, the applicable performance date shall be deemed extended for a period equal to each such default or delay. Each party shall give the other immediate notice at the start and end of any such default or delay affecting its performance.

18. **Status of Parties.** The parties shall be deemed to have the status of independent contractors, and nothing in this Agreement shall be deemed to place the parties in the relationship of employer-employee, principal-agent, partners or joint venturers. Neither party has the authority to bind the other nor to incur any obligation on behalf of the other party or to represent itself as the other's agent or in any way that might result in confusion as to the fact that the parties are separate and distinct entities.

19. **Severability.** If any provision of this Agreement is determined by a court to be unenforceable, the parties will deem such provision to be modified to the extent necessary to allow it to be enforced to the extent permitted by law, or if it cannot be modified, such provision will be severed and deleted from this Agreement, and the remainder of this Agreement will continue in full force and effect.

20. **Governing Law.** The validity, construction, and enforceability of this Agreement shall be governed by the laws of the State of New York (without reference to the choice of law provisions thereof) applicable to contracts entered into and performed entirely within that state. Any court of competent jurisdiction sitting within the State of New York, New York County will be the exclusive jurisdiction and venue for any dispute, action, suit or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby. The parties hereto unconditionally and irrevocably agree and consent to the exclusive jurisdiction and venue of any such court and waive any argument or objection that such venue is not appropriate or convenient and further agree not to commence any such dispute, action, suit or proceeding

EXECUTION COPY

except in any such court.

21.  Entire Agreement. This Agreement contains the entire understanding and agreement between the parties and supersedes all previous oral or written representations or agreements with respect to the subject matter hereof. No modification of or change to this Agreement shall be binding unless in writing and signed by all parties hereto. There are no representations, warranties, promises, covenants or understandings of the parties other than those expressly set forth herein. Any and all riders or endorsement attached to this Agreement and signed or initialed by the parties hereto shall have the same force and effect as if incorporated into the numbered terms and provisions of this Agreement. No contrary or inconsistent terms or conditions in delivery memos, invoices, letters or other documents will be binding on Publisher unless expressly agreed to in writing by Publisher. The section headings and captions herein are for convenience only and not to be considered in construing this Agreement.


IN WITNESS WHEREOF, the parties have executed this Agreement the day and year first above written.


STERLING PUBLISHING CO., INC.                    MICHAEL WARD


By: _____              _____
Name:  Theresa Thompson
Title:    Executive Vice President                SSN:_____
                                                  Email: mwpublishing@xtra.co.nz

# EXHIBIT C

8/8/13                                    scratch hangman mike ward | Barnes & Noble

Sign In | MyAccount ⌄ | Order Status | MyNOOK | Stores & Events | Help

# BARNES & NOBLE
BN.com

*Fall Preview*: Pre-Order Exciting New Books 

| scratch hangman mike ward | Books ⌄ | ⊛ ⌄ | **Search** |

Shopping Bag ( 0 items )
Spend $25, Get FREE SHIPPING

Books | NOOK Books | nook | Textbooks | Newsstand | Teens | Kids | Toys & Games | Home & Gifts | Movies & TV | Music | Gift Cards | Deals & Offers

**Categories** ⊟
Teens
Kids
Entertainment
Reference
Sports & Adventure

**Price Range** ⊟
Discounted
Under $10
$10 - $25

**Format** ⊟
Paperback

Showing all of 40 results for scratch hangman mike ward in Books.

Sort by: [Best Selling ⌄]   View: [View All ⌄]   View as: ⊞ ⊟        Page 1 of 1



Extreme Scratch &
Solve...
Mike Ward
★★★★★
Paperback $8.88



Scratch & Solve
Hangman
Mike Ward
★★★★☆
Paperback $8.88



Scratch & Solve
Sports Hangman
Mike Ward
★★☆☆☆
Paperback $5.95



Scratch & Solve
Hangman #1
Mike Ward
★★☆☆☆
Paperback $5.95



Scratch & Solve
Hangwoman
Dane Ward
Paperback $5.95



Scratch & Solve
Tough Hangman...
Mike Ward
Paperback $6.95



Scratch and Solve
Travel...
Mike Ward
Paperback $5.95



Scratch & Solve
Hangman in the...
Mike Ward
Paperback $6.95



Scratch & Solve
Hangman #2
Mike Ward
★★★☆☆
Paperback $5.95



Scratch & Solve
Tough Hangman...
Mike Ward
Paperback $5.95



Scratch & Solve Movie
Hangman
Mike Ward
★☆☆☆☆
Paperback $5.95



Scratch & Solve
Hangman for...
Mike Ward
Paperback $5.95



Scratch & Solve
Hangman About...
Mike Ward
Paperback $6.95



Scratch & Solve
Hangman for...
Mike Ward
Paperback $5.95



Hip Pocket Hangman
Mike Ward
Paperback $6.95



Elegant Hangman: 250
Scratch &...
Mike Ward
Paperback $7.95



Scratch & Solve
Hangman #4
Mike Ward
★★★☆☆
Paperback $5.95



Scratch & Solve
Tough Hangman...
Mike Ward
Paperback $6.95



Scratch & Solve
Happy-Go-Lucky...
Mike Ward
Paperback $5.95



Scratch & Play Holiday
Hangman
Mike Ward
★★☆☆☆
Paperback $8.95

8/8/13                                    scratch hangman mike ward | Barnes & Noble

    

Scratch & Solve        Hangman Mania     Scratch & Solve      Whole Lotta Hangman   Scratch & Solve
Hangman #6             Mike Ward          Tough Hangman...     Mike Ward             Hangman #3
Mike Ward             Paperback $11.02    Mike Ward           Paperback $11.02       Mike Ward
Paperback $5.95                           Paperback $5.95                            ★★★☆☆
                                                                                     Paperback $5.95

    

Jumbo Hangman         Hip Pocket Tough    Scratch & Solve      Scratch & Solve       Scratch & Solve
Mike Ward             Hangman             Tough Hangman...     Tough Hangman...      Tough-as-Nails...
Paperback $7.65       Mike Ward           ★★★★☆                ★★★★☆                 Mike Ward
                      Paperback $6.95     Paperback $5.95      Paperback $5.95       Paperback $5.95

    

Scratch & Solve       Audacious Scratch & Dobonair Hangman:   Scratch & Solve       Scratch & Solve
Tough Hangman...      Solve...            250 Tough...         Hangman #5            Hangman for...
★★★★★                 Mike Ward           Mike Ward            Mike Ward             ★★★★★
Paperback $5.95       Paperback $1.99     Paperback $1.99      Paperback $1.99       Paperback $1.99

    

Scratch & Solve Music Scratch & Solve     Scratch & Solve      Scratch & Solve       Scratch & Solve
Hangman...            Tough Hangman...    Tough Hangman...     Tough Hangman...      Tough Hangman...
Mike Ward            Mike Ward            Mike Ward            Mike Ward             Mike Ward
★★★★☆                 ★☆☆☆☆               Paperback $1.99      Paperback $1.99       Paperback $5.95
Paperback $5.95       Paperback $1.99

Sort by:  Best Selling      ▼   View:  View All   ▼        View as:  ⊞ ⊟           Page 1 of 1

Categories related to scratch hangman mike ward

Games                          Word Games                   Children - Games & Activities

Puzzles                        Games & Activities           Teens - Art, Creativity & Games

Children                       Entertainment                Puzzles, Brain Teasers & Logic Games

Word games and puzzles->Children's   Film Reference         Brain Teasers & Games
nonfiction

Film                           General Reference            Performing Arts - Reference

Puzzles->General               Travel Games                 Trivia

# EXHIBIT D

8/6/13                                                Sterling Publishing: Catalog



# STERLING PUBLISHING

Quick Search [                    ] GO

**Retailers and Wholesalers**

Contact our sales group for ordering information

**Readers**

Our books are available in fine stores everywhere. You can also purchase them online.

Scratch & Solve Series

## Trivia Hangman

*Francis Heaney*

Series: Scratch & Solve® Series
Publisher: Puzzlewright
Published: October 2010
Age range: 12 upwards
160 pages
ISBN: 1-4027-7352-8
ISBN13: 9781402773525
$8.95 US
$10.95 Canadian
Paperback

5 3/8 X 8 1/4
Carton Quantity: 48
Territory: World

Hangman has entertained for eons, but now it's two games in one, testing both your word skills and your knowledge of trivia. Start by scratching off the silver-coated circles to try and find the right letters; you get six chances before you're hanged. Play four times to find four different words or phrases. If you guess them all correctly, try to discover what links all the answers. For instance, WORLD'S FAIR; PARIS, FRANCE; LATTICEWORK; and STEEL GIRDERS would lead to the answer EIFFEL TOWER. It's a real treat!

Francis Heaney is a former editor-at-large for *Games* magazine, whose crosswords have appeared in the *New York Times*, *The Onion*, the *New York Sun*, *Games*, *Newsday*, and other publications. Puzzle books he has written or co-written include *Trivial Pursuit Crosswords*, *The Sudoku Code*, *Crosswords*, and *Scratch & Solve Trivia Games*. In 2007 and 2009, he was the third-place finisher in the American Crossword Puzzle Tournament.



8/8/13                                                Sterling Publishing: Catalog



# STERLING PUBLISHING

Quick Search [_____] [GO]

**Retailers and Wholesalers**

Contact our sales group for ordering information

**Readers**

Our books are available in fine stores everywhere. You can also purchase them online.

Scratch & Solve Series

## Scratch & Solve® Hollywood Hangman
*Patrick Blindauer*



Series: Scratch & Solve® Series
Publisher: Puzzlewright
Published: November 2011
All
96 pages
ISBN: 1-4027-8552-6
ISBN13: 9781402785528
$5.95 US
$6.95 Canadian
Paperback

4 1/2 X 6
Carton Quantity: 150
Territory: World

Play hangman Hollywood style! Each page in this star-studded compilation contains a puzzle whose answer is a famous actor or actress. Just pick a letter, scratch off the silver circle, and see if the letter you picked is in the person's name. Keep picking until you figure out the star, but no more than 6 wrong guesses or you flop! Think you're a chart-topper? Then try a **bonus** puzzle: identify the movie in which the actors on the left and right pages costarred.

Patrick Blindauer has had puzzles published in the *New York Times*, the *New York Sun*, the *Wall Street Journal*, the *Washington Post*, *Los Angeles Times*, and *Games*. His other books include: *CLUE Sudoku*, *Sit & Solve Straight-Ahead Mazes*, and *SCRABBLE Sticker Crosswords*. Blindauer also appeared in seven episodes of *Strangers With Candy* and had a line in *A Beautiful Mind*. He lives in Astoria, New York, and his website is patrickblindauer.com.

8/8/13                                      Sterling Publishing: Catalog


STERLING PUBLISHING

Quick Search [_____] GO

**Retailers and Wholesalers**

Contact our sales group for ordering information

**Readers**

Our books are available in fine stores everywhere. You can also purchase them online.

| Word Puzzles & Games |

### Scratch & Solve® Geography Hangman
*Jack Ketch*



Series: Scratch & Solve® Series
Publisher: Puzzlewright
Published: February 2013
Age range: 12 upwards
96 pages
ISBN: 1-4549-0702-9
ISBN13: 9781454907022
$6.95 US
$8.95 Canadian
Paperback

4 1/2 X 6
Carton Quantity: 150
Territory: World



The hugely popular *Scratch & Solve® Hangman* series ventures into new territory: geography! See how many countries, cities, towns, and famous features and sites you know as you fill in the blanks and complete the word. But remember: six misses and you're hanged! As always, each puzzle has the 26 letters of the alphabet accompanied by silver circles to scratch off. Select one and give it a rub to find out if it's in the puzzle, and where.



STERLING PUBLISHING

Quick Search [        ] GO

**Retailers and Wholesalers**

Contact our sales group for ordering information

**Readers**

Our books are available in fine stores everywhere. You can also purchase them online.


Word Puzzles & Games

### Scratch & Solve® Science Hangman
*Jack Ketch*



Series: Scratch & Solve® Series
Publisher: Puzzlewright
Published: February 2013
Age range: 12 upwards
96 pages
ISBN: 1-4549-0701-0
ISBN13: 9781454907015
$6.95 US
$8.95 Canadian
Paperback

4 1/2 X 6
Carton Quantity: 150
Territory: World

From "anatomy" and "amino acid" to "tyrannosaurus" and "voltmeter," the words in this collection of hangman puzzles all connect to the world of science. Whether it's the name of a famous physicist (Stephen Hawking), a concept (biodiversity), or a discovery (like cosmic rays), the theme makes everything just a little bit more challenging—and fun. Just scratch the silver circle <u>next</u> to the letter you want to see if it's in the word, and where. But six wrong guesses leave you hanging!



STERLING PUBLISHING

Quick Search [_____]


Word Puzzles & Comics

## Scratch & Solve® Spelling Bee Hangman
*Jack Ketch*



**Series:** Scratch & Solve Series
**Publisher:** Puzzlewright
**Published:** February 2013
**Age range:** 12 upwards
96 pages
ISBN: 1-4549-0700-2
ISBN13: 9781454907008
$6.95 US
$8.95 Canadian
Paperback

4 1/2 X 6
Carton Quantity: 150
Territory: World

**Retailers and Wholesalers**

Contact our sales group for ordering information

**Readers**

Our books are available in fine stores everywhere. You can also purchase them online.

Hangman has always been a great game for good spellers—but these words are for champions! Whether they have tricky double letters (cappucino) or "silent" ones (sovereign), or are just long, complicated, and foreign-sounding (schadenfreude), they're all designed to challenge. But even though the words are hard, you STILL only get six wrong choices before you're hanged. Just scratch off the silver circles near the letters you want and see how you do.

Case 1:13-cv-07851-JMF   Document 1   Filed 11/05/13   Page 36 of 40
8/8/13
Scratch & Solve(r) Prime Time Hangman: Amazon.co.uk Jack Ketch: Books

**amazon**.co.uk

Your Amazon.co.uk    Today's Deals    Gift Cards    Sell    Help



Back to School
> Shop now

(intel)

Shop by Department ▾     Search    Books ▾    scratch hangman jack ketch    Go    Hello, Sign in Your Account ▾    Try Prime ▾    0 Basket ▾    Wish List ▾

Books    Advanced Search    Browse Genres    Bestsellers    New & Future Releases    Paperbacks    Seasonal Offers    Study Books    Audiobooks    Sell Your Books



Click to open expanded view

Publisher: learn how customers can search inside this book.



**Tell the Publisher!**
I'd like to read this book on Kindle

Don't have a Kindle? Get your Kindle here, or download a FREE Kindle Reading App.

### Scratch & Solve(r) Prime Time Hangman [Paperback]
Jack Ketch (Author)

RRP: £4.57

Price: **£4.54** & this item Delivered **FREE in the UK** with Super Saver Delivery. See details and conditions

You Save: **£0.03 (1%)**

Pre-order Price Guarantee. Learn more.

**This title has not yet been released.**
You may pre-order it now and we will deliver it to you when it arrives.
Dispatched from and sold by Amazon. Gift-wrap available.

---

**Trade-In Store**     **Amazon.co.uk Trade-In Store**
Did you know you can trade in your old books for an Amazon.co.uk Gift Card to spend on the things you want? Visit the Books Trade-In Store for more details. Learn more.

---

Quantity: 1 ▾

⊙ Pre-order this item today
or
Sign in to turn on 1-click ordering

Add to Wish List

Share ✉ 📷 ❂ ✦

## Special Offers and Product Promotions
- Pre-order Price Guarantee: order now and if the Amazon.co.uk price decreases between the time you place your order and the release date, you'll be charged the lowest price. Here's how (terms and conditions apply)

## Product details
**Paperback:** 96 pages
**Publisher:** Puzzlewright (4 Nov 2014)
**Language:** English
**ISBN-10:** 1454907037
**ISBN-13:** 978-1454907039

Did we miss any relevant features for this product? Tell us what we missed.
Would you like to update product info, give feedback on images, or tell us about a lower price?

## Sell a Digital Version of This Book in the Kindle Store
If you are a publisher or author and hold the digital rights to a book, you can sell a digital version of it in our Kindle Store. Learn more.

## Customer Reviews
There are no customer reviews yet.

5 star
4 star
3 star
2 star
1 star

This item has not been released yet and is not eligible to be reviewed.



amazon.co.uk    Your Amazon.co.uk    Today's Deals    Gift Cards    Sell    Help          Back to School  >Shopnow  (intel)

Shop by
Department ▾        Search   Books ▾   scratch hangman jack ketch        Go       Hello. Sign in    Try      Wish
                                                                                  Your Account ▾   Prime ▾   Basket ▾   List ▾

Books    Advanced Search    Browse Genres    Bestsellers    New & Future Releases    Paperbacks    Seasonal Offers    Study Books    Audiobooks    Sell Your Books



Click to open expanded view
Publisher: learn how customers can search inside this book.

### Scratch & Solve(r) Underwater Hangman [Paperback]
Jack Ketch (Author)

RRP: £4.57

Price: £4.54 & this item Delivered FREE
in the UK with Super Saver
Delivery. See details and conditions

You Save: £0.03 (1%)
Pre-order Price Guarantee. Learn
more.

This title has not yet been released.
You may pre-order it now and we will deliver it to
you when it arrives.
Dispatched from and sold by Amazon. Gift-wrap
available.

Quantity: 1 ▾
Pre-order this item today!
or
Sign in to turn on 1-Click ordering.
Add to Wish List

Share ✉ ⊠ ⊗ ⊙

Trade-In Store    **Amazon.co.uk Trade-In Store**
Did you know you can trade in your old books for an Amazon.co.uk Gift
Card to spend on the things you want? Visit the Books Trade-In Store for
more details. Learn more.

**Tell the Publisher!**
I'd like to read this book on Kindle

Don't have a Kindle? Get your Kindle here, or download a
FREE Kindle Reading App.

## Special Offers and Product Promotions
• Pre-order Price Guarantee: order now and if the Amazon.co.uk price decreases between the time you place your order and the release
  date, you'll be charged the lowest price. Here's how (terms and conditions apply)

## Product details
**Paperback:** 96 pages
**Publisher:** Puzzlewright (4 Nov 2014)
**Language:** English
**ISBN-10:** 1454907045
**ISBN-13:** 978-1454907046

Did we miss any relevant features for this product? Tell us what we missed.
Would you like to update product info, give feedback on images, or tell us about a lower price?

## Sell a Digital Version of This Book in the Kindle Store
If you are a publisher or author and hold the digital rights to a book, you can sell a digital version of it in our Kindle Store. Learn more

## Customer Reviews
There are no customer reviews yet.

5 star
4 star
3 star
2 star
1 star

This item has not been released yet and is not
eligible to be reviewed.

## RELEASE

TO ALL TO WHOM THESE PRESENTS SHALL COME OR MAY CONCERN, KNOW THAT THE UNDERSIGNED, **MICHAEL WARD** ("Releasor") in consideration of Sterling Publishing Co., Inc.'s ("Sterling") agreement, following the execution of this Release, to only publish *SCRATCH HANGMAN* and *SCRATCH & SOLVE HANGMAN* books by Releasor and no other party, and other good and valuable consideration received from or on behalf of Sterling, receipt of which is hereby acknowledged, does hereby RELEASE and DISCHARGE, Sterling and its current and former officers, directors, partners, managers, employees, shareholders, agents, attorneys, representatives, trustees, parent, subsidiaries, affiliates, related companies, branches and divisions, and the current and former officers, directors, partners, managers, employees, shareholders, agents, attorneys, representatives, and trustees of any such parent, subsidiary, affiliate, related company, branch or division, and the heirs, executors, administrators, receivers, predecessors, successors and assigns of all of the foregoing (collectively, "Releasees") from or in connection with, and hereby waives and/or settles, any and all actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims, demands whatsoever, in law, admiralty or equity (collectively, "Claims") which against the Releasees, the Releasor, Releasor's current and former officers, directors, partners, managers, employees, shareholders, agents, attorneys, representatives, trustees, parents, subsidiaries, affiliates, related companies, branches and divisions, and the current and former officers, directors, partners, managers, employees, shareholders, agents, attorneys, representatives, and trustees of any such parent, subsidiary, affiliate, related company, branch or division, and the heirs, executors, administrators, receivers, predecessors, successors and assigns of all of the foregoing ever had, now have or hereafter can, shall or may have for, upon, or by reason of any matter, cause or thing whatsoever, from the beginning of the world through and including the day of the date of this Release, in connection with the allegedly unauthorized publication and sale of *SCRATCH HANGMAN* and *SCRATCH & SOLVE HANGMAN* books by authors other than Releasor, including without limitation claims for copyright infringement, trademark or trade dress infringement, unfair competition, damages, and/or attorneys' fees. For clarity, it is agreed and understood that Sterling may continue to sell all *SCRATCH HANGMAN* and *SCRATCH & SOLVE HANGMAN* books by authors other than Releasor that Sterling published prior to the execution of this Release.

It is agreed and understood that Sterling has not, and is hereby not, admitting liability for said claims and damages. This Release is not a confession or admission of negligence or other liability on the part of those hereby released, and shall not be construed as any sort of confession of admission in any claim, suit or proceeding, no matter by whom the same may be brought.

It is further agreed and understood that this Release shall not affect or modify Sterling's and Releasor's six (6) publishing agreements, dated October 14, 2004 as amended, August 9, 2005 (for *MOVIE HANGMAN*), August 9, 2005 (for *SPORTS HANGMAN*), April 17, 2009, April 12, 2012, and January 22, 2013, in any respect.

In addition, Releasor agrees to Sterling's offer to enter into the publishing agreement for a new work (tentatively) entitled: *SCRATCH & SOLVE UNDERWATER HANGMAN*, which is attached hereto as EXHIBIT A, and the publishing agreement for a new work (tentatively) entitled: *SCRATCH & SOLVE PRIME TIME HANGMAN*, which is attached hereto as EXHIBIT B, and Releasor further agrees to simultaneously execute such two (2) publishing agreements along with this Release.

**Releasor acknowledges that this Release has been carefully read and is executed voluntarily with full knowledge of its significance.**

Witness my hand this _____ day of _____, 2013

_____

**Michael Ward**

State of _____   County of _____

On this _____ day of _____, 2013, before me personally appeared _____

_____, who is personally known to me or who produced a _____ as identification.

Sworn and signed before me: _____.

**Notary Public**

# EXHIBIT F

<u>EXHIBIT – NEW YORK TIMES ARTICLE EXCERPT</u>

<u>Interview with Peter Gordon, the Editorial Director at Sterling Publishing, published in the New York Times on May 18,2009.</u>

*What books are you most proud of at Sterling? What upcoming books are you most excited about?*

Since I've been at Sterling, we've put out more than 600 puzzle books. We just started a new imprint, Puzzlewright Press, for the puzzle books. Lately we've been averaging just under 80 books a year. That should keep even the most voracious puzzler busy.

When I first started there, I had the idea of making books in the shape of toilet seat covers, calling them "Sit & Solve." Let's face it: much of our work is done by people on the throne. Everyone thought it was a cute idea, but too crazy to try. For five years I pestered them to try, and they finally gave it a shot. That was in 2002. We've sold over two million "Sit & Solve" books to date. Another big success is our "Scratch & Solve" line of hangman books that work like instant lottery tickets. A guy in New Zealand had done it there, and he wanted to expand to the U.S., so he contacted me. Less than a minute after I opened the envelope, I knew it was going to be huge. We've sold a million of those.