**UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF NEW YORK**
_____X

MICHAEL WARD,
d/b/a BRAINTEASER PUBLICATIONS,

                         Plaintiff,                    **Civil Action No. 13-cv-7851 (JMF)**

       -against-

BARNES & NOBLE, INC.,
STERLING PUBLISHING CO., INC.,
FRANCIS HEANEY, AND
PATRICK BLINDAUER,

                         Defendants.
_____X


**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**<u>MOTION FOR SUMMARY JUDGMENT</u>**


LAW OFFICE OF BARRY E. JANAY
Barry E. Janay, Esq.
90 Broad Street, 25th Floor
New York, NY 10004
Tel. 917-756-8501
Fax 855-374-2884

*Attorney for Plaintiff(s)*

# TABLE OF CONTENTS

**Page**

<u>**INTRODUCTION**</u> ……………………………………………………………………1

<u>**FACTUAL BACKGROUND**</u>…………………………………………...…………………....1

<u>**ARGUMENT**</u>………………………………………………………………………..4

**I.     DEFENDANTS' INFRINGED ON PLAINTIFF'S U.S. AND NEW
        ZEALAND COPYRIGHTS**…………………………………………………..4

      **A.     Defendants Infringed Plaintiff's Copyrights in the New Zealand
        Book**…………………………………………………………….......................6

      **B.     Defendants Infringed Plaintiff's U.S. Copyrights in the Scratch &
        Solve
        Works**…………………………………………………………...……9

      **C.     Identical Text was Copied by Sterling from Ward's
        Book**……………………………………………………………...……15

**II.    DEFENDANTS INFRINGED PLAINTIFF'S TRADE DRESS USED IN
        THE NEW ZEALAND BOOK AND U.S. SCRATCH & SOLVE
        WORKS**………………………………………………………………………15

**III.   DEFENDANTS' ACTIONS AMOUNT TO UNFAIR COMPETITION AND
        UNJUST
        ENRICHMENT**……………………………………...……………….....………….20

**IV.    FOR ALL INTENTS AND PURPOSES, THE 2004 AGREEMENT
        ENTERED INTO BY PLAINTIFF AND STERLING IS A LICENSING
        AGREEMENT**………………………………………………………….22

**V.     CONCLUSION**………………………………………………….................22

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Atrium Group De Ediciones Y Publicaciones, S.L v. Harry N. Abrams, Inc.*,
    565 F.Supp 2d 505 (S.D.N.Y. 2008)..................................................................21

*Colour & Design v. U.S. Vinyl Mfg. Corp.*,
    No. 04 Civ. 8332 (S.D.N.Y. June 3, 2005)........................................................21

*Durham Indus., Inc. v. Tomy Corp.*,
    630 F.2d 905 (2d Cir. 1980)..............................................................................5

*Eyal R.D. Corp. v. Jewelex N.Y., Ltd.*,
    576 F.Supp.2d 626 (S.D.N.Y. 2008).................................................................4

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
    499 U.S. 340 (1991)..............................................................................4,5,7,14

*George Basche Co. v. Blue Coral Inc.*,
    968 F.2d 1532 (2d Cir. 1992)..........................................................................16

*Hamil Am., Inc. v. GFI*,
    193 F.3d 92 (2d Cir. 1999)................................................................................5

*Hoehling v. Universal City Studios, Inc.*,
    618 F.2d 972 (2d Cir. 1980)..............................................................................4

*Inwood Labs., Inc. v. Ives Labs.*,
    *Inc.*, 456 U.S. 844 (1982)..........................................................................18, 19

*John H. Harland Co. v. Clarke Checks, Inc.*,
    711 F.2d 966 (11th Cir. 1983)........................................................................15

*Landscape Forms, Inc. v. Columbia Cascade Co.*,
    113 F.3d 373 (2d Cir. 1997).......................................................................16, 20

*Liechtenstein v. Columbia Broadcasting Sys., Inc.*,
    672 F.2d 1095, 1105 (2d Cir. 1982)................................................................21

*Mannion v. Coors Brewing Co.*,
    377 F.Supp.2d 444 (S.D.N.Y. 2005)..................................................................9

*Metrokane, Inc. v. The Wine Enthusiast*,
    160 F.Supp.2d 633 (S.D.N.Y. 2001)................................................................18

*MPD Accessories B.V. v. Urban Outfitters*,
    2014 WL 2440683 (S.D.N.Y. 2014)..................................................................6

*Natural Organics, Inc. v. Nutraceutical Corp.*,
    426 F.3d 576 (2d Cir. 2005)…………….......................................................19

*Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*,
    602 F.3d 57 (2d Cir. 2010)..................................................................5, 8

*Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*,
    274 F.2d 487 (2d Cir. 1960).....................................................................5

*Photopaint Technologies, LLC v. Smartlens Corp.*,
    335 F.3d 152  2d Cir. 2003)…………………………………………….……...12

*Repp v. Webber*,
    132 F.3d 882 (2d Cir. 1997).....................................................................4

*R.F.M.A.S., Inc. v. Mimi So*,
    619 F.Supp.2d 39 (S.D.N.Y. 2009)...........................................................8

*Roy Export Co. Establishment of Vaduz, Liechtenstein v. Columbia Broadcasting Sys., Inc.*,
    672 F.2d 1095 (2d Cir. 1982)………………………………………….………21

*Sherwood 48 Assocs. v. Sony Corp of Am.*,
    76 Fed. App'x 389 (2d Cir. 2003)..........................................................16

*SLY Magazine LLC v. Weider Publ'ns LLC*,
    529 F. Supp. 2d 425 (S.D.N.Y. 2007)………………………...……………………21

*Stormy Clime Ltd. v. ProGroup, Inc.*,
    809 F.2d 971 (2d Cir. 1987)...................................................................15

*TrafFix Devices, Inc. v. Marketing Displays. Inc.*,
    532 U.S. 23 (2001)........................................................................17, 18

*Universal Athletic Sales Co. v. Salkeld*,
    511 F.2d 904 (3d Cir. 1975).....................................................................7

*Ward v. Andrews McMeel Pub., LLC*,
    963 F. Supp. 2d 222 (S.D.N.Y. 2013)....................................................6, 16

*Warner Bros. Inc. v. ABC*,
    720 F.2d 231 (2d Cir. 1983).....................................................................5

*Yurman Design, Inc. v. PAJ*, Inc.,

262 F.3d 101 (2d Cir. 2001)......................................................................................5, 8, 18

**<u>Statutes, Rules & Secondary Authorities</u>**

37 U.S.C. § 202.3(2)(ii)(C)...........................................................................................13

38 A.L.R.5th 1 (1996)................................................................................................ 22

Fed. R. Civ. P. 56(a)......................................................................................................4

The Berne Convention and Berne Convention Implementation Act................................................6

## INTRODUCTION

Michael Ward d/b/a Brainteaser Publications ("Ward") filed the present action to enforce the copyright and trade dress protection afforded to his unique rendition of the game of hangman which incorporates a lottery ticket like scratch-off element creating a unique and distinguishable single-player game experience for the customer. Plaintiff also asserts that the defendants engaged in unfair competition and have been unjustly enriched by their activities. As a result, Plaintiff seeks damages against the Defendants for these transgressions.

## FACTUAL BACKGROUND

Plaintiff Mike Ward is a New Zealand based author who created a puzzle book that combined the novel and unique concept of using scratch-off ink (akin to a lottery ticket) in connection with the age-old game of hangman. Ward originally published the books in 2000 in New Zealand where copyright protection was obtained in accordance with New Zealand law. Statement of Undisputed Facts (hereinafter "SUF")¶ 8, The book became an instant success and a series of "Scratch-Hangman" books followed. (Janay Decl. ¶ 3, Ex. A) To expand the reach of this new style of publication, Ward sent a proposal to Sterling in June of 2004 which fully described his publication and included samples of the format. SUF ¶¶ 13-18. On July 7, 2004, Peter Gordon, the puzzle and games acquisitions editor at Sterling, responded via email to Ward's proposal indicating that they wished to pursue publishing rights. (Janay Decl. ¶4, Ex. B.) Subsequently, on July 9, 2004 Peter Gordon informed Plaintiff Ward that Sterling wished to publish four books in 2005 and then two books every six months, with Sterling having exclusive rights to the books in the U.S. and Canada as long as they published a minimum of four books per year. (Janay Decl. ¶5, Ex. C.)

Shortly thereafter a publishing agreement ("2004 Agreement") was entered into which provided, *inter alia*, that Ward was the Author and Proprietor of the Work, which were defined as "SCRATCH HANGMAN a series from which six books are to be published initially under the terms of this Agreement with an option for two additional books every six months." The 2004 Agreement further provided that Sterling would obtain copyright protection in the United States in Ward's name for the Work to be sold in the U.S. and Canada. Ederer Decl. ¶ 13, Ex. 11.[1] Ward 56.1 ¶¶ 16, 17. The 2004 Agreement also provided that Sterling had an option to copyright material it supplied "in its own name or the name of its owner as the publisher may elect" Id., however they never did so. The books sold well (Janay Decl. ¶ 6, Ex. D), in fact over a million copies were sold by June 17, 2009 and that number reached over 1.5 million copies by 2013 (Janay Decl. ¶ 7, Ex. E). In total, forty (40) separate publishing agreements were entered into between Sterling and Ward from 2004 to 2013 following the pattern and course of dealing stemming from the July 9, 2004 email. Janay Decl.¶5 Ex. C.

In 2011 Ward notified Sterling of the potential infringement of the works by a company named Andrews McMeel Publishing ("AMP") showing that they utilized a similar lottery ticket like scratch-off gameplay with a single player hangman soft cover book and had a similar layout as well as used many of the same words. Janay Decl. ¶ 10, Ex. H (Deposition of Ward at p.. 93:12-19). Ward supplied supporting documentation to Sterling concerning his claims, but Sterling took no action to enjoin AMP. Id. Instead, Sterling informed Ward that he should pursue the protection of any rights in the Scratch & Solve series works on his own. Id. Ward filed a complaint on October 26, 2012 asserting copyright infringement, trade dress infringement, and common law unfair competition claims, seeking an injunction and damages.

---

[1] Defendants' counsel misleadingly asserts that the copyright protection Sterling obtained for Ward was limited to "text only," when no such limitation is contained in any of the publishing agreements.

Janay Decl. ¶ 16, Ex. N. Despite having been notified by Ward and having a contractual

obligation, Sterling did not assert any ownership claims to either the works' text or its

illustrations from the time they were notified of the suit on up until the matter was settled. Id.

On August 1, 2014, Judge Paul A. Crotty issued an Opinion and Order dismissing, with leave to

replead, the trade-dress claims asserted by Ward but left intact his copyright and unfair

competition claims. Janay Decl. ¶ 30, Ex. BB. The matter settled thereafter and AMP stopped

producing and selling the allegedly infringing works.

In late 2011, Sterling began publishing virtually identical works to that of Ward's first

using their employees Francis Heaney as the Author (see Janay Decl. ¶ 14, Ex. L; Deposition of

Ward at p. 119:15-23), then another employee Patrick Blindauer in early 2012 (Id.), and finally

they made up pseudonym "Jack Ketch" and published the books under that name in late 2012

(Id.).  A total of five works (the "Infringing Works") were produced without Ward's consent.

Ward 56.1 Counterstatement ¶¶ 38-47.  The works included the same shape and materials,

similar exterior artwork, identical interior designs, identical organization, an identical interior

color scheme to the earlier Scratch & Solve books owned by Ward all of which was substantially

similar to that of Plaintiff's New Zealand series. Id. ¶¶ 41, 44, 47. The instructions found in

Plaintiff's Scratch & Solve works were identical to those found in the Infringing Books. Id. ¶ 46.

Ward complained to Sterling about the Infringing Works. Id. ¶ 48, Janay Decl. ¶16, Ex.

N. Two weeks later Sterling offered to publish one more of Plaintiff's books in the "Scratch &

Solve," however for the first time in their contractual relationship, Sterling sought specifically to

get Ward to agree to language limiting his contribution and also requiring Ward to sign a Release

as a condition precedent to entering into another publishing arrangement. Id. ¶¶ 49-52. Plaintiff

refused to sign this Draft 2013 Agreement and the Release because he believed that the terms,

particularly the limitation and the Release were totally unreasonable in light of the fact that in the past publishing Agreements Ward was acknowledged to be the proprietor and Author without such limitation.. SUF Response to ¶ 20. Ward was left with no other choice but to file the present action for copyright and trade dress infringement, unfair competition, and unjust enrichment. Ederer Decl. ¶ 3, Ex. 1 [Complaint].

## ARGUMENT

The Second Circuit has long held that summary judgment has traditionally been frowned upon in copyright litigation. *See* Hoehling v. Universal City Studios, Inc., 618 F.2d 972, 977 (2d Cir. 1980). However, summary judgment may be appropriate where the moving party can show that there is "no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is "material" within the meaning of Rule 56 when its resolution "might affect the outcome of the suit under the governing law." Eyal R.D. Corp. v. Jewelex N.Y., Ltd., 576 F.Supp.2d 626, 632 (S.D.N.Y. 2008). An issue is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the non-moving party." Id. In determining whether an issue is genuine on a motion for summary judgment, the court must draw all reasonable inferences in the light most favorable to the non-moving party. *See* id. For the reasons set forth below Defendants' motion must be denied.

## I. DEFENDANTS' INFRINGED ON PLAINTIFF'S U.S. AND NEW ZEALAND COPYRIGHTS.

Both Plaintiff's New Zealand and U.S. copyrights were infringed by the Defendants.. Copyright infringement is "established when the owner of a valid copyright demonstrates unauthorized copying." Repp v. Webber, 132 F.3d 82, 889 (2d Cir. 1997); *see also* Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991). "To qualify for copyright protection, a work must be original to the author," which "means only that the work was independently

created by the author (as opposed to copied from other works), and that it possesses *at least some minimal degree of creativity*." Feist, 499 U.S. at 345 (Emphasis added). Thus, the initial prong of copyright protection is the existence and validity of a copyright. *See* Durham Indus., Inc. v. Tomy Corp., 630 F.2d 905, 908 (2d Cir. 1980).

The Second Circuit has held that "the test for infringement of a copyright is of necessity vague." Peter Pan Fabrics, Inc. v. Martin Weiner Corp., 274 F.2d 487, 489 (2d Cir. 1960). To prove infringement plaintiff must demonstrate that "'(1) the defendant has actually copied the plaintiff's work; and (2) the copying is illegal because a substantial similarity exists between the defendant's work and the protectable elements of plaintiff's.'" Peter F. Gaito Architecture, LLC v. Simone Dev. Corp., 602 F.3d 57, 63 (2d Cir. 2010) (quoting Hamil Am., Inc. v. GFI, 193 F.3d 92, 99 (2d Cir. 1999)). "The standard test for substantial similarity between two items is whether an 'ordinary observer, unless he set out to detect disparities, would be disposed to overlook them, and regard the aesthetic appeal as the same.'" Yurman Design, Inc. v. PAJ, Inc., 262 F.3d 101, 111 (2d Cir. 2001) (quoting Hamil Am., 193 F.3d at 100). In applying this test, and in stark contrast to Defendants' slicing and dicing approach, the Second Circuit has "disavowed any notion that we are required to dissect [the works] into their separate components and compare only those elements which are in themselves copyrightable," because courts are "*principally guided by comparing the contested design's total concept and overall feel with that of the alleged infringed work, as instructed by our good eyes and common sense.*" Gaito Architecture, 602 F.3d at 66 (emphasis added). Importantly for purposes of Defendants' argument that no infringement has taken place, *the Second Circuit has traditionally reserved non-infringement questions for the trier of fact* because "the question of substantial similarity typically presents an extremely close question of fact." *See* id. at 63 (quoting Warner Bros. Inc. v. ABC, 720 F.2d

231, 240 (2d Cir. 1983)). In the instant matter there are simply too many material facts in dispute to grant Defendants motion.

### A. Defendants Infringed Plaintiff's Copyrights in the New Zealand Book.

Defendants' argument concerning the validity of Plaintiff's New Zealand copyright fails (Ederer Memo at 9-12), Plaintiff's New Zealand work is afforded protection in the United States via the Berne Convention. In New Zealand, to obtain a copyright a work simply needs to be published, there is no registration requirement. *See* Janay Decl. ¶ 22, Ex. T. ("copyright comes into existence automatically…when a work is put into material form," and "no registration is necessary, nor is any other formality required for securing copyright protection."). This protection is extended to the United States because both New Zealand and the United States are signatories to the Berne Convention. See also Janay Decl. ¶ 25, Ex. W; *see also, e.g.,* MPD Accessories B.V. v. Urban Outfitters, 12 CIV. 6501 LTS KNF, 2014 WL 2440683 (S.D.N.Y. May 30, 2014) ("The Berne Convention Implementation Act allows owners of unregistered foreign copyrights from Berne Convention signatory nations to bring claims of copyright infringement in United States courts."); . Thus, because it is undisputed that plaintiff did publish his New Zealand book in New Zealand, the copyrights associated with that book, and namely the unique approach to publishing the scratch hangman game as well as the interior and exterior designs, are protected in the United States. *See* id.

Plaintiff's New Zealand works have many elements (including its overall feel), that are copyrightable. "It is well settled that 'the requisite level of creativity [for copyright protection] is extremely low; even a slight amount will suffice. The vast majority of works make the grade quite easily, as they possess some creative spark, no matter how crude, humble or obvious it may be.'" Ward v. Andrews McMeel Pub., LLC, 963 F. Supp. 2d 222, 233-34 (S.D.N.Y. 2013)

(quoting <u>Feist</u>, 499 U.S. at 345) (internal quotations omitted). Here, the illustrations of the hangman and other design elements in the New Zealand Book indisputably have originality. *See* Ederer Decl. ¶ 5, Ex. 3 at WARD000039. First, the orientation of the stick figure and gallows is such that the vertical shaft of the gallows always appears between the stick figure and the edge of the page. Second, the horizontal shaft at the top is shorter than the horizontal base of the gallows. Third, the gallows are always positioned to the left of the stick figure. Fourth, the horizontal base of the gallows extends slightly beyond the vertical shaft. Fifth, the gallows contain an additional diagonal piece supporting the vertical and horizontal shafts in the upper left hand corner of the gallows pole. Sixth, the limbs of the stick figure are straight. Seventh, the scratch-off circles are placed to the side of the gallows. Eighth, the answer lines are placed below the scratch-off circles. Many of the very elements discussed above, when considered by the Honorable Paul A. Crotty, were found to be afforded copyright protection, reasoning that "they display the minimal 'modicum of creativity' needed for copyright protection." *See* <u>Ward</u>, F. Supp. 2d at 234 (quoting <u>Universal Athletic Sales Co. v. Salkeld</u>, 511 F.2d 904, 908 (3d Cir. 1975)). As such, the design of the New Zealand Book, or parts of the design at the very least, are indeed protected.

Clearly and indisputably, the question of whether the Infringing Books bare a substantial similarity to the New Zealand Book should be reserved for a trier of fact. According to the Second Circuit:

> [T]he defendant may infringe on the plaintiff's work not only through literal copying of a portion of it, but also by parroting properties that are apparent only when numerous aesthetic decisions embodied in the plaintiff's work of art - the excerpting, modifying, and arranging of unprotectable elements - are considered in relation to one another. *Thus, in the end, our inquiry necessarily focuses on whether the alleged infringer has misappropriated the original way in which the author has selected, coordinated, and arranged the elements of his or her work.*

Gaito Architecture, 602 F.3d at 66 (internal quotations omitted) (emphasis added). The Infringing Books share many design similarities with Plaintiff's New Zealand Book: the orientation of the stick figure and gallows is such that the vertical shaft of the gallows always appears between the stick figure and the edge of the page; the horizontal shaft at the top is shorter than the horizontal base of the gallows; the scratch-off circles are used in a similar way in both works, they are placed to the side of the gallows; the answer lines are placed below the scratch-off circles; the scratch-off circles are silver. Thus, although some of the elements described above may not be protectable on their own, when cocombined they present a unique and highly successful method of presenting the hangman game. Whether the combination – or the overall look, concept and feel – of the Accused Books is *substantially similar* to Plaintiff's New Zealand Book, as in AMP, is very much a close factual question that should be left for a jury to determine. *See* Ward, F. Supp. 2d at 234.

Unlike Defendants' ambitious argument that summary judgment is proper here on substantial similarity, the Southern District of New York has consistently denied summary judgment in similar copyright cases. In R.F.M.A.S., Inc., summary judgment was denied on the issue of substantial similarity where defendants allegedly had access to a piece of jewelry and copied it. *See* R.F.M.A.S., Inc. v. Mimi So, 619 F.Supp.2d 39, 65 (S.D.N.Y. 2009) ("the Court finds that factual disputes exist as to whether the Gate B9 pieces are "substantially similar" to the protectible elements of the one Stella piece available for comparison: the large-link Stella necklace pictured in RFMAS's memorandum."). In Yurman Design, summary judgment on the issue of substantial similarity was denied where defendants--much like Defendants in this case-- failed to specifically describe the absence of an alleged plagiarism of a piece of Jewelry. Yurman Design, Inc. v. Golden Treasure Imports, Inc., 275 F.Supp.2d 506, 517 (S.D.N.Y. 2003) ("In

their papers filed in support of their motion, the defendants do not provide any analysis of the differences or similarities between the two sets of designs, but simply invite the Court to compare the designs and to conclude on its own that there is an absence of such similarity."). In Mannion, summary judgment on the issue of substantial similarity was denied where the difference between two photographs were described as follows: "[o]ne image is black and white and dark, the other is in color and bright. One is the mirror image of the other. One depicts only an unidentified man's torso, the other the top three-fourths of Kevin Garnett's body. The jewelry is not identical. One T-shirt appears to fit more tightly than the other." Mannion v. Coors Brewing Co., 377 F.Supp.2d 444, 463 (S.D.N.Y. 2005) ("the images are such that infringement cannot be ruled out-or in-as a matter of law."). Here, as in the three cases discussed above, Defendants likewise had access to the New Zealand Book. Moreover, Defendants also make conclusory and unsupported statements regarding substantial similarity, often mischaracterizing Plaintiff's deposition testimony in an effort to mislead the court and support their paper thin argument that the works bear no resemblance to one another let alone "substantial similarity.".[2] Lastly, as in Mannion, the New Zealand Book concededly has numerous elements that are both protectable and not, and therefore it is, at the very least, difficult to conclude that no reasonable jury could find substantial similarity of the Infringing Books to either the protectable elements or the unique combination of protectable and unprotectable elements in the New Zealand Book.

**B.      Defendants Infringed Plaintiff's U.S. Copyrights in the Scratch & Solve Works.**

Notwithstanding the fact that Plaintiff owns a valid copyright in his New Zealand works which are substantially similar to that of the Infringing Works, Plaintiff owns U.S. registered

---

[2] Defendants repeatedly reference Plaintiff's responses in his deposition (Ederer Memo at 12) that he is attempting to claim copyright ownership in an "idea" or "concept;" plaintiff is not a lawyer and was not giving testimony as to the legal standard, he is a fact witness who was oftentimes confused by the questions asked by Defendants attorney.

copyrights in the Scratch & Solve series which Sterling obtained on his behalf pursuant to the 2004 Publishing Agreement and those that followed. Ederer Decl. ¶ 13, Ex. 11; Ederer Decl. ¶ 22, Ex. 20 at 8. Defendants argue that the copyrights they obtained extended only to the "text (i.e. game words)" *See* Defendants 56.1b Statement ¶ 20 Ward supplied, rather than for Plaintiff's total contribution or for the Works as a whole. *See* Ederer Decl. ¶ 13, Ex. 11 ¶ 2 at DEFS000223. This flies in the face of the plain language of the 2004 Agreement which names Ward as the proprietor of the Works. While it is true that the 2004 Agreement and its progeny state that where Sterling "supplie[d] material for the [books] (such as illustrations)", Sterling had the *option* to "copyright material in its own name") they never did so despite their enormous resources.[3] The course of dealing between Sterling and Plaintiff, contractual language in the Publishing Agreements, and registration procedures all lead to the conclusion that Ward's copyright protection extends far beyond the text alone.

Next, the extensive course of dealing between Sterling and Plaintiff demonstrate that Plaintiff Ward owned more than just the "Entire Text" in the Scratch & Solve works. Indeed, from the outset Sterling obtained the template as well as received extensive advice from Plaintiff Ward when developing the design of the interior and exterior of the Scratch & Solve Series. *See* Janay Decl. ¶ 33, Ex. EE at DEFS000387-387. Sterling not only obtained images of Plaintiff's New Zealand Books as samples, but also notified Plaintiff of changes made to the design and inquired of Plaintiff of any stylistic suggestions. Id. After the designs were finalized, Defendants marketed the Scratch & Solve works as Plaintiff Ward's, specifically stating so on the Barnes & Noble website. ("[Mike] Ward, who is based in New Zealand, published the *Scratch-Hangman* books down there, and sold more than 250,000 copies locally, before assigning the title to

---

[3] This also shows a clear dispute as to a material fact, specifically how far does Ward's copyright ownership extend (i.e. to the whole Works or just the text). Plaintiff of course contends that he owns the whole Work, not just the text as Defendants argue.

Sterling") *See* Janay Decl. ¶ 27, Ex. Y at DEFS000038, 41, 50 59, 71, 84. Moreover, and importantly, when Plaintiff notified Sterling of possible infringement of the Scratch & Solve works by McMeel Publishing, Sterling's reply was that this was not their problem and that Plaintiff should retain counsel in order to pursue his copyright infringement claims. Janay Decl. ¶ 10, Ex. H at DEFS002723-739. This course of dealing undeniably shows that Ward owned far more than the "text only" as Defendants would have you believe.

The numerous publishing agreements between Plaintiff and Defendant Sterling evidences Plaintiff's ownership rights to more than simply the "words and text," as argued by Defendants. Taking the 2004 Agreement as a guide (and the subsequent agreements contain mostly the same language) the relevant excerpts provide:

> MIKE WARD….the author and proprietor of a work tentatively entitled SCRATCH HANGMAN, a series from which six books are to be published initially under the terms of this Agreement…
>
> 2. Copyright. The Publisher shall copyright the Work in the United States in the name of the Author. If the Publisher supplies material for the Work (such as illustrations), the Publisher *may* copyright such material in its own name…

Ederer Declaration Exhibit 11 (emphasis added). Although the 2004 Agreement, which was drafted by Sterling, clearly states that Plaintiff will be the owner of the then forthcoming books later known as the Scratch & Solve series, Defendants feebly attempt to hide this point.. The fact that Sterling *could have* copyrighted illustrations and materials they supplied is irrelevant since they did not do so considering the remainder of the agreement and the parties course of dealing. *See* Ederer Decl. ¶ 13, Ex. 11 at DEFS000223 (Preamble).

Most strikingly is how Sterling argues that there is a limitation in the publishing agreement (Ederer Memo at 22) that Plaintiff was to supply *only* words and text and that his protection extends only to said contributed text and game-words <u>SUF Response</u> ¶ 20.

Concededly, some of the publishing agreements contain descriptions such as:

> Book #1 shall be described as follows: 100 new and original puzzle words to fill 96 pages.

Ederer Decl. ¶ 20, Ex. 18 at DEFS002701 [2013 Agreement, Clause (1)(b)]. However that is in no way a limitation on Ward's ownership rights. The clause is labeled as a description of "Book #1," rather than a limitation on "the Work," the term used in the rest of the contract to refer to each puzzle book. Moreover, neither the term "limitation" nor any terms of like meaning can be found in any of the numerous publishing agreements. At most, this book description is susceptible to multiple interpretations, which of course should be resolved against Sterling, the drafter. *See* <u>Photopaint Technologies, LLC v. Smartlens Corp.</u>, 335 F.3d 152, 161 (2d Cir. 2003). By creating limitations in the publishing agreements where none exist Sterling's lawyers, like their client, appear to be in the business of producing works of fiction.

Had Sterling truly intended to limit Plaintiff's contribution to the Scratch & Solve series to text only or "gameplay words," they could have easily inserted that language into one of the forty (40) publishing agreements over the approximately nine year relationship, but they did not do that. In fact, only after Ward raised the specter of infringement against them did Sterling supply a publishing agreement, which was never executed, which provided the following::

> The Work shall be described as follows: sufficient list of words and phrases to fill 96 pages. *It is understood and agreed that publisher shall provide materials and content for the Work.*

Janay Decl. ¶ 11, Ex. I at DEFS02782-2787. Moreover, to ensure that the limitation is effective and Sterling is not held liable for infringement, Sterling, for the first time, also required the signing of a Release, with the following relevant language:

> **MICHAEL WARD** ("Releasor")...does hereby RELEASE and DISCHARGE, Sterling...from or in connection with...the allegedly unauthorized publication and sale of *SCRATCH HANGMAN* and *SCRATCH & SOLVE HANGMAN* by authors

other than Releasor, including without limitation claims for copyright infringement, trademark or trade dress infringement, unfair competition, damages, and/or attorneys' fees….It is agreed and understood that Sterling has not, and is hereby not, admitting liability for said claims and damages.

Janay Decl. ¶ 12, Ex. J at DEFS002755. Thus, Defendant Sterling was more than capable of inserting an actual limitation – and not a figment of their imagination – into the numerous publishing agreements, but instead their lawyers attempted to create a limitation *post hac* and attempt to mislead the court in doing so. <u>SUF Response</u> ¶ 22.

Defendants grasp at straws in their argument that the manner of the filing of the copyrights for Ward, namely that they were for the "Entire Text" of the Works and that this somehow excludes ownership of anything other than the "text (i.e. game-words)" (*See* Defendants Memorandum of Law at p. 4) is meritless and in direct conflict with the registration protocols elucidated by Congress in 37 U.S.C. § 202.3:

> In cases where a work contains elements of authorship in which copyright is claimed which fall into two or more classes, the application should be submitted in *the class most appropriate* (Emphasis Added) to the type of authorship that predominates in the work as a whole.

37 U.S.C. § 202.3(2)(ii)(C). Based on this statutory language it is clear that Congress did not contemplate any limitation based on the way the copyright registration is filed.  Further, based on the extensive course of dealing and contractual relationship between Plaintiff and Sterling, Defendants' assertion that the Ward registrations exclude copyright ownership as to the visual arts elements of the Works is simply false.  After all, it is undisputed Ward supplied the original template and reviewed and gave his approval of all elements in the Works prior to them being published. <u>SUF</u>  ¶ 14. This at the very least presents a close factual question best reserved for a trier of fact (i.e. whether Ward's copyright ownership extends to the designs and illustrations used in the Scratch & Solve Works). *See* <u>Gaito</u>, 602 F.3d at 63.

As to the copyright protection of the interior and exterior artwork used in the Scratch & Solve works, it is clear here that, as in the New Zealand Book, the minimum requirement for originality is met. *See* <u>Feist</u>, 499 U.S. at 345. Namely, the unique depiction of the hangman and gallows, the specific placement of the silver circles to side side of the gallows, the placement of the answer lines under the silver circles, and the overall look and feel of Plaintiff's Scratch & Solve works are unquestionably protectable elements.[4]

It is almost indisputable that the Infringing Books are not only substantially similar to Plaintiff's Scratch & Solve works, but are very much identical. This point becomes quite clear when examining the two works side by side:

| Plaintiff Ward's Scratch & Solve Interior Illustrations (From *Scratch & Solve Hangman #1*). | Defendants' Infringing Books Interior illustrations (From *Science Hangman*) |
|---|---|
|  | |

*See* Elder Decl. ¶ 16, Ex. 14; Ederer Decl. ¶ 27, Ex. 25, Janay Decl. ¶ 13, Ex. K at WARD000008. Outside of the slight variation in the legs of the hangman, everything else, including the depiction of the hangman and gallows, the overall organization of the page, and the look and feel of both works are identical. Clearly, even if the more stringent "discerning

---

[4] In fact, Judge Crotty has ruled as much in another infringement case filed by Plaintiff against the Scratch & Solve Books. *See* Janay Decl. ¶ 30, Ex. BB at WARD000068

observer" test is used here to determine whether there is substantial similarity, it will be quite difficult to argue that the above two images are not, for all intents and purposes, identical.

## C. IDENTICAL TEXT WAS COPIED BY STERLING FROM WARD'S BOOK

For the sake of argument, if Ward's copyrights did only extend to "text only," it is of no moment or consequence since the identical text of the instructions can be found on page 3 of both Ward's Scratch and Solve Work "Tough Hangman" and those of Defendant Sterling's pseudonym Jack Ketch title "Science Hangman" (one of the Infringing Works) (Janay Decl. Ex. FF, Plaintiff's Rule 56.1(b) counterstatement at p. 42, ¶ 46). The significance of the instructions cannot be understated, the instructions are found very near the front of the book and give the roadmap for the entire gameplay the consumer will experience, further customers are likely to review the instructions when they make the decision of whether or not to purchase the Work. In light of this identical copy of the text of Plaintiff's Work and the fact that Sterling does not deny that Ward has ownership over the Entire Text, perhaps Mike Ward should be the party moving for summary judgment in his favor on the issue of liability for copyright infringement by Sterling..

## II. DEFENDANTS INFRINGED PLAINTIFF'S TRADE DRESS USED IN THE NEW ZEALAND BOOK AND U.S. SCRATCH & SOLVE WORKS.

Generally, "the trade dress of a product 'involves the total image of a product and may include features such as size, shape, color or color combinations, texture or graphics.'" Stormy Clime Ltd. v. ProGroup, Inc., 809 F.2d 971, 974 (2d Cir. 1987) (quoting John H. Harland Co. v. Clarke Checks, Inc., 711 F.2d 966, 980 (11th Cir. 1983)). To plead a claim of trade dress infringement involving the appearance of the product, plaintiffs must allege that the claimed trade dress: (1) is non-functional; (2) has secondary meaning; and, (3) there is a likelihood of

confusion between plaintiff's and defendant's work. *See* <u>Sherwood 48 Assocs. v. Sony Corp of Am.</u>, 76 Fed. App'x 389, 391 (2d Cir. 2003).

Contrary to Defendants' assertion that Plaintiff owns no trade dress rights in the Scratch & Solve Hangman Series, Plaintiff owns not only rights in both the New Zealand Trade works dress but to that of the Scratch & Solve works published by Sterling as well. Firstly, Ward's name is associated by consumers with the Scratch and Solve works as evidenced by the many reviews that state such (*See* Janay Decl. ¶ 15, Ex. M). Second, Ward carried the mantle of owner in his suit against Andrews McMeel Publishing where the very first paragraph in the complaint alleges: "This action arises out of AMP's willful and blatant acts of unfair competition and infringement of Brainteaser's highly successful series of "Scratch & Solve Hangman" books published by Sterling Publishing Co., Inc. [internal quotations omitted] a subsidiary of Barnes & Noble [internal quotations omitted], for which Brainteaser owns several federally registered copyrights and widely recognized trade dress in the books' unique design." (<u>Ward v. Andrews McMeel Pub., LLC</u>, 963 F. Supp. 2d 222, 233-34 (S.D.N.Y. 2013). Sterling was given notice of his intention to file suit and despite being offered a chance to participate they refrained.


Plaintiff's trade dress is unique and distinctive to its New Zealand Book and U.S. Scratch & Solve works. Trade dress "involves the total image of a product." <u>George Basche Co. v. Blue Coral Inc.</u>, 968 F.2d 1532, 1535 (2d Cir. 1992). "Thus, although each element of a trade dress individually might not be inherently distinctive, . . . the combination of elements' may be indicative of source." <u>Landscape Forms, Inc. v. Columbia Cascade Co.</u>, 113 F.3d 373, 381 (2d Cir. 1997) (internal quotations omitted). "The design or packaging of a product may acquire a distinctiveness which serves to identify the product with its manufacture or source; and a design

or package which acquires this secondary meaning, assuming other requisites are met, is a trade dress which may not be used in a manner likely to cause confusion to the origin, sponsorship, or approval of the goods." TrafFix Devices, Inc. v. Marketing Displays, Inc., 532 U.S. 23, 28 (2001). Plaintiff's New Zealand book bares many unique characteristics in its presentation that have made it an extremely successful product: its small size; a series of silver scratch and solve letters as the answers, akin to an instant lottery ticket; the overall arrangement of the interior pages with the answer letters above the numbered blank answer lines and the hangman and gallows image to the side of the silver circles; the overall presentation of the work as a puzzle book and a challenge; the presentation of the book as an educational source; and, the monotonous coloring of the interior (generally black, white, and silver). This unique and distinctive trade dress is extended in the Scratch & Solve works, and made to conform to the U.S. market, to include: toilet seat shaped books of small sizes (or books similarly sized to the New Zealand Books); a similarly styled interior that uses similarly monotonous coloring; a similarly organized interior with the hangman and gallows placed to the side of the lettering and silver circles; a more modern looking hangman and gallows, with the addition of a noose around the hangman's head, but the dimensions of the gallows similar to the New Zealand original version; an image of a hangman on the front cover, similar to the New Zealand Book, to draw the attention of purchasers; and, the presentation of the Scratch & Solve series works as an educational source and a challenge. These unique characteristics are distinctive to Ward's works because they create a unique image of a product that is simple due to its easy instructions and simple interior layout, child and adult friendly as there are difficulty levels for all ages, educational as it challenges users based on different educational topics, and in addition, addictive as a result of the unique idea of using scratch circles and being able to play with one player.

Moreover, Plaintiff's unique and distinctive trade dress is non-functional. "[A] product's feature is function if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." Inwood Labs., Inc. v. Ives Labs., Inc., 456 U.S. 844, 851 (1982). "[I]n cases involving an aesthetic feature, the dress is also functional if the right to use it exclusively 'would put competitors at a significant non-reputation-related disadvantage.'" Yurman Design, 262 F.3d at 116 (quoting TrafFix Devices, 532 U.S. at 32). Here, the unique trade dress elements of Ward's works, as described above, are neither essential for the purpose of puzzle books nor affect their cost or quality. In essence, there are various ways to present similar game ideas, including using colorful interior designs and presenting them as something other than an educational challenge, which would not put competitors at a disadvantage. Even the use of the scratch-circles – which has an aesthetic value akin to an instant lottery game – although arguably functional, could be replaced with empty spaces or invisible ink. Thus, it seems clear here that Plaintiff's unique trade dress elements are non-functional, thus protectable.

In Metrokane, Inc., when addressing the functionality of a rabbit shaped cork screw, the court reasoned as follows:

> The Rabbit corkscrew fits this narrow exception. Plaintiff describes its overall look aesthetically, stating that [t]he rounded head and the lever, when viewed from the side, resemble the head and ears of a rabbit. Physically, the head of plaintiff's corkscrew is rounded and shaped like a rabbit's, the bolt on which the lever extending from the head pivots is set in the head to appear as a rabbit's eyes, and the lever extending from the head is shaped to appear as retracted rabbit's ears. In sum, plaintiff's corkscrew was designed to, and indeed does, resemble a rabbit. These features clearly are more "arbitrary, incidental [and] *ornamental*" than merely functional.

Metrokane, Inc. v. The Wine Enthusiast, 160 F.Supp.2d 633, 638 (S.D.N.Y. 2001) (internal quotations omitted). Here, as in Metrokane, Inc., the elements of Plaintiff's trade dress, including the unique presentation of Plaintiff's works as scratch-off, educational, challenging, and simple

puzzle books are very much aesthetic elements. Their appeal to the general public "clearly are more 'arbitrary, incidental [and] ornamental' than merely functional. Id.

Plaintiff's highly successful puzzle books have, over the years, developed a secondary meaning that points to Plaintiff Ward as the source of the works. "To establish secondary meaning, a manufacturer must show that, in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself." Inwood Labs., 456 U.S. at 851. Here, based on the numerous customer reviews, it is clear that customers identified the one player scratch hangman game with Ward's unique design elements as Ward's works.[5]

Due to the Infringing Works being substantially similar or even identical to Ward's works, the likelihood of confusion is great. The Second Circuit applies the eight [Polaroid] factors to determine the likelihood of confusion in trade dress claims, namely:

> (1) the strength of the plaintiff's trade dress; (2) similarity of the trade dresses; (3) proximity of the products in the marketplace; (4) likelihood that the plaintiff will bridge the gap between the products (enter a market related to that in which defendant sells its product); (5) evidence of actual confusion; (6) the defendant's bad faith; (7) quality of the defendant's product; and (8) sophistication of the relevant consumer group."

Natural Organics, Inc. v. Nutraceutical Corp., 426 F.3d 576, 578 (2d Cir. 2005) (internal quotations omitted). Here, Plaintiff has developed a unique and highly distinctive trade dress that has led to successful sales in both New Zealand and the United States. The similarities between Plaintiff's and Defendants' trade dress, especially when compared to Plaintiff's U.S. Scratch & Solve works, are indisputable:

---

[5] Consumers have specifically identified the source of the Scratch & Solve Series as Mike Ward. *See* Janay Decl. ¶ 15, Ex. M at WARD000012 ("In his clever Scratch & Solve Hangman, Mike Ward offers a neat twist on an old favorite.").
5

| Interior and Exterior Images of Plaintiff's *Scratch & Solve Hangman #1* Puzzle Book. | Interior and Exterior Images of Defendants' *Hollywood Hangman* Puzzle Book. |
|---|---|
|  | |

Ederer Decl. ¶ 16, Ex. 14; Ederer Decl. ¶ Ex. 24**.** Both products were made to be sold in the same

market, and generally, would even be found in the same section in book stores and in the same

categories on the web. Moreover, the consumer for this product, in this case overwhelming

children and parents, will likely overlook the author's name on these works and identify the

product's source based on its overall look and feel.[6] Lastly, defendants whole scheme of first

using the New Zealand Book to create the Scratch & Solve series, and then making an identical

copy of the highly successful Scratch & Solve series authored by Plaintiff, overwhelmingly

smacks of bad faith. Thus, it seems obvious here that defendants intentionally and knowingly

copied the successful trade dress of Plaintiff's New Zealand and Scratch & Solve works in an

attempt to pass it off as their own. Clearly, the combination of stylistic elements of Ward's

works, adopted almost entirely by the Infringing Books, are indicative of Plaintiff Ward as the

source. *See* Landscape Forms, Inc. v. Columbian Cascado Co., 113 F.3d 373, 381 (2d Cir. 1997).

## III.    DEFENDANTS' ACTIONS AMOUNT TO UNFAIR COMPETITION AND UNJUST ENRICHMENT.

Defendants' have unfairly competed with Plaintiff's works by passing off their books as

Plaintiff's and, as a result, were unjustly enriched. "An unfair competition claim involving

---

[6] *See* Janay Decl. 15, Ex. M at WARD000012 ("In his clever Scratch & Solve Hangman, Mike Ward offers a neat twist on an old favorite").

misappropriation usually concerns the taking and use of the plaintiff's property to compete against the plaintiff's own use of the same property." <u>Roy Export Co. Establishment of Vaduz, Liechtenstein v. Columbia Broadcasting Sys., Inc.</u>, 672 F.2d 1095, 1105 (2d Cir. 1982). Likewise, "The Second Circuit has held that the Copyright Act preempts a state law claim for unjust enrichment unless the claim has some 'extra element' that renders it qualitatively different from a copyright infringement claim." <u>Atrium Group De Ediciones Y Publicaciones, S.L. v. Harry N. Abrams, Inc.</u>, 565 F.Supp.2d 505 (S.D.N.Y. 2008). Under New York common law, a claim for unfair competition requires a showing of "(1) either factual confusion or a likelihood of confusion; and (2) bad faith on the part of the defendant." <u>SLY Magazine LLC v. Weider Publ'ns LLC</u>, 529 F. Supp. 2d 425, 443 (S.D.N.Y. 2007). Here, defendants willfully, in bad faith and in conscious disregard for Plaintiff's ownership rights in the New Zealand Books and Scratch and Solve Works, produced the Infringing Books that are substantially similar and even identical to Plaintiff's works, without Plaintiff's consent. Moreover, Defendants attempted to use almost identical trade dress in the Infringing Books to pass the books as if they were Plaintiff's.

As such, and contrary to Defendants' preemption argument, Plaintiff has a valid and actionable claim under common law for unfair competition. <i>See</i> <u>Colour & Design v. U.S. Vinyl Mfg. Corp.</u>, No. 04 Civ. 8332, 2005 WL 1337864, *6 (S.D.N.Y. June 3, 2005) ("claims that allege the tort of 'passing off' one's goods as those of another or creating confusion as to the source of goods are not preempted because they do not entail the assertion of rights equivalent to those protected by the federal copyright law."). Moreover, and for the same reasons, Plaintiff has an actionable claim for unjust enrichment.

## IV. FOR ALL INTENTS AND PURPOSES, THE 2004 AGREEMENT ENTERED INTO BY PLAINTIFF AND STERLING IS A LICENSING AGREEMENT.

Lastly, contrary to defendants' long and winded argument that there was no licensing agreement, the 2004 Agreement is structured very much like a licensing agreement. A typical licensing agreement is described as follows:

> The license is basically an agreement granting a right to use the program upon the terms and conditions found in the license, and as supplemented by the areas of substantive intellectual property law governing the program, such as copyright law. The typical license is a negotiated, arms-length agreement between commercial entities. Through the licensing arrangement title to the intellectual property rights embodied in the program, and usually the particular copy of the program, remain with the licensor. The licensor, through the license, usually retains the right to control the use of the program....The license may be perpetual or for a fixed term.

38 A.L.R.5th 1 (Originally published in 1996). The 2004 Agreement does just that, it grants Defendant Sterling the license to publish Plaintiff's Scratch & Solve Hangman series for an extended period of time, with Plaintiff retaining title to his intellectual property. Thus, contrary to Defendants' claims, there was, for all intents and purposes a licensing-type agreement.

## V. CONCLUSION

In sum, Defendants have failed to demonstrate—much less establish—that under this Circuit's prevailing law, there is no genuine issue of material fact with regards to Plaintiff's claim for copyright infringement, trade dress infringement, unfair competition, and unjust enrichment. As Plaintiff has alleged and a comparison of the works at issue shows, a reasonable juror could certainly find that Defendants unlawfully misappropriated the protectable creativity in Plaintiff's series of books and award judgment to Plaintiff. Defendants' motion for summary judgment should be denied accordingly.

Dated: June 23, 2014
New York, New York

By:       /Barry E. Janay /

Barry E. Janay, Esq. (BJ9311)
90 Broad St., 25th Flr.
New York, New York, 10022
Phone 917-756-8501
Fax 855-374-2884
bjanay@lobej.com
*Attorneys for Plaintiff(s)*