UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                                                  :
MICHAEL WARD d/b/a BRAINTEASER                                    :
PUBLICATIONS,                                                     :
                                                                  :
                                         Plaintiff,              :
                                                                  :
                -v-                                               :
                                                                  :
BARNES & NOBLE, INC., et al.,                                    :
                                                                  :
                                         Defendants.             :
                                                                  :
------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  02/23/2015____

13-CV-7851 (JMF)

OPINION AND ORDER

JESSE M. FURMAN, United States District Judge:

      Plaintiff Michael Ward, doing business as Brainteaser Publications ("Plaintiff"), brings

this action against Barnes & Noble, Inc., Sterling Publishing Co., Inc. ("Sterling"), Francis

Heaney, and Patrick Blindauer (collectively, "Defendants"), alleging copyright infringement in

violation of Title 17, United States Code, Sections 101 *et seq.*; trade dress infringement in

violation of the Lanham Act, Title 15, United States Code, Section 1125(a); and common law

claims of unfair competition and unjust enrichment. The parties' dispute concerns their

respective versions of a well-known game that allegedly dates back to the reign of Queen

Victoria — namely, Hangman. Defendants now move for summary judgment. For the reasons

stated below, Defendants' motion is GRANTED in part and DENIED in part.

## BACKGROUND

      Barnes & Noble, Inc. is the largest book retailer in the United States. (Defs.' Statement

Undisputed Material Facts Pursuant Local Civ. R. 56.1 (Docket No. 22) ("Defs.' Rule 56.1

Statement") ¶ 1). Sterling, acquired by Barnes & Noble in 2003, is a publishing company with

over 5,000 book titles in print in various categories, including puzzles and games.

(Counterstatement Material Facts Pursuant Local R. 56.1(b) Opp'n Defs.' Mot. Summ. J. (Docket No. 33) ("Pl.'s Rule 56.1 Counterstatement") ¶ 2).  Francis Heaney and Patrick Blindauer, both Sterling employees, authored books published by Sterling as part of a "Scratch and Solve" series incorporating elements of the traditional Hangman game: Heaney authored "Trivia Hangman," published in 2010, and Blindauer authored "Hollywood Hangman," published in 2011.  (Defs.' Rule 56.1 Statement ¶¶ 3, 4; Decl. Louis S. Ederer Supp. Defs.' Mot. Summ. J. (Docket No. 21) ("Ederer Decl."), Exs. 21, 23).

Plaintiff, doing business as Brainteaser Publications, is a citizen of New Zealand.  (Defs.' Rule 56.1 Statement ¶ 5).  In 1994, Plaintiff filed a provisional patent application in New Zealand's patent office, seeking protection for an invention he titled "Scratch Hangman."  (*Id.* ¶ 6).  "Scratch Hangman," Plaintiff asserted in his provisional patent application, was a "novel system," involving a variant on the game Hangman, that would ultimately "produce[] a book entitled 'Scratch Hangman.'" (Ederer Decl., Ex. 2, at 3).  In the traditional version of Hangman — which, according to Plaintiff, originated during Queen Victoria's reign (*Id.*., Ex. 4 (Depo. Michael Ward ("Ward Depo.")) 74:17-20) — one player thinks of a word or phrase for a second player to guess, and draws out dashes corresponding to each letter in the phrase.  The second player proceeds to call out letters that he or she suspects are in the word or phrase; if the player guesses correctly, the first player fills in the corresponding letters, but if the player guesses a letter that does not appear in the phrase, the first player fills in one body part of a stick figure hanging from a gallows drawn to the side.  The goal of the game is for the second player to complete the phrase before the first player draws the entire stick figure and "hangs" the man. (*See generally id.*, Ex. 34).

The game described and diagrammed in Plaintiff's provisional patent application proceeds from the same idea, but is made for one player instead of two.  That is, instead of calling out letters for another player to fill in, the player scratches off circles corresponding to each letter of the alphabet, which reveal either a number indicating where in the phrase a letter is located, or a cross indicating that the player guessed incorrectly (and must fill in a body part of a dotted "hangman" to the side).  (Defs.' Rule 56.1 Statement ¶ 6; Ederer Decl., Ex. 2; Ward Depo. 74:14-23).  Plaintiff was issued a provisional patent, which lasted for twelve months.  (Ward Depo. 81:20-23, 86:4-17).  Upon the advice of an attorney, however, Plaintiff decided not to further pursue the patent application, and hence was never issued a full patent.  (Defs.' Rule 56.1 Statement ¶ 7; Ward Depo. 86:18-87:7).  Shortly thereafter, Plaintiff published a "Scratch Hangman" series with New Zealand distributor Gordon and Gotch; the series sold well throughout New Zealand, particularly in supermarket chains, and within four years became a "mass market publication."  (Decl. Barry Janay Opp'n Defs.' Mot. Summ. J. (Docket No. 32) ("Janay Decl."), Ex. A).  In 2000, Plaintiff published a book in New Zealand titled "Scratch Hangman Puzzle Book" (the "New Zealand Book"), with game boards resembling the diagram presented in Plaintiff's provisional patent application.  (Defs.' Rule 56.1 Statement ¶¶ 6, 8-9; Ederer Decl., Ex. 3).

In the summer of 2004, Plaintiff contacted Sterling about bringing the "Scratch Hangman" series to the United States.  (Defs.' Rule 56.1 Statement ¶ 13; Ederer Decl., Ex. 9 at 1-2, 6).  In an e-mail to a staff member at Sterling, Plaintiff represented that he held "the world rights to this style of publication through patent & copyright protection" and indicated that he was willing to "either sell the publishing rights, or to arrange for the publishing of this title to be carried out under license in the U.S."  (Ederer Decl., Ex. 9 at 2).  On October 14, 2004, Plaintiff

and Sterling entered into their first publishing agreement (the "2004 Agreement").  (Defs.' Rule

56.1 Statement ¶ 19; Ederer Decl., Ex. 11).  The 2004 Agreement provided that Sterling would

publish a series of six "Scratch Hangman" books, with the option of publishing two more every

six months.  (Ederer Decl., Ex. 11 at 1).  It further specified that Sterling "shall copyright the

Work in the United States in the name of [Ward]," but indicated that if Sterling "supplies

material for the Work (such as illustrations)," Sterling "may copyright such material in its own

name or in the name of its owner." (*Id.*).  The 2004 Agreement also contained a merger clause,

providing that it "contains the entire understanding between the parties, supersedes all previous

oral or written representations or agreements with respect to the Work, and may not be changed,

modified, or discharged orally."  (*Id.* at 5; Defs.' Rule 56.1 Statement ¶ 23).

On February 16, 2005, Sterling sent Plaintiff preliminary versions of the first four books

in what was now named the "Scratch and Solve" series, including the instructions and game

board.  (Defs.' Rule 56.1 Statement ¶ 24; Ederer Decl. Ex. 12).  When Plaintiff responded, he

noted that "the whole concept of the game has been changed; now players only have 5 chances

before being hung, instead of the original 10."  (Defs.' Rule 56.1 Statement ¶ 25; Ederer Decl.,

Ex. 13 at 3).  After some additional back-and-forth (Ederer Decl. Ex. 13), Sterling published

*Scratch & Solve Hangman #1* on September 1, 2005.  (Defs.' Rule 56.1 Statement ¶ 26; Ederer

Decl. Ex. 14).  In the years thereafter, Plaintiff and Sterling entered into several extensions of the

2004 Agreement, all providing for the publication of additional books in the "Scratch and Solve"

series.  (Defs.' Rule 56.1 Statement ¶ 28; Ederer Decl. Ex. 16).  In 2012 and 2013, Plaintiff and

Sterling entered into two new publishing agreements (the "2012 Agreement" and the "2013

Agreement"), each covering two new books to be published by Sterling.  (Defs.' Rule 56.1

Statement ¶¶ 30, 33; Ederer Decl., Exs. 17-18).  Both agreements described the forthcoming

books as either a specified number of "new and original puzzle words to fill 96 pages" (Ederer Decl., Ex. 17 at 1, ¶ 1(b); Pl.'s Rule 56.1 Counterstatement ¶ 31) or "sufficient list of words and phrases to fill 96 pages" (Ederer Decl., Ex. 18 at 1, ¶ 1(b); Pl.'s Rule 56.1 Counterstatement ¶ 34).  During that time, Sterling obtained copyright registrations in Plaintiff's name for the books covered by the various Publishing Agreements and extensions.

Before entering into the 2012 Agreement, Plaintiff learned that Andrew McMeel Publishing ("AMP") had released a series of books titled "Pocket Posh Hangman."  (Janay Decl., Ex. R; *see* Ederer Decl., Ex. 17).  In an e-mail to Sterling on September 13, 2011, Plaintiff alleged that twenty percent of the solutions in AMP's series had previously appeared in the "Scratch and Solve" series.  (Janay Decl., Ex. R at 2).  On October 26, 2012, Plaintiff — but not Sterling — filed a lawsuit against AMP, alleging copyright infringement, trade dress infringement, and unfair competition, which was assigned to the Honorable Paul A. Crotty, a United States District Judge in this District.  *See Ward v. Andrews McMeel Publ'g, LLC*, No. 12-CV-7987 (S.D.N.Y.).  AMP filed a motion to dismiss Plaintiff's claims on February 2, 2013 (*see* Janay Decl., Ex. BB at 1), which Judge Crotty granted as to Plaintiff's trade dress infringement claim, but denied as to Plaintiff's remaining claims.  *See Ward v. Andrews McMeel Publ'g, LLC*, 963 F. Supp. 2d 222 (S.D.N.Y. 2013).  Shortly thereafter, Plaintiff and AMP settled and the case was dismissed.  (*See* Janay Decl., Ex. P at 2; 12-CV-7987 Docket No. 35).

In late 2011 and early 2012, Plaintiff learned that Sterling had published additional books in the "Scratch and Solve" series that did not identify him as an author: one, titled *Trivia Hangman*, was authored by Heaney and published in October 2010; the other, titled *Hollywood Hangman*, was authored by Blindauer and published in November 2011.  (Defs.' Rule 56.1 Statement ¶¶ 37, 39, 42, 44; Janay Decl., Ex. Q).  Additionally, in February 2013, Sterling

published three more books in the "Scratch and Solve" series under the pseudonym "Jack Ketch": *Science Hangman*, *Geography Hangman*, and *Spelling Bee Hangman*. (Defs.' Rule 56.1 Statement ¶ 46; Ederer Decl., Exs. 25-27). In April 2013, Plaintiff notified Sterling that he believed those books (collectively, the "Challenged Books") infringed his copyrights (Janay Decl., Ex. N at 3), but he indicated that he nevertheless wished to continue his business relationship with Sterling. (*Id.*, Ex. O at 1). Sterling then sent Plaintiff new publishing agreements, intended to cover the publication of two new "Scratch and Solve" books — *Scratch and Solve Prime Time Hangman* and *Scratch and Solve Underwater Hangman*. (*Id.*, Ex. P at 3; *id.*, Ex. I). Plaintiff refused to sign the publishing agreements because they contained provisions that Plaintiff deemed "unacceptable," including a release form accompanying the agreements that would have barred Plaintiff from bringing suit against Sterling for copyright infringement or related claims. (*Id.*, Ex. P at 2; *id.*, Ex. I at 1). On November 3, 2013, Plaintiff filed this lawsuit, claiming that he had "c[o]me up with the concept and created the unique style of the 'Scratch-Hangman series of books'" (Compl. ¶ 12) and that the publication of additional "Scratch and Solve" books under different authors' names infringed Plaintiff's copyrights and trade dress. (*Id.* ¶¶ 23-40). As noted, Plaintiff also alleges claims of unfair competition and unjust enrichment. (Compl. ¶¶ 41-53).

## THE SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where the admissible evidence and the pleadings demonstrate "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (per curiam). A dispute over an issue of material fact qualifies as genuine if the "evidence is such that a reasonable jury could return a judgment for the nonmoving party." *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *accord Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim."  *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (citing *Celotex*, 477 U.S. at 322-23); *accord PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002).

In ruling on a motion for summary judgment, all evidence must be viewed "in the light most favorable to the non-moving party," *Overton v. N.Y. State Div. of Military & Naval Affairs*, 373 F.3d 83, 89 (2d Cir. 2004), and the court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought," *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004). To defeat a motion for summary judgment, the non-moving party must advance more than a "scintilla of evidence," *Anderson*, 477 U.S. at 252, and demonstrate more than "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The non-moving party "cannot defeat the motion by relying on the allegations in [its] pleading or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible."  *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (citation omitted).  Affidavits submitted in support of, or opposition to, summary judgment must be based on personal knowledge, must "set forth such facts as would be admissible in evidence," and must show "that the affiant is competent to testify to the matters stated therein." *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004) (quoting Fed. R. Civ. P. 56(e)).

**DISCUSSION**

As noted, Plaintiff brings claims for copyright infringement, trade dress infringement, unfair competition and unjust enrichment.  The Court addresses each claim in turn.

**A.  Copyright Infringement Claims**

The Copyright Act gives the owner of a copyright certain "exclusive rights," 17 U.S.C. § 106, to protect "original works of authorship," 17 U.S.C. § 102(a).  Significantly, however, not all elements of a work are eligible for copyright protection.  For example, a copyright "does not protect an idea, but only the *expression* of an idea."  *Kregos v. Associated Press*, 3 F.3d 656, 663 (2d Cir. 1993); *see also* 17 U.S.C. § 102(b) ("In no case does copyright protection for an original work of authorship extend to any idea[,] . . . concept, [or] principle, . . . regardless of the form in which it is described, explained, illustrated, or embodied in such work."); *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 547 (1985) ("[N]o author may copyright . . . ideas.").  Additionally, under the *scènes à faire* doctrine, protection does not extend to "sequences of events that necessarily result from the choice of a setting or situation," *Williams v. Crichton*, 84 F.3d 581, 587 (2d Cir. 1996) (internal quotation marks omitted), or "elements of an image that flow naturally and necessarily from the choice of a given concept," *Bill Diodato Photography, LLC v. Kate Spade, LLC*, 388 F. Supp. 2d 382, 392 (S.D.N.Y. 2005).  Unprotected elements of a copyrighted work are "free for the taking and cannot be appropriated by a single author."  *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 710 (2d Cir. 1992).  Finally, in order to qualify for copyright protection, a work must "possess[] at least some minimal degree of creativity," although the "vast majority of works make the grade quite easily, as they possess some creative spark, no matter how crude, humble, or obvious it might be."

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345 (1991) (internal quotation marks omitted).

Mindful of the foregoing, to prevail on a claim of copyright infringement, a plaintiff must establish that "(1) the defendant has actually copied the plaintiff's work; and (2) the copying is illegal because a substantial similarity exists between the defendant's work and the *protectible* elements of plaintiff's." *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 63 (2d Cir. 2010) (emphasis added) (internal quotation marks omitted). "Because direct evidence of copying is seldom available, a plaintiff may establish copying circumstantially by demonstrating that the person who composed the defendant's work had access to the copyrighted material . . . and that there are similarities between the two works that are probative of copying." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 51 (2d Cir. 2003) (internal citations and quotation marks omitted). With respect to the second requirement, the Second Circuit has made clear that "[t]he standard test for substantial similarity between two items is whether an ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard the aesthetic appeal as the same." *Peter F. Gaito Architecture*, 602 F.3d at 66 (internal quotation marks omitted).

"On occasion," however, the Court of Appeals has "noted that when faced with works that have both protectible and unprotectible elements," the analysis "must be more discerning," and that a court "must attempt to extract the unprotectible elements from . . . consideration and ask whether the protectible elements, standing alone, are substantially similar." *Id.* (internal quotation marks and citations omitted); *accord DiTocco v. Riordan*, 496 F. App'x 126, 128 (2d Cir. 2012) (summary order); *see also, e.g.*, *Key Publ'ns, Inc. v. Chinatown Today Publ'g Enters., Inc.*, 945 F.2d 509, 514 (2d Cir. 1991) ("What must be shown is substantial similarity between

9

those elements, and only those elements, that provide copyrightability to the allegedly infringed [work].").  Under either test, however, a court must not "dissect the works into their separate components, and compare only those elements which are in themselves copyrightable." *Peter F. Gaito Architecture*, 602 F.3d at 66 (internal quotation marks omitted).  Instead, it must "compar[e] the contested design's total concept and overall feel with that of the allegedly infringed work as instructed by [its] good eyes and common sense." *Id.* (internal quotation marks and citations omitted).

### 1.  Plaintiff's Claim That Defendants Infringed His New Zealand Copyright

With the above standards in mind, the Court turns first to Plaintiff's claim that Defendants infringed his copyright in the New Zealand Book.  (Pl.'s Mem. Law Opp'n Defs.' Mot. Summ. J. (Docket No. 34) ("Pl.'s Mem.") 4-9).  The parties dispute whether Plaintiff even has a valid New Zealand copyright (*compare* Defs.' Mem. Law Supp. Mot. Summ. J. (Docket No. 20) ("Defs.' Mem.") 9, *with* Pl.'s Mem. 6), but the Court need not address that question because, even if he does, his claim fails as a matter of law because he cannot show that "a substantial similarity exists between the defendant's work and the protectible elements of plaintiff's." *Peter F. Gaito Architecture*, 602 F.3d at 63 (internal quotation marks omitted). First, many elements of Plaintiff's New Zealand Book artwork that he contends Defendants infringed are simply not copyrightable.  Apart from the hangman and gallows, Plaintiff's game board design consists entirely of a series of silver scratch-off circles, sorted alphabetically, with dashed lines representing the answer letters below.  (*See* Pl.'s Mem. 7).  As Judge Crotty held in the previous case brought by Plaintiff (against AMP), those elements are not entitled to copyright protection.  *See Ward*, 963 F. Supp. 2d at 232.  The silver circles themselves are not protectable, as a "plaintiff has no right to copyright . . . a common geometrical shape." *William S. Geiger*

*Corp. v. Gigi Accessories, Inc.*, No. 97-CV-5034 (JSM), 1997 WL 458668, at *2 (S.D.N.Y. Aug. 11, 1997).  Nor can one copyright "variations of typographic ornamentation, lettering, or coloring."  37 C.F.R. § 202.1(a).  And as for the alphabetical arrangement of the scratch-off circles, simply arranging items alphabetically "is devoid of even the slightest trace of creativity."  *Feist Publ'ns*, 499 U.S. at 362.

The artwork for Plaintiff's hangman and gallows, meanwhile, arguably flows directly from the unprotectable idea with which the figures are virtually synonymous: a game that, Plaintiff himself asserts, has existed since "Queen Victoria's reign."  (Ward Depo. at 74:17-20).  "The rendering of such an idea is not in itself protectable; only the particularized expression of that idea, for example, the particular form created by the decision to accentuate certain [parts of a figure], can be protected."  *Mattel, Inc. v. Azrak-Hamway Int'l, Inc.*, 724 F.2d 357, 360 (2d Cir. 1983).  Here, even the most cursory inspection of the hangman and gallows figure in Plaintiff's New Zealand Book reveals no such "particularized expression."  Indeed, Plaintiff's chosen depiction — with exclusively straight lines and a basic stick figure with no distinctive characteristics — is virtually indistinguishable from how the same shapes are typically represented in Hangman games.  (*See, e.g.*, Ederer Decl., Exs. 34-35).  It follows that Plaintiff's hangman and gallows are unprotectable, as either an unparticularized "rendering of . . . [the] idea" of Hangman, *Mattel, Inc.*, 724 F.2d at 360, or as a *scène à faire*, a figure that is "as a practical matter indispensable, or at least standard" in representations of the age-old game, *Hudson v. Universal Studios, Inc.*, No. 04-CV-6997 (GEL), 2008 WL 4701488, at *3 (S.D.N.Y. Oct. 23, 2008), *aff'd*, 369 F. App'x 291 (2d Cir. 2010).

In any event, even if Plaintiff's representation of the hangman and gallows were a sufficiently particularized expression of the underlying concept — and possessed "the minimal

degree of creativity" required to confer copyright protection, *Feist*, 499 U.S. at 345 — his claim would fail, as there is no substantial similarity between the hangman and gallows depicted in the New Zealand Book and that used in Defendants' Challenged Books.  Plaintiff's hangman is comprised entirely of straight lines (except for the circular head), whereas the hangman in Defendants' books is made entirely out of curved lines.  Plaintiff's gallows consists of the same black dotted lines used for the hangman, whereas the gallows in Defendants' books is made of solid lines in two shades, black and gray.  The noose in Plaintiff's illustration consists of a straight dotted line connecting the hangman's head to the top of the gallows, whereas the noose in Defendants' books is a curved (and solid) line that encircles the hangman's head.  (*Compare, e.g.*, Ederer Decl., Ex. 25 at 4, *with id.*, Ex. 3 at 2).  Accordingly, even if Plaintiff's hangman and gallows were protectable, "no reasonable jury, properly instructed, could find" substantial similarity between the protectable elements.  *Peter F. Gaito Architecture*, 602 F.3d at 63 (internal quotation marks omitted).

Finally, in evaluating substantial similarity, the Court is mindful that it must not "lose sight of the forest for the trees" by "factoring out similarities based on non-copyrightable elements."  *Softel, Inc. v. Dragon Med. & Scientific Commc'ns, Inc.*, 118 F.3d 955, 964 n.8 (2d Cir. 1997).  In addition to evaluating substantial similarities in protectable elements of a plaintiff's work, the Court must also "compar[e] the contested design's total concept and overall feel with that of the allegedly infringed work," *Tufenkian Imp./Exp. Ventures, Inc. v. Einstein Moomjy, Inc.*, 338 F.3d 127, 133 (2d Cir. 2003) (internal quotation marks omitted), and ask whether Defendants have infringed "the original way in which the author has selected, coordinated, and arranged the elements of his or her work," *Knitwaves, Inc. v. Lollytogs Ltd. (Inc.)*, 71 F.3d 996, 1004 (2d Cir. 1995) (internal quotation marks omitted).  The Court finds no

such infringement.  As Defendants correctly note, there are marked differences between the New Zealand Book's overall arrangement and those of the Challenged Books: The New Zealand book includes two puzzles per page, whereas the Challenged Books only have one; and the New Zealand Book's scratch-off circles are arranged in a tight grid, whereas the Challenged Books use a loose, non-rectangular arrangement.  (*See* Defs.' Mem. 18-19).  At most, the two works "employ similar elements . . . placed in a similar spatial arrangement," but "the accumulation of [the] differences" between the two works "gives [Defendants'] design a substantially different total concept and overall feel."  *Klauber Bros. v. Bon-Ton Stores, Inc.*, 557 F. App'x 77, 80 (2d Cir. 2014) (summary order) (internal quotation marks omitted).  Accordingly, Defendants are entitled to summary judgment on Plaintiff's claim of copyright infringement based on his New Zealand Book.

### 2.  Plaintiff's Claim That Defendants Infringed His U.S. Copyrights

The Court turns next to Plaintiff's claim that Defendants infringed the U.S. copyrights Sterling registered in his name.  (Pl.'s Mem. 9-15; Ederer Decl., Ex. 20).  As a threshold matter, Defendants argue that the Court should not even consider the claim because, in his deposition, Plaintiff testified that his cause of action for copyright infringement was based only on the copyright in his New Zealand book, not on any registered U.S. copyrights.  (Ward Depo. at 11:17-25; 16:25-17:20).  Defendants argue that Plaintiff should not be permitted to revive the claim in opposing summary judgment, lest the "process become[] a sham."  (Defs.' Reply Mem. Law Further Supp. Mot. Summ. J. (Docket No. 35) ("Defs.' Reply Mem.") 3).  In making that argument, Defendants rely heavily on *Carter v. Ford Motor Co.*, 561 F.3d 562 (6th Cir. 2009), in which the Sixth Circuit upheld a lower court's refusal to entertain a claim that the plaintiff had disavowed during her deposition and then revived in opposing a summary judgment motion,

despite the fact that the plaintiff's complaint could be construed to encompass such a claim.  The Court found that the defendant "had no notice" that the plaintiff would be pursuing such a claim after her deposition testimony and "it would be unfair to allow [her] to pursue a claim that she expressly disavowed and which did not otherwise come to light during the discovery period." *Id.* at 569.

As the *Carter* court made clear, however, "the question [is] whether [a defendant] had adequate notice of the charges it was defending," an inquiry that "necessarily proceeds on a case-by-case basis."  *Id.* at 568.  Here, Defendants themselves admit that before Plaintiff's deposition on March 20, 2014 — more than three months after the Court approved the parties' case management plan setting the scope of discovery and related deadlines (Docket No. 11) — "Defendants had assumed . . . that Plaintiff was asserting an ownership interest in artwork Sterling had created for the Hangman gameboard appearing in Sterling's Scratch & Solve Hangman series" (Defs.' Mem. 2).  Thus, Defendants had several months before taking Plaintiff's deposition to pursue discovery and assemble a theory of the case based around Plaintiff's alleged ownership of "Scratch and Solve" artwork and related copyrights.  Moreover, they identify no prejudice (in the form of discovery that they would have taken but for Plaintiff's deposition, for example) that would flow from allowing Plaintiff's claim to proceed.  Given that, and the absence of Second Circuit precedent on point, the Court will not disregard Plaintiff's claim based solely on his testimony at the deposition.

Turning to the merits, Plaintiff first claims that, because he "supplied the original template and reviewed and gave his approval of all elements in the ['Scratch and Solve' books] prior to them being published" (Pl.'s Mem. 13), the copyrights Sterling registered on his behalf extend to the "Scratch and Solve" interior game boards and artwork.  (*Id.* at 10-14).  That

argument, however, is belied by the language of the copyright registrations themselves.  All of the copyright registrations submitted in this case that include an "authorship" section list only "text" or "entire text" as the extent of Plaintiff's authorship of the Scratch and Solve books in question (Ederer Decl., Ex. 20); because "[i]n general, the nature of authorship defines the scope of the registration," that section "represents an important copyright fact." *Axelrod & Cherveny Architects, P.C. v. Winmar Homes*, No. 05-CV-711 (ENV) (ETB), 2007 WL 708798, at \*5 (E.D.N.Y. Mar. 6, 2007) (internal quotation marks omitted).  Indeed, the Copyright Office's own procedures make it clear that "[a]s a general rule," with an exception for cases where an author is excluding unclaimable material from the claim, such as work already in the public domain, "a claim to copyright is defined by the information provided in the Author Created field . . . or in the Nature of Authorship space" in a copyright application — information that "appear[s] . . . in the online public record in the field marked Authorship." *Compendium of U.S. Copyright Office Practices* §§ 618.1, 618.2, 618.3 (3d ed. 2014), *available at* http://copyright.gov/comp3/.  What is more, Plaintiff himself admits in his original (albeit improperly filed) Local Rule 56.1 Counterstatement that his U.S. copyright extends, at most, only to "text or words."  (Pl.'s Statement Undisputed Material Facts Pursuant Local Civ. R. 56.1 (Docket No. 28) ¶ 33).  *See, e.g.*, *Brown v. N.Y.C. Dep't of Educ.*, 755 F.3d 154, 158 (2d Cir. 2014) (noting that parties are bound by their concessions in Rule 56.1 statements and citing cases).

    In the alternative, Plaintiff appears to argue that he is entitled to copyright protection for the "Scratch and Solve" artwork because Sterling had published the "Scratch and Solve" series under license from Plaintiff, rendering the series subject to his prior copyright in the New Zealand Book.  (Ederer Decl., Ex. 21; Pl's Mem. 10-12; *see also* Pl.'s Mem. 22).  That argument, however, is belied by the plain language of the 2004 Publishing Agreement, which (like the later

agreements) does not contemplate Plaintiff retaining any vested copyrights in the series other than the copyrights to be obtained by Sterling in his name.  Indeed, Plaintiff expressly "grant[ed] and assign[ed] to [Sterling], during the full term of copyright and any renewals thereof, the exclusive rights to manufacture [and] publish" the series, "*together with all ancillary and additional rights pertaining to the Works*."  (Ederer Decl., Ex. 11 at 1 ¶ 1 (emphasis added)).  Moreover, by its terms, the 2004 Publishing Agreement (like the subsequent agreements) expressly entitled Sterling to copyright any material it provided for the works in its own name. (*Id*. at 1 ¶ 2).  To the extent Plaintiff goes beyond the plain language of the Publishing Agreements to rely on "previous arrangement[s]" or a "course of dealing" with Sterling (Ward Depo. at 68:23-69:4; Pl.'s Mem. 10-11), those arguments run straight into the merger clauses in the 2004 Publishing Agreement and later agreements.  (*See, e.g.*, Ederer Decl., Ex. 11 at 5 ¶ 18; *id.*, Ex. 17 at 6 ¶ 21).

Although Plaintiff has no infringement claim with respect to the "Scratch and Solve" illustrations, his claim based on the "Scratch and Solve" instructions cannot be dismissed.  That is, while the plain language of Plaintiff's U.S. copyright registrations does not protect the "Scratch and Solve" illustrations, it does protect the "Scratch and Solve" instructions insofar as the instructions constitute the "text" of the books.  (Ederer Decl., Ex. 20).  And while "the 'idea' upon which a game is based cannot be copyrighted . . . 'the wording of instructions for the playing of a game is itself copyrightable so as to prevent a literal or closely paraphrased copying.'"  *Milligan v. Worldwide Tupperware, Inc.*, 972 F. Supp. 158, 162 (W.D.N.Y. 1997), *aff'd sub nom. Milligan v. Tupperware Worldwide, Inc.*, 159 F.3d 1347 (2d Cir. 1998) (quoting 1 Nimmer, *Nimmer on Copyright* § 2.18[H][3][a] (1995)).  Plaintiff has put forth sufficient evidence to create a genuine issue of fact as to whether a "literal or closely paraphrased copying"

16

occurred.  Indeed, the instructions accompanying one of the "Scratch and Solve" books, *Tough Hangman*, are identical to those in one of the challenged books, *Science Hangman*.  (Janay Decl., Ex. FF).  Accordingly, Plaintiff's claim for copyright infringement based on the "Scratch and Solve" instructions survives Defendants' motion for summary judgment.

## B. The Trade Dress Infringement Claim

Plaintiff next brings a claim for trade dress infringement under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).  (Compl. ¶¶ 35-40).  To succeed on such a claim, "a plaintiff must prove (1) that the mark or dress is distinctive as to the source of the good or service at issue, and (2) that there is the likelihood of confusion between the plaintiff's good or service and that of the defendant."  *ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 154 (2d Cir. 2007).  Like copyright law, however, trade dress law does not "protect an idea, a concept, or a generalized type of appearance."  *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 115 (2d Cir. 2001) (internal quotation marks omitted).  Accordingly, although "there is no question that trade dress may protect the 'overall look' of a product," a plaintiff must "articulat[e] . . . the specific elements which comprise its distinct dress."  *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 381 (2d Cir. 1997).  "[C]ourts have been reluctant to extend trade dress protection to a product's design (as opposed to its packaging)," *Nat'l Lighting Co. v. Bridge Metal Indus., LLC*, 601 F. Supp. 2d 556, 561 (S.D.N.Y. 2009), as "granting trade dress protection to an ordinary product design would create a monopoly in the goods themselves," *Landscape Forms*, 113 F.3d at 380.

To that end, "a product's design is distinctive, and therefore protectible, only upon a showing of secondary meaning" among consumers.  *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 216 (2000); *see also R.F.M.A.S., Inc. v. Mimi So*, 619 F. Supp. 2d 39, 81 (S.D.N.Y.

2009).  To prove that his trade dress has acquired secondary meaning, a plaintiff must show that "in the minds of the public, the primary significance of [the trade dress] is to identify the source of the product rather than the product itself."  *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 851 n.11 (1982).  "Indicators of secondary meaning include advertising expenditures used to link a product with its mark; consumer studies or direct testimony from consumers linking the mark to the source; sales success; unsolicited media coverage; attempts to plagiarize; and length and exclusivity of use of the mark."  *Coach, Inc. v. We Care Trading Co.*, 67 F. App'x 626, 629 (2d Cir. 2002) (summary order) (internal quotation marks omitted).

In this case, Plaintiff's claim fails as a matter of law because he adduces no evidence that his trade dress has acquired secondary meaning — the only way of establishing distinctiveness in a trade dress claim based on product design.  *See Wal-Mart*, 529 U.S. at 216; *see also R.F.M.A.S.*, 619 F. Supp. 2d at 81.[1]  Plaintiff asserts that "customers identified the one player

---

[1]     Plaintiff's claim arguably fails for another reason: He did not articulate the specific elements of his trade dress until his opposition to summary judgment.  (Pl.'s Mem. 17 (describing "many unique characteristics" of the New Zealand Book, features that were then extended to the "Scratch & Solve" series).  He did not do so, for example, in the Complaint, merely stating that his "trade dress is distinctive and unique in the industry."  (Compl. ¶ 36).  Nor did he do so in his deposition, indicating that his trade dress consisted of the "format . . . of the scratch style Hangman game" (Ward Depo., at 158:5-11), "the name Scratch Hangman" (*id.* at 159:7-11), and the "look and feel of the whole book" (*id.* at 166:11-16).  In fact, up until his opposition to the present motion, the most specific description of his trade dress that Plaintiff had given was, in a response to Defendants' interrogatory, "the characteristics of the visual appearance of the works, including but not limited to the design, shape, packaging, and product configuration" and "each and every design element of the works and the combination thereof that serves as a source identifier for the works."  (Ederer Decl., Ex. 7 at 5).  Some courts have refused to consider trade dress elements that were not articulated, as here, until the summary judgment stage.  *See, e.g.*, *Hammerton, Inc. v. Heisterman*, No. 06-CV-00806 (TS), 2008 WL 2004327, at *4 (D. Utah May 9, 2008) ("Plaintiff cannot wait until after the close of discovery, indeed until filing its opposition to summary judgment, to disclose the combination of design elements that comprise its trade dress claims.  Doing so deprived Defendants of the opportunity to conduct discovery with respect to the specific elements of each trade dress . . . ."); *SG Servs. Inc. v. God's Girls Inc.*, No. 06-CV-989 (AHM), 2007 WL 2315437, at *8 n.10 (C.D. Cal. May 9, 2007) ("In its Opposition, Plaintiff also seeks trade dress protection for 'DIY graphics, distressed

18

scratch hangman game with Ward's unique design elements as Ward's works" (Pl.'s Mem. 19),
but the only evidence he proffers to that effect is (1) an interview with the editorial director of
Sterling, published in *The New York Times*, that mentions the "Scratch and Solve" series and the
"guy in New Zealand" who brought the concept to Sterling (Janay Decl., Ex. F); (2) statements
by Sterling employees indicating the sales success of the "Scratch and Solve" series (*Id.*, Exs. F,
G); and (3) consumer reviews for the original book in the "Scratch and Solve" series, *Scratch
and Solve Hangman* — only two of which even name Plaintiff.  (*Id.*, Ex. M at 1, 4).  This
"scintilla of evidence," *Anderson*, 477 U.S. at 252, is insufficient to show that consumers have
come to associate Plaintiff's purported trade dress with him.  *See, e.g.*, *Mana Prods., Inc. v.
Columbia Cosmetics Mfg., Inc*., 65 F.3d 1063, 1071 (2d Cir. 1995) (affirming the district court's
finding that the plaintiff had failed to raise a material issue of fact as to secondary meaning by
submitting one customer affidavit and claiming that it had spent over $3 million in advertising);
*Jewish Sephardic Yellow Pages, Ltd. v. DAG Media, Inc.*, 478 F. Supp. 2d 340, 345-46, 365
(E.D.N.Y. 2007) (granting summary judgment to the defendant where the plaintiff had provided
fourteen affidavits from advertisers but failed to conduct a consumer survey and did not provide
advertising or sales figures).  Accordingly, Defendants' motion for summary judgment is granted
as to Plaintiff's trade dress infringement claim.

## C.  State-Law Claims

Finally, Plaintiff claims that Defendants' publication of the Challenged Books
"amount[s] to unfair competition and unjust enrichment," in violation of New York law.  (Pl.'s
Mem. 20).  Defendants contend that both claims are preempted by the Copyright Act.  (Defs.'

---

typography, specific phrasing, and specific formatting.'  Plaintiff cannot seek protection for these
elements because they were not alleged in the SAC, and were not disclosed during discovery as
being support for what was alleged.").  The Court need not decide whether Plaintiff's belated
identification of his trade dress is fatal, however, as the claim fails regardless.

Mem. 24-25).  The Copyright Act "exclusively governs a claim when: (1) the particular work to which the claim is being applied falls within the type of works protected by the Copyright Act under 17 U.S.C. §§ 102 and 103, and (2) the claim seeks to vindicate legal or equitable rights that are equivalent to one of the bundle of exclusive rights already protected by copyright law under 17 U.S.C. § 106."  *Briarpatch Ltd., L.P v. Phoenix Pictures, Inc.*, 373 F.3d 296, 305 (2d Cir. 2004).  The works at issue here — puzzles — have long been held to be copyrightable, *see Laureyssens v. Idea Grp., Inc.*, 964 F.2d 131, 139 (2d Cir. 1992), and a work "need not consist entirely of copyrightable material in order to meet the subject matter requirement."  *Integrative Nutrition, Inc. v. Acad. of Healing Nutrition*, 476 F. Supp. 2d 291, 295-96 (S.D.N.Y. 2007). Accordingly, whether Plaintiff's state-law claims are preempted turns on the second requirement, also known as the "general scope" requirement.  *See Briarpatch*, 373 F.3d at 305; *see also Nat'l Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841, 850 (2d Cir. 1997).

A state-law claim falls within the "general scope" of the Copyright Act only if the state-created right "may be abridged by an act which, in and of itself, would infringe one of the exclusive rights provided by federal copyright law." *Id.* (internal quotation marks omitted).  To do so, the claim must involve "acts of reproduction, performance, distribution or display." *Barclays Capital Inc. v. Theflyonthewall.com, Inc.*, 650 F.3d 876, 893 (2d Cir. 2011) (internal quotation marks omitted).  Additionally, in order to ensure that only state-law claims equivalent to copyright actions are preempted, a claim subject to preemption must not require a plaintiff to prove extra elements that "change the nature of the action so that it is *qualitatively* different from a copyright infringement claim."  *Id.* at 909 (internal quotation marks omitted).  Accordingly, "claims based on breaches of fiduciary duty, contractual promises of confidentiality, or trade secrets often survive preemption because the underlying right they seek to vindicate is the right

to redress violations . . . different from an exclusive right protected by copyright." *Id.* (internal quotation marks omitted).  By contrast, "[i]f unauthorized publication is the gravamen of [a plaintiff's] claim, then it is clear that the right [the plaintiff] seek[s] to protect is coextensive with an exclusive right already safeguarded by the Act." *Harper & Row Publishers, Inc. v. Nation Enters.*, 723 F.2d 195, 201 (2d Cir. 1983), *rev'd on other grounds*, 471 U.S. 539 (1985).

Applying those principles here, Plaintiff's unjust enrichment claim is plainly preempted by the Copyright Act, as it is based wholly on Defendants' "unauthorized" copying "of the 'Scratch-Hangman' series or confusingly similar works, the rights of which belong to the Plaintiff," (Compl. ¶ 50) — a claim that falls within the ambit of rights already protected by the Copyright Act.  *See Briarpatch Ltd.*, 373 F.3d at 306 (finding preemption of plaintiffs' unjust enrichment claim based on unauthorized use of a novel and screenplay in producing a movie); *see also, e.g.*, *Stewart v. World Wrestling Fed'n Entm't, Inc.*, No. 03-CV-2468 (RLC), 2005 WL 66890, at *5 (S.D.N.Y. Jan. 11, 2005) (observing that "[t]he overwhelming majority of courts in this circuit" have found preemption of unjust enrichment claims based upon the copying of subject matter within the scope of the Copyright Act (internal quotation marks omitted)).  By contrast, Plaintiff's unfair competition claim is not preempted, as Plaintiff alleges that Defendants intentionally deceived customers by "passing off" their goods as Plaintiff's.  (*See* Compl. ¶ 44 ("Defendants have deceptively published their own 'Scratch-Hangman' series[,] thereby improperly trading on Plaintiff's goodwill and valuable rights in and to the trade dress. Consumers are mistakenly led to believe that Plaintiff is the source of Defendants['] almost identical 'Scratch-Hangman series . . . .'"); *id.* ¶ 45 (alleging that Defendants committed the foregoing acts "willfully, in bad faith, and in conscious disregard of Plaintiff's rights").  As the Second Circuit has held, "intentional deception constitutes an extra element not required in a

copyright infringement claim." *Samara Bros., Inc. v. Wal-Mart Stores, Inc.,* 165 F.3d 120, 131 (2d Cir. 1998) *rev'd on other grounds*, 529 U.S. 205 (2000) (internal quotation marks omitted). Accordingly, claims of "passing off" are not preempted by the Copyright Act. *See Uni-World Capital, L.P. v. Preferred Fragrance, Inc.,* No. 13-CV-7204 (PAE), 2014 WL 3610906, at *11 n.8 (S.D.N.Y. July 21, 2014).

Nevertheless, no reasonable jury could find for Plaintiff on his unfair competition claim for other reasons. "The essence of unfair competition under New York common law is the bad faith misappropriation of the labors and expenditures of another, likely to cause confusion or to deceive purchasers as to the origin of the goods." *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 34 (2d Cir. 1995) (internal quotation marks omitted). "Thus, the standard for federal mark infringement and unfair competition is virtually identical to that under New York common law, because both require a showing that the public is likely to confuse the defendant's product or service with that of the plaintiff." *SLY Magazine, LLC v. Weider Publ'ns L.L.C.*, 529 F. Supp. 2d 425, 443 (S.D.N.Y. 2007), *aff'd*, 346 F. App'x 721 (2d Cir. 2009) (internal quotation marks omitted). To pursue a state-law unfair competition claim, therefore, a plaintiff "must adduce proof of . . . 'secondary meaning.'" *ITC Ltd.,* 518 F.3d at 161. It follows that Plaintiff's unfair competition claim fails for the same reason that his trade dress claim fails: He does not raise a triable issue of fact as to whether his goods have acquired a secondary meaning among consumers. *See Rockland Exposition, Inc. v. Alliance of Auto. Serv. Providers of N.J.*, 894 F. Supp. 2d 288, 328 (S.D.N.Y. 2012).

## CONCLUSION

For the foregoing reasons, Defendants' summary judgment motion is GRANTED in part and DENIED in part. Specifically, all of Plaintiff's claims are dismissed except for his copyright

infringement claims based on the texts of the Challenged Books to the extent those claims are based on Plaintiff's U.S. copyright registrations.

Within thirty days of this Opinion and Order, the parties shall submit to the Court for its approval a Joint Pretrial Order prepared in accordance with the Court's Individual Rules and Practices and Fed. R. Civ. P. 26(a)(3).  The parties shall also follow Paragraph 5 of the Court's Individual Rules and Practices, which identifies submissions that must be made at or before the time of the Joint Pretrial Order, including any motions *in limine*.

If this action is to be tried before a jury, joint requests to charge, joint proposed verdict forms, and joint proposed *voir dire* questions shall be filed on or before the Joint Pretrial Order due date in accordance with the Court's Individual Rules and Practices.  Jury instructions may not be submitted after the Joint Pretrial Order due date, unless they meet the standard of Fed. R. Civ. P. 51(a)(2)(A).  If this action is to be tried to the Court, proposed findings of fact and conclusions of law shall be filed on or before the Joint Pretrial Order due date in accordance with the Court's Individual Rules and Practices.  Unless the Court orders otherwise for good cause shown, the parties shall be ready for trial two weeks after the Joint Pretrial Order is filed.

Finally, if the parties are interested in a referral to Magistrate Judge Maas for settlement purposes, they shall so advise the Court by joint letter as soon as possible.

The Clerk of Court is directed to terminate Docket No. 19.


SO ORDERED.

Date:   February 23, 2015
        New York, New York

JESSE M. FURMAN
United States District Judge