F7SJWAR1

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  MICHAEL WARD, d/b/a
   Brainteaser Publications,
4

5              Plaintiff,

6
            v.                          13 Civ. 7851 JMF
7
   BARNES & NOBLE, INC., et al.,
8
              Defendants.
9
   ------------------------------x
10

11

12                                      July 28, 2015
                                        9:36 a.m.
13

14

15

16  Before:

17              HON. JESSE M. FURMAN,

18                                      District Judge
                                         and a jury
19

20

21

22

23

24

25

F7SJWAR1

1

2                          APPEARANCES

3

4

LAW OFFICE OF BARRY E. JANAY, PC
5        Attorneys for plaintiff
BY:  BARRY ERAN JANAY, Esq.
6              Of counsel

7

8

9    ARNOLD & PORTER, LLP
         Attorneys for defendants
10   BY:  LOUIS SHERMAN EDERER, Esq.
         MATTHEW THOMAS SALZMANN, Esq.
11       SUSAN LEE SHIN, Esq.
         MAXWELL PRESTON, Esq.
12       – and –
         GILLIAN BERMAN, In-House Counsel
13       Sterling Publishing Co., Inc.

14

15

16

17

18

19

20

21

22

23

24

25

F7SJWAR1

1          (In open court; jury not present)

2          THE COURT:  You may be seated.

3          (Case called)

4          THE COURT:  All right.  Anyone else need to note their

5    appearances in the back?

6          All right.

7          MR. EDERER:  May we also introduce Gillian Berman,

8    in-house counsel for defendant Sterling.

9          THE COURT:  All right.  Welcome, Ms. Berman.

10          Let me make sure, and who is the other gentleman?

11          MR. EDERER:  That is Mr. Preston from our office, but

12    he will be operating the technical materials.

13          THE COURT:  I understand, but I want to ask the

14    prospective jurors if they know any of you.  So what is Mr.

15    Preston's first name?

16          MR. EDERER:  Maxwell.

17          THE COURT:  I also have a Julie Simeone in the back,

18    okay?  All right.

19          Very good.  A couple of preliminary matters.  We

20    should have a jury pool here in a matter of minutes.  There are

21    a couple of things I know you have communicated with my law

22    clerk about over the past few days, but I wanted to raise them

23    and also put them on the record.

24          First, I have a matter that requires me attendance in

25    Washington tomorrow afternoon, so I think my law clerk

1    mentioned I had to change the trial schedule a little bit, for

2    which I apologize.  As you know, today we'll be going for the

3    full day until 5:00 o'clock.  Tomorrow, in light of that, we

4    are going to end at noon and we'll take just one short break in

5    the morning, and then on Thursday, in order to make up for lost

6    time, we will sit the full day again with, you know,

7    appropriate lunch break and the like.

8             Now, Friday, if we get there, we will resume my more

9    normal trial schedule, which is to say, 9:00 to 2:30.  If we

10   continue into next week, we will continue on that schedule as

11   well.  I should tell you when the jury is deliberating, I give

12   the jury the option of remaining past 2:30 so you know that.

13            Any questions on that?

14            All right.  Now, second, I did receive from you a

15   document of proposed stipulations, basically memorializing the

16   stipulations that were in the joint pretrial order, and

17   pursuant to my direction, that should be essentially a

18   stand-alone document that could be admitted at trial.

19            I had communicated through my law clerk that I did not

20   want that document to cite to materials that would not be

21   admitted at trial.  The document that was sent to me cited to

22   Mr. Ederer's declaration and other things that would not be

23   necessarily exhibits at trial.

24            So I did ask you, through her, to essentially redo it

25   and remove those citations, and I received a modified version

F7SJWAR1

1    without citations to things outside of the trial record.  Are

2    we set on that?  Anything we need to discuss there?

3            MR. EDERER:  No, your Honor.

4            THE COURT:  Mr. Janay, anything?

5            MR. JANAY:  No, your Honor.

6            THE COURT:  All right.  Very good.

7            Now, third, I was advised that the defendants wanted

8    to use or want to use demonstratives in their opening and that

9    plaintiff had an objection that basically objected to their

10   showing the instructions from some or all of the relevant books

11   without showing I think the copyright page or the whole book or

12   something of that nature.

13           I had indicated, through my law clerk, to the extent

14   that was the objection, it was overruled.  Obviously, the full

15   exhibit will be admitted at trial, and I don't think there is

16   any prejudice that arises from showing the instructions,

17   particularly since that is the central gravamen of the claims

18   that were made in the case.

19           Now, Mr. Ederer, I know that the exhibit that or the

20   document that I was sent has any number of pages, I think it is

21   26-pages long.  Are you intending to show all of that in your

22   opening?

23           MR. EDERER:  No, your Honor.  Those are all of the

24   demonstratives we may use during the trial, certainly not

25   nearly all of the ones we plan to show during opening.

F7SJWAR1

1          THE COURT:  What you show during opening should be

2     something that is marked as an exhibit and you anticipate

3     coming into evidence during the trial if you have it.

4          Anyway, all right?

5          MR. EDERER:  Okay.

6          THE COURT:  Very good.  Lastly, I did have one

7     question.  As you know, in my preliminary remarks to the jurors

8     this morning, I will give them a brief description of the case

9     just so that they know what it is about and can, therefore,

10    identify any biases or issues or knowledge of the case or the

11    like.

12         Now, the question I had is whether it might make sense

13    to show them either an actual copy of one of the books involved

14    in this case or a picture of one of them, just on the theory

15    that a juror might recognize it by sight rather than by name.

16    I don't know if you think that is a good idea, bad idea, if we

17    can agree on something to show them or not.  I wanted to pose

18    that as a possibility.  Mr. Janay?

19         MR. JANAY:  A copy of the book to show the jury?

20         THE COURT:  Yes.

21         MR. JANAY:  I have no objection.

22         THE COURT:  Mr. Ederer?

23         MR. EDERER:  I don't have a problem with that.  I want

24    to make sure I understand.  Are we just simply going to hold up

25    a book and show it to them or pass it around?

F7SJWAR1

1      THE COURT:  No.  I would simply hold it up and say

2 here is an example of one of the books at issue in the case.

3      MR. EDERER:  No objection.

4      THE COURT:  Does either of you have one?  It looks

5 like you have one in your hand.  Would you show it to Mr.

6 Janay?

7      MR. JANAY:  Sure.

8      THE COURT:  All right.  That is No. 7?

9      MR. EDERER:  That is No. 1.

10      THE COURT:  No. 1?  Excuse me.  I will hold this up

11 when I tell them what the kinds of books involved, just so if

12 they recognize it, that may help.

13      All right.  Any other preliminary issues that we need

14 to address?  Otherwise, I will sit here and wait for the jury

15 pool to arrive?  Mr. Janay, anything on your end?

16      MR. JANAY:  No, your Honor.

17      THE COURT:  Mr. Ederer?

18      MR. EDERER:  No, your Honor.

19      THE COURT:  All right.  Very good.  I will sit here

20 and wait.

21      (Pause)

22      THE COURT:  Mr. Janay, the Court Reporter is back.  Is

23 there something you wanted to raise?

24      MR. JANAY:  Yes, your Honor.

25      THE COURT:  Just stand please and speak into the

1   microphone.

2           MR. JANAY:  Sorry.  My client is somewhat hard of

3   hearing, and I just have to ask everybody speak up when they're

4   talking to him and maybe look at him directly so that we know

5   that he's hearing and understanding what we're saying.

6           THE COURT:  How hard of hearing is he?

7           MR. JANAY:  We did some tests yesterday, and he is

8   quite hard of hearing, some anecdotal tests.

9           THE COURT:  Does he have a hearing aid or something?

10          MR. JANAY:  He does not.  I don't think he knows sign

11  language.  I don't know, either.

12          THE COURT:  This is something that one would want to

13  know before 9:46 on the morning of trial.

14          MR. JANAY:  We did raise it before.

15          THE COURT:  Yes, I know you told my law clerk

16  yesterday.

17          MR. JANAY:  And Judge Maas is well aware of that as

18  well.  In fact, scheduling phone conferences for -- he was

19  coming from New Zealand, he was well aware of that.

20          THE COURT:  He'll do the best he can.

21          MR. JANAY:  I ask everyone speak up.

22          THE COURT:  I always ask that everybody speak up.  The

23  acoustics in here are bad enough for people who don't have

24  hearing issues.  If he can't function and testify, you have to

25  make adequate arrangements to make sure that he can.  If you

F7SJWAR1

 1   don't, then you don't and we'll take it as it comes.

 2          I will certainly remind people to speak up and speak

 3   loudly and clearly and into the microphone, and defense

 4   counsel, if you can take note of that, I will appreciate that.

 5          MR. JANAY:  That is exactly why I am bringing it up

 6   now, too.

 7          Also really on a secondary note, I noticed on the ECF

 8   system that my address and contact information remains the past

 9   contact information from over 10 years ago, and in every case I

10   had I put in my new contact information and notice of

11   appearance and asked them to update it, but it still hasn't

12   been updated.  I don't know what else to do with that.

13          THE COURT:  Call the help desk.

14          MR. JANAY:  I have.

15          THE COURT:  Call again.  I am not involved in that,

16   but it shouldn't be hard to correct.

17          Anything else?

18          MR. JANAY:  No, your Honor.

19          THE COURT:  All right.

20          (Pause)

21          (Jury Selection was reported but not ordered

22   transcribed)

23          (Continued on next page)

24

25

F7SJWAR1

 1           (Time noted: 12:20 pm)

 2           THE CLERK:  Can you please rise and raise your right

 3   hands.

 4           (The jury was empaneled and sworn)

 5           THE COURT:  You may be seated.  All right.  Let me

 6   tell you a few things.  Again we are going to take a break for

 7   lunch.  When you come back, I will give you slightly longer

 8   preliminary instructions and we will start with the case.  I

 9   will explain what that means, but basically we'll go into

10   opening statements from the lawyers and then into the first

11   witnesses in the case.  For now let me say a couple of things.

12           First of all, I want you to keep an open mind.  You

13   have not heard any evidence at all in this case, so you don't

14   really know anything about it and you don't have any evidence

15   from which you can form a judgment or render a verdict, and I

16   will be repeating these words many times during the trial,

17   basically until the time you are excused to deliberate.  You

18   should continue to keep an open mind.  Even as you deliberate,

19   you should keep an open mind.

20           Second, do not talk to anybody about the case.  That

21   includes one another.  It includes your friends.  It includes

22   your family.  You may tell your employer, your friends you have

23   been seated as juror in a civil case, but please don't tell

24   them anything else about the case, and that is, as one would

25   imagine, to ensure you don't learn anything about the case or

1    hear anything other than the evidence that you will see and

2    hear in the court today.

3         Now, third, you were probably told earlier that you're

4    not supposed to use the cafeteria here in this courthouse or

5    for that matter in the courthouse across the street.  I want to

6    remind you of that.  The reason for that rule is that it helps

7    ensure you don't run into anyone involved in the case, anyone

8    either who works for the court or any of the parties or their

9    lawyers or witnesses for that matter.

10        In that regard, my Deputy is telling me you were told

11   you may use the cafeteria across the street in 500 Pearl

12   Street.  Why don't I amend what I just said and say you can use

13   the courthouse cafeteria there, but you cannot use the

14   cafeteria in this building, and I will make sure the lawyers

15   and the parties know they can only use the cafeteria in this

16   building and not the one across the street.

17        In that regard, let me tell you if you do happen to

18   run into any of the lawyers or parties in this case, they have

19   been instructed by me they may not communicate with you in any

20   way, shape or form.  If they do not acknowledge your existence,

21   if they don't acknowledge your presence, do not smile at you,

22   don't hold the door for you, don't say anything to you, don't

23   take it personally.  They are just following my instructions.

24        The last thing I will say is when it comes time for

25   you to line up, what I would recommend is that you line up in

1    the order that you are currently seated, so Mr. Eddy would be

2    Juror No. 1, Mr. Rutkowski is Juror 2, and so on down, as you

3    can figure out.

4          Now, remember where you are.  Remember who is ahead of

5    you, and if you line up in that way, it will make it a little

6    bit easier as you file into the jury box to sit where you are

7    supposed to sit.

8          It is currently 12:22.  So that you can get the

9    preliminary instructions from Ms. Barnes and have an adequate

10   time for lunch, why don't we plan to start promptly at 1:30.  I

11   will ask you to be back in the jury room a few minutes before

12   1:30.  So 1:25, at the latest.  Ms. Barnes will show you how

13   you should go into and out of the jury room.  There is a direct

14   entrance into the jury room area, which is to say, you should

15   not come back into the courtroom just to ensure you don't see

16   or hear anything that is not evidence in this case.

17         Now, I should also say please don't linger in any of

18   the public areas in the courthouse.  You're welcome to stay in

19   the jury room if you like or go out for lunch.  If you need to

20   use the restroom, there are two restrooms right by the jury

21   room.  You should use those rather than using the public areas

22   in the courthouse, and again that is just to ensure you don't

23   run into anyone that is involved in the case.  With that, I

24   thank you.  You are excused and please be in the jury room at

25   1:25.

F7SJWAR1

1          MR. JANAY:  May I have a sidebar?

2          THE COURT:  Not right now.

3          MR. JANAY:  It involves the selection process.

4          THE COURT:  Not right now.  You are excused.

5          (Jury excused)

6          THE COURT:  Mr. Janay, if you make a request for a

7    sidebar and I say no, the answer is no.  Don't repeat it.

8    Don't explain what it is about.  The answer is no.

9          I was excusing the jurors.  If you have something you

10   need to raise, you can raise it now, but there is no need to do

11   that and there was no need to reiterate after I explicitly gave

12   you an answer.  What is the issue?

13         MR. JANAY:  It involves my failure to raise the Batson

14   objection, and I cycled through my mind and recalled the

15   objection, and I actually do have one.  I hope that it is not

16   lost at this point.  I want to hear an answer from the

17   defendant's counsel as to why the --

18         THE COURT:  I personally think you have waived any

19   Batson challenge.  I gave you an opportunity to make it before

20   the jury was selected, and you said you did not have any

21   motion.  I asked if you were satisfied with the jury left over,

22   and you said yes.  I think you have waived it.  If you want to

23   make a record to preserve it for appeal, what is your

24   challenge?

25         MR. JANAY:  I note for the record, Jurors 4 and 8 were

F7SJWAR1

1    the only minority jurors on the panel, and I am curious to hear

2    defendant's rationale, if he has any other rationale, for

3    striking them when, if there is any other basis other than

4    their race.

5            THE COURT:  Well, Mr. Ederer, I think the challenge

6    has been waived.  It is not clear to me that he has satisfied

7    the requirements for making out a prima facie case.  It is not

8    clear to me they are the only minority jurors in the pool,

9    quite frankly.  Out of an abundance of caution, and for the

10   sake of a complete record, do you want to articulate briefly

11   what your grounds for striking those jurors was.

12           MR. EDERER:  Your Honor, it had to do with the level

13   of education and employment and had absolutely nothing to do

14   with the issue of race.

15           THE COURT:  All right.  Mr. Janay, do you have any

16   evidence or basis to challenge the strikes on any ground other

17   than their race, or any reason to find that that is a pretext?

18           MR. JANAY:  No.  I just note that they appear to be

19   the only ones of colored skin on the jury panel.

20           THE COURT:  Your motion is denied.

21           Now, please be back here no later than 1:25

22   yourselves.  At 1:30 we will proceed with preliminary

23   instructions to the jury after which we will -- Mr. Janay,

24   please put your electronic device away.  Thank you -- after

25   that, we will proceed directly into opening statements.

F7SJWAR1

1        If you would like to move the podium so that it is

2   directly in front of the jury box so that you can address the

3   jury, you are welcome to do that.  Then after opening

4   statements, we will proceed directly into the first witness

5   called by the plaintiff.  I will see you shortly before 1:30.

6   Thank you.

7            (Luncheon recess)

8            (Continued on next page)

F7snwar2

1          A F T E R N O O N   S E S S I O N

2                          (1:30 p.m.)

3          THE COURT:  Ms. Barnes will get the jury and we will

4     proceed on preliminary instructions and then openings.

5          Mr. Janay, did you want to move the podium?

6          MR. JANAY:  Sure.

7          THE COURT:  How long do you expect your opening to be,

8     Mr. Janay.

9          MR. JANAY:  No more than ten minutes.

10         THE COURT:  Mr. Ederer, are you opening for

11    defendants?

12         MR. EDERER:  Yes, your Honor.

13         THE COURT:  How long do you expect your opening to be?

14         MR. EDERER:  15 to 20 minutes, your Honor.

15         THE COURT:  All right.  Thank you.

16         MR. EDERER:  Your Honor, may I just raise an issue we

17    do have some demonstratives that we wanted to show during

18    opening.  We wanted to make sure that the monitors are working.

19         THE COURT:  They will be.

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  Good afternoon and welcome back, ladies

3    and gentlemen.

4          This case is now on trial officially.

5          As I stated earlier, the trial is scheduled to last no

6    more than a week, so it should end at the latest early next

7    week.  We will begin tomorrow and any additional days at 9:15

8    sharp.  To help ensure that we can start on time please be in

9    the jury room each morning by 9 a.m. at the latest so that we

10   can begin without delay.

11         As an enticement for you to be on time, I have

12   arranged for some breakfast and coffee for you to be in the

13   jury room.  I should note that we can't begin, and I will

14   stress this later as well, we can't begin until all eight of

15   you are here.

16         So, please, out of respect not only for the trial

17   participants but for your fellow jurors, please try to be on

18   time.

19         Unfortunately, for a variety of reasons, when we end

20   each day is going to vary a little bit over the course of the

21   trial.  For example, tomorrow I am unable to preside over the

22   case in the afternoon so we will only be sitting in the

23   morning, and we will end at noon, while on Thursday we will sit

24   for the whole day, that is, until 5:00 p.m.

25         I will address the schedule thereafter as we get

F7snwar2

 1    there.  I want to let you know that now so that you can plan

 2    accordingly.

 3         Now that you have been sworn, let me give you some

 4    instructions about your duties as jurors.  At the end of the

 5    trial, I will give you more detailed instructions, and those

 6    instructions will control your deliberations in this case, but

 7    for now let me explain how the trial will proceed.  If you can

 8    listen carefully that would be great.

 9         The first step in the trial, as I mentioned earlier,

10    will be opening statements.

11         First, the plaintiff's lawyer, Mr. Janay, will make an

12    opening statement.  Then the defendant's lawyer, Mr. Ederer,

13    will make an opening statement.  Opening statements are neither

14    evidence nor argument.  They are simply outlines to help you

15    understand the evidence as it is presented.

16         After opening statements, the plaintiff will present

17    his evidence.  The plaintiff's evidence will consist of the

18    testimony of witnesses as well as documents and exhibits.

19         The plaintiff's lawyer will examine the witnesses and

20    then the defendant's lawyer may cross-examine them.  Following

21    the plaintiff's case, the defendants may present a case as

22    well.  The plaintiff's lawyer will then have an opportunity to

23    cross-examine any witnesses testifying for the defendants.

24         After the presentation of evidence is completed, the

25    lawyers will deliver their closing arguments to summarize and

F7snwar2

1   interpret the evidence.

2           Just as the lawyers' opening statements are not

3   evidence, their closing arguments are not evidence either.

4   Following closing arguments, I will instruct you on the law.

5   Then you will retire to deliberate on your verdict, which must

6   be based solely on the evidence presented at trial.

7           All eight of you must agree on any verdict, and while

8   that verdict will obviously be made public, your deliberations

9   are and will remain secret. You will never have to explain

10  your verdict to anyone.

11          It is important to remember that this is a civil case.

12  As I mentioned during jury selection, you may have heard of the

13  beyond-a-reasonable-doubt standard that applies in criminal

14  cases. That requirement does not apply to a civil case, and

15  you should put it entirely out of your mind. In civil cases,

16  the burden is different, and it is called proof by a

17  preponderance of the evidence.

18          To establish facts by a preponderance of the evidence

19  means to prove that the facts are more likely true than not

20  true. I will, however, instruct you fully on the burden of

21  proof after all of the evidence has been received.

22          Now let me explain to you the jobs that you and I are

23  to perform during the trial.

24          I will decide which rules of law apply to the case. I

25  will decide that by making legal rulings during the

F7snwar2

1    presentation of the evidence and also, as I told you, in giving

2    the final instructions to you after the evidence and arguments

3    are completed.

4         In order to do my job, I may have to interrupt the

5    proceedings from time to time to confer with the lawyers about

6    the rules of law that should apply here.  Sometimes we will

7    talk here at the sidebar at the bench outside of your hearing,

8    as you saw us do during jury selection a couple of times.  Some

9    of the conferences may take more time than others, and so as a

10   convenience to you I may excuse you from the courtroom.

11        I will try to avoid any such interruptions as much as

12   possible, but please be patient and understand that those

13   conferences are not only necessary to ensure the fairness of

14   the trial, but they often help to make the trial go faster.

15        While I decide the law that applies to this case, you,

16   ladies and gentlemen of the jury, are the triers of fact.  You

17   will weigh the evidence presented and decide whether the

18   plaintiff has proved by a preponderance of the evidence that a

19   defendant is liable to him.  You must pay close attention to

20   all of the evidence presented, and you must base your decision

21   only on the evidence in the case and my instructions about the

22   law.

23        What, then, is evidence?

24        Evidence consists only of the testimony of witnesses,

25   documents, and other things admitted as evidence or

1   stipulations agreed to by the parties.

2           Some of you may have heard the terms circumstantial

3   evidence and direct evidence.  Do not be concerned with those

4   terms.  You are to consider all of the evidence given in the

5   trial.

6           Certain things are not evidence and must not be

7   considered by you.  The following is a list of what is not

8   evidence:

9           First, arguments, statements, and questions by the

10  lawyers are not evidence, nor are statements that I make or

11  questions that I may ask of a witness.

12          Second, objections to questions are not evidence.

13          The lawyers have an obligation to make an objection

14  when they believe evidence being offered is improper under the

15  rules of evidence.  You should not be influenced by the

16  objection or by my rulings on any objection.  If the objection

17  is sustained, ignore the question and any answer that may have

18  been given.  If an objection is overruled, treat the answer as

19  you would any other.  If you are instructed that some item of

20  evidence is received for a limited purpose only, you must

21  follow that instruction.

22          Third, testimony that I exclude or tell you to

23  disregard or strike is not evidence and must not be considered.

24          Fourth, anything you have seen or heard outside the

25  courtroom is not evidence and must be disregarded.  You are to

F7snwar2

1  decide this case, as I mentioned several times during jury

2  selection, based solely on the evidence presented here in the

3  courtroom.

4        There is no formula to evaluate testimony or exhibits.

5  For now suffice it to say that you bring with you into this

6  courtroom all of the experience and background of your lives.

7  Do not leave your common sense outside the courtroom.  The same

8  types of tests that you use in your everyday dealings are the

9  tests that you should apply in deciding how much weight, if

10  any, to give to the evidence in this case.

11        The law does not require you to accept all of the

12  evidence admitted at the trial.  In determining what evidence

13  you accept, you must make your own evaluation of the testimony

14  from each of the witnesses and the exhibits that are received

15  in evidence.

16        It is essential, however, that you keep an open mind

17  until you have heard all the evidence in this case.  A case can

18  be presented only step by step, witness by witness before all

19  evidence is before you.

20        As you know from experience, you can hear one person

21  give his or her version of an event and think it sounds very

22  impressive and even compelling and yet, upon hearing another

23  person's version of the same event or even the same person

24  cross-examined with respect to the event, things may seem very

25  different.

F7snwar2

1    In other words, there may be another side to any

2    witness's story.  You should use your common sense and good

3    judgment to evaluate each witness's testimony based upon all of

4    the circumstances.

5    Again, I cannot emphasize too strongly that you must

6    keep an open mind until the trial is over.  You should not

7    reach any conclusions until you have all of the evidence before

8    you.

9    Finally, let me caution you about certain rules and

10    principles governing your conduct as jurors in this case.

11    First, as I already told you, you must not talk to

12    each other about this case or about anyone involved in this

13    case, until the end of the case when you go to the jury room to

14    decide on your verdict.

15    The reason for that requirement is that you must not

16    reach any conclusion on the claims or defenses until all of the

17    evidence is in.  As I have said, keep an open mind until you

18    start your deliberations at the end of the case.

19    Second, as I also told you, do not communicate with

20    anyone else about this case or anyone who has anything to do

21    with it until the trial has ended and you have been excused as

22    jurors.

23    Anyone else includes members of your family, your

24    friends, and your employers.  And no communicating about the

25    case means no communicating in person, by telephone, on

1    Facebook, Twitter, Google, blogs, whatever form of

2    communication you might use at all.

3           As I told you earlier, you may tell your friends and

4    family and employers that you are a juror in a civil case, but

5    please do not tell them anything else about the case until you

6    have been excused.

7           You may think that tweeting something or posting

8    something about the case is harmless, but I can assure you that

9    it isn't, and that if you do anything like that it will be a

10   major inconvenience to everyone involved in the trial and

11   especially to you, so please do not do it.

12          Third, do not let anyone talk to you about the case or

13   about anyone who has anything to do with the case.  If any

14   person should attempt to communicate with you about this case

15   at any time throughout the trial, either in or out of the

16   courthouse, you must immediately report that to my deputy,

17   Ms. Barnes, and to no one else.

18          When I say report that communication to no one else, I

19   mean that you should not tell anyone, including your fellow

20   jurors.  To minimize the probability of any such improper

21   communication, it is important that you go straight to the jury

22   room when you come in in the morning and after any lunch break

23   and that you remain in the jury room for the duration of the

24   trial day except for the longer lunch breaks.

25          You should use the bathrooms, as I mentioned, in the

F7snwar2

1    hallway right outside the jury room rather than the bathrooms

2    on this floor or any other public bathrooms.  And, as I told

3    you earlier, you may not use the cafeteria in this building,

4    although you may use it across the street at 500 Pearl Street.

5            And, finally, as I also told you, you should not

6    linger in the public areas of the courthouse on this floor or

7    elsewhere.

8            Now, I would say to the extent that you can, except

9    when we take longer breaks for lunch, you should remain in the

10   jury room, if you can, both to ensure that we can begin

11   promptly and also to avoid any encounters with folks involved

12   in the case.

13           Fourth, do not do any research or investigation about

14   the case or about anyone that has anything to do with the case

15   on your own.  Don't go visit any place described in the trial,

16   don't read or listen to or watch any news reports about the

17   case, don't go on the Internet or use whatever digital or

18   communications device it is that you use to see what you can

19   learn to inform yourself about this matter.

20           That is because, as I told you, your decision in this

21   case must be based solely on the evidence presented at the

22   trial.  In other words, all that you need to know will be

23   presented here in open court by the parties.

24           I expect you to inform me immediately through

25   Ms. Barnes if you become aware of another juror's violation of

F7snwar2

1  these instructions.

2         Finally each of you has been given a notebook and a

3  writing implement.  That is because I permit jurors to take

4  notes, but you do not have to take notes.  Notes are just an

5  aid to your own recollection.  The court reporters in this

6  case, as you have seen, are recording everything that is said

7  in the courtroom, and any portion of the testimony can be read

8  back to you during your deliberations.

9         If you do take notes, be aware that note-taking may

10  distract you from something important that is happening on the

11  witness stand.  Whether or not you take notes, rely on your own

12  recollections and don't be influenced by the fact that another

13  juror has taken notes.

14         If you do take notes, all notes must be left each day

15  in the jury room.  Ms. Barnes will make sure that they are

16  secure there.

17         From this point until the time you retire to

18  deliberate, it is your duty not to discuss the case and not to

19  remain in the presence of other persons who may be discussing

20  the case.

21         In that regard, again I want to remind you that you

22  should understand that the parties and the lawyers in this case

23  have been instructed by me not to have any contact with you.

24  So if you happen to see any of them outside the courtroom and

25  they do not acknowledge you, do not take offense.  They are not

1  being rude.  They are, as I told you, just following my

2  instructions.

3          That concludes my preliminary instructions to you.

4  Now we will begin with the initial stage of the case, which, as

5  I mentioned, is opening statements, and we will begin with the

6  opening statement of the plaintiff, by Mr. Janay.

7          So at this time I will ask each of you to give your

8  undivided attention to Mr. Janay and then to defense counsel as

9  they make their opening statements.

10          Mr. Janay.

11          MR. JANAY:  Good afternoon, ladies and gentlemen of

12  the jury.  I would first like to say thank you to each and

13  every one of you for being here today and performing this civic

14  duty.  You know, it is extremely important in our democratic

15  society that we have people like you who have taken the time

16  out of your lives, and I just want to say that I'm very

17  grateful.

18          Now, you are all here today to be the triers of fact

19  and to make some determinations as to some simple things.  It

20  will all come down to questions of what's right and what is

21  wrong at the end when you make your decision.

22          I represent Mike Ward, who is the person sitting right

23  here.  And he is an author.  He is the originator and creator

24  of a book that is a unique book that involves a single-player

25  scratch hangman game that you scratch off letters like a

 1    lottery ticket to reveal the underlying words.

 2            Now, Mike is from New Zealand, and he originated or he

 3    created this book maybe 2000 or before then.  The evidence will

 4    show the exact date.  The book was wildly successful in

 5    New Zealand.  He filed a provisional patent application for

 6    that book, and later -- in New Zealand copyright is an

 7    automatic right.  Once you publish a book, it becomes your

 8    ownership.  You own that.

 9            So he self-published the book in New Zealand and sold

10    I believe over a million copies.  He's going to testify to all

11    of this.

12            When his distributor in New Zealand said that, you

13    know, these books are great, but New Zealand is a small market

14    you should go and try to find someone in the United States to

15    publish and distribute your book, he sent out mailers.  One of

16    his mailers was sent out to a defendant in this action named

17    Sterling Publications.  Sterling is a wholly owned subsidiary

18    of Barnes & Noble Incorporated.

19            The editor at large or chief editor of Sterling says

20    in a New York Times article that once he opened up the letter

21    from my client showing the manuscript for these books, these

22    single-player scratch hangman books -- I'm sorry, Mr. Peter

23    Gordon is his name, and he was the editor for the puzzle

24    division of Sterling Publications, which was called

25    Puzzlewright Press.

1              In any event, he opens the envelope from my client and

2    says immediately he knew this would be an enormous success in

3    the U.S. market.  So they came to terms of contract, whereby

4    they would produce a minimum of two books annually, two of

5    these books tentatively to be entitled Scratch Hangman with

6    Mike Ward as the author and proprietor of the books.

7              They started producing these books.  In the contract

8    it said that Sterling would be obtaining copyright

9    registrations on behalf of Mr. Ward in his name for the books.

10   It didn't say whether it was text entire text or whatever, but

11   Sterling did, in fact, obtain copyright registrations in

12   Mr. Ward's name on his behalf for the text of the books.

13             The books sold I believe over one and a half million,

14   maybe two million copies in the United States, very popular

15   books, selling for about $6 a book.  So this is a series that

16   obviously the defendants care a great deal about.

17             Mr. Ward would supply the materials for these books --

18   well, supply, I should say he supplied the original manuscript

19   for the book and the concept, of course.  You are going to hear

20   a lot from the defendant about the concept and how you can't

21   copyright an idea.

22             In fact, the issues in this case have basically been

23   narrowed down so much through the three years of litigation

24   that we have had to just --

25             THE COURT:  Sustained.  Counsel, move on.

1          MR. JANAY:  OK.

2          We have an issue in this case of who is the author,

3     who is the author of the copyrighted work, which is limited to

4     the instructions of the books.

5          Now, Mr. Ward has continuously claimed that he is the

6     author, and in fact the contract says author, lists him as

7     author.

8          So, now, the defendants, how did they injure Mr. Ward?

9          After I think six years or so, from 2004 to 2010 or

10    '11 they had the two books per year.  It went up to four or

11    five books a year at some point because they were so

12    successful.  But in 2010 they made a decision to start

13    producing the same Scratch & Solve Hangman books with their own

14    employees listed as the author.  Obviously, this upset

15    Mr. Ward.

16         They used two of their own employees who are now

17    defendants in this action as well.  One is named Patrick

18    Blindauer and the other is named Francis Heaney, who were

19    listed as authors of these Scratch & Solve Hangman books.  And

20    then they started even more brazenly using a pseudonym, a name

21    they just made up out of thin air to be the author of Scratch &

22    Solve Hangman books.

23         Mr. Ward attempted to resolve this amicably with

24    Sterling.

25         THE COURT:  Sustained.

1              MR. EDERER:  Thank you, your Honor.

2              THE COURT:  The jury will disregard that last comment.

3              MR. JANAY:  They were unsuccessful in -- this is what

4    resulted in the lawsuit.  The fact that the publisher of

5    Mr. Ward's books had turned their back on him and started

6    producing the same books with other authors' names and a

7    pseudonym.

8              That brings us to this lawsuit and why we're here

9    today, and hopefully not here past Friday.  I know the judge

10   has said this might go on for a week, but I don't think it will

11   go until Friday, just to give you some peace of mind.

12             So I guess I will summarize by saying this is a true

13   case of David versus Goliath.  We are fighting a Fortune 500 --

14             MR. EDERER:  Objection.

15             THE COURT:  Sustained.

16             MR. EDERER:  Thank you.

17             MR. JANAY:  Mr. Ward is a humble man from New Zealand

18   who cares a great deal about the work that he has produced and

19   would like to see his grievances redressed.

20             I thank you very much for giving us the opportunity to

21   present the evidence to you today and the next few days.

22             THE COURT:  Thank you.

23             Mr. Ederer.

24             MR. EDERER:  One moment, your Honor.

25             Good afternoon, ladies and gentlemen.  My name is

1   Louis Ederer, from the law firm of Arnold & Porter here in New

2   York, and we represent the defendants in this case, which as

3   you have you have heard include the well-known bookseller,

4   Barnes & Noble, and the publishing company that Barnes & Noble

5   owns, which is Sterling Publishing.

6           I would like to introduce you to my colleagues here,

7   Matt Salzmann from Arnold & Porter Susan Shin from Arnold &

8   Porter, and seated next to Susan is the in-house lawyer from

9   Sterling Publishing Gillian Berman, who will be joining us for

10  the duration of the trial.

11          I want to start out by thanking you for your service

12  here today.  We realize it's taking you away from work, from

13  personal matters that you may need to tend to, but it is very

14  important to us and to our legal system, and my clients thank

15  you for that and for your close attention to this very

16  important matter.

17          Ladies and gentlemen, I would like to make something

18  perfectly clear to you right now.  We need to establish right

19  here and now before you hear the in evidence this case what

20  this case is about and what it is not about.

21          Let me say this to you, and I will ask you to keep

22  this in mind as you listen to the evidence.  This case is not

23  about what Mr. Janay and his client would like you to think it

24  is about.

25          This case is not about whether my clients required Mr.

1    Ward's permission to use his idea for a hangman game.  What

2    this case is about, and virtually the only thing it's about,

3    the key issue for you to decide is whether my clients violated

4    U.S. copyright law by using any copyrighted material owned by

5    Mr. Ward without his permission.

6            In this case, the only thing that could possibly be is

7    the single page of instructions in these hangman books that you

8    have heard about.  That is right.  The single page of

9    instructions that appear on page 3 of the book entitled How to

10   Play Hangman.

11           This is a 96-page book, and 95 out of 96 pages

12   contain -- or 93 contain puzzles and there is one page of

13   instructions.  That is virtually the only thing that this case

14   is about, is that single page of instructions.  So there will

15   be two simple questions that you will be asked to decide at the

16   end of this trial with respect to this claim.

17           First, you must decide whether Mr. Ward is even the

18   author of the instructions that appear in the hangman books

19   that Sterling put out under his name.

20           And don't be fooled.  It doesn't matter that Mr. Ward

21   may have come up with the idea for this single-player hangman

22   game.  That doesn't mean he was the author of the instructions.

23   No.  In order to be considered the author of the instructions,

24   Mr. Ward must have written the instructions.

25           What you are going to hear unequivocally from the

1    Sterling witnesses is that Mr. Ward did not write the

2    instructions that appear in the hangman books that Sterling put

3    out under his name.

4         In fact, Sterling wrote the instructions.  Again, just

5    because Mr. Ward approached Sterling with his idea for a

6    single-player hangman game, and just because he had previously

7    published some single-player hangman games in his home country

8    of New Zealand and written some instructions for them, that

9    doesn't mean he had anything to do with writing the

10   instructions that appear in the books that Sterling published

11   under his name here in the United States.  In fact, all of the

12   evidence will be to the contrary.

13        As you will hear from Sterling's employee, Peter

14   Gordon, who is the head of Sterling's puzzle and game division,

15   and who was involved with Mr. Ward right from the beginning of

16   his relationship with Sterling, Sterling wrote the instructions

17   that appear in the hangman books Sterling put out under

18   Mr. Ward's name.

19        Not only that, but back in 2005, when Sterling first

20   sent a draft of the instructions to Mr. Ward, he objected to

21   them, saying that Sterling had completely changed the game and

22   that what Sterling had sent him wasn't even his game anymore.

23        So don't be misled.

24        Now Mr. Ward wants you to believe that just because,

25   according to him, the single-player hangman game in these books

1    was his idea that means he somehow wrote the instructions in

2    the Sterling books.

3           No.  As you heard from Mr. Janay you can't copyright

4    an idea.  You are not the author of something you didn't

5    actually write yourself.

6           It's that simple.  Here the evidence will clearly show

7    that Mr. Ward did not write or contribute anything to the

8    instructions that appear in these books other than the concept

9    or the idea for the game.  That is not enough.

10          The only thing he actually wrote, the only words or

11   text Mr. Ward ever contributed to these books, as the evidence

12   will show, are the words that comprise the solutions to the

13   individual hangman puzzles, what we call the game words.

14          You will hear that expression throughout the trial,

15   the game words.  You will hear the evidence on this, Mr. Ward's

16   only contribution to the text of the hangman books that

17   Sterling put out under his name was to provide Sterling with

18   lists of words that were the solutions to the individual

19   hangman games, which by the way Sterling is not accused of

20   infringing in this case.

21          But he did not write the instructions.  So, remember

22   this case is about the instructions.  It's the instructions my

23   clients are accused of infringing.

24          So the first thing you will be asked to decide is

25   whether Mr. Ward was even the author of the instructions, and

1   in order for you to make that determination, you would have to

2   find that he actually wrote them.

3           As you will hear from the defendant's witnesses over

4   the next few days, Mr. Ward had nothing to do with writing the

5   instructions.  So, as far as we are concerned, this is pretty

6   much an open-and-shut case.  Like I said, you are not the

7   author of what you didn't write, and the evidence will show

8   that Mr. Ward did not write the instructions he comes into

9   court claiming to own.

10          What this means is that Sterling had every right to

11  use these instructions in the hangman books they later put out

12  under other author's names.  That's because they wrote the

13  instructions.

14          Let's take a quick look at the instruction that this

15  case is all about and that you will be seeing through the

16  trial.  I think once you actually see the instructions you will

17  understand exactly what I am talking about, that Mr. Ward

18  contributed nothing to them other than the idea for the game,

19  which they tell you how to play.

20          Even though the game is pretty much self-explanatory

21  anyway, it's hangman.  For goodness sakes, everyone knows how

22  play hangman.  That is the whole point of these books.  The

23  evidence will show that Mr. Ward didn't actually write the

24  instruction, and therefore my clients didn't infringe any

25  copyright in them.

1           So, let's take a look.

2           First, what we see here, and hopefully you have

3     something up on your screen right now, are the instructions

4     that Mr. Ward wrote for some hangman books he published in

5     New Zealand in the early 2000s, before he ever got in touch

6     with Sterling about publishing any books in the United States.

7           Now, understand these are not the instructions that

8     are involved in this case or any of the instructions that

9     Mr. Ward is claiming that my clients infringed.

10          The reason I am showing you these instructions is

11    because they are the only instructions we know of that Mr. Ward

12    ever actually wrote himself.  But this particular set of

13    instructions, these particular words never appeared in any

14    books put out by Sterling in the United States.

15          Instead what Mr. Ward seems to be saying is that these

16    instructions are similar in concept or in theme to the

17    instructions that Sterling wrote, and that somehow means that

18    he is now the author of these instructions.

19          But, as you will hear over and over again in this

20    case, and as Sterling actually told Mr. Ward when they first

21    talked to him about publishing hangman books under his name,

22    you can't copyright an idea, only the particular way that you

23    express that idea, the words that are actually written on a

24    piece of paper.  In particular, you simply can't copyright the

25    idea of haw to play the game of hangman.

1    So the only reason I'm showing you these instructions

2  from Mr. Ward's New Zealand book is to make sure you can

3  clearly see how different they are from the instructions that

4  Sterling wrote when they were preparing to put out books under

5  Mr. Ward's name back in 2005.

6    OK.  Can you show the next one.  OK.

7    So here's the instructions that Sterling wrote back in

8  2005 after signing its first publishing agreement with

9  Mr. Ward.

10    As you can see, other than generally explaining how to

11  play the game, and there's only so many ways you can explain to

12  somebody how to play the game of hangman, the words that appear

13  in these instructions, which were written by Sterling

14  employees, bear no resemblance to the words used in the

15  instructions appearing in Mr. Ward's New Zealand book.

16    In fact, the game Sterling was describing had

17  different rules from the game Mr. Ward was describing in these

18  New Zealand book.  In his New Zealand book Mr. Ward was giving

19  the player ten wrong answers before the player was hanged.  But

20  Sterling was only giving the player six wrong answers.

21    So we are not only talking about a different set of

22  instructions, but a different way to play game.  In fact, as

23  you will see from the evidence, these changes to the basic

24  rules of the game so concerned Mr. Ward that after receiving

25  Sterling's draft set of instructions in 2005, what we call the

1    proofs, he wrote back to Sterling and said, Why did you do

2    this?  You're changing my whole game.

3              But, in any case, there's no doubt that Mr. Ward

4    didn't write the instructions that you are looking at.  In

5    fact, he contributed nothing to them.  So whatever copyright he

6    ended up owning in the text of these books was limited to the

7    only words he actually contributed, and as the evidence will

8    show, the only words Mr. Ward ever contributed to any of the

9    books that Sterling without out under his name were the game

10   words and only the game words.  He simply did not write the

11   instructions in any of the hangman books that Sterling put out

12   under his name.

13             You will see and hear as the evidence is presented to

14   you over the years Sterling made a few updates and

15   modifications to the instructions that it wrote for the hangman

16   books that it put out under Mr. Ward's name, the ones you are

17   looking at.

18             But what's important to remember is that, first, all

19   of these revisions were made to the original set of

20   instructions that Sterling had written, the instructions we

21   just showed you; and, second, all of them are written by

22   Sterling, not by Mr. Ward.

23             So once again, as you will hear, the only thing

24   Mr. Ward ever contributed to these books were the game words

25   and some general concepts and ideas.  This is very important so

1    keep it in mind as you're listening to the evidence.

2            You cannot be the author of an idea.  You are only the

3    author of the particular way that the idea is expressed in

4    actual words.  As you sit through this trial, Mr. Ward may tell

5    you, well, this was my idea or that was my idea.  But the one

6    thing you won't actually hear him say when it comes to the

7    instructions is, yes, I wrote that.  I actually wrote those

8    words.  And I can show you where I wrote them.  He will not be

9    able to do that.

10           And if he can't do that, then guess what?

11           He's not the author of the instructions.

12           Now, if and only if you were to decide that Mr. Ward

13   was the author of these instructions, only then would you be

14   asked to decide the second issue, which is whether the

15   instructions that Sterling used in the five hangman game books

16   that it put out under the names of other authors infringe any

17   version of the instructions that appear in the hangman books

18   that Sterling put out under Mr. Ward's name.

19           So, as you have heard, there are five of these books

20   all together.  We will call them the accused books.

21           One was written by Mr. Francis Heaney, a Sterling

22   puzzle book editor who you will hear from.

23           One was written by Mr. Patrick Blindauer, another

24   Sterling puzzle book editor who you will also hear from.

25           And three were put under the name Jack Ketch.  Jack

1    Ketch is just a historical name, an executioner from the 1600s,

2    an actual hangman, if you will.  And this is what also called a

3    pseudonym in the publishing industry.

4              As to these three books, Sterling's employee, Peter

5    Gordon, the head of the puzzle book division as well as

6    Mr. Heaney and Mr. Blindauer, all had a hand in putting those

7    three Jack Ketch books together.

8              As you will hear from Mr. Heaney and Mr. Blindauer,

9    the instructions that appear in the books published under their

10   names were actually written by them.  Not only that, they are

11   completely different from any of the instructions in the books

12   put out by Sterling under Mr. Ward's name.

13             As you will see there is a good reason for that.  In

14   the books that Mr. Heaney and Mr. Blindauer wrote, the games

15   themselves are different.  They are not just hangman books

16   there is a trivia component to the game as well, and so the

17   instructions needed to be different in order to explain the

18   trivia component of the game.

19             So if we could just put up on the screen the first

20   slide.

21             You see here is Mr. Heaney's book called Trivia

22   Hangman.  You can see that the instructions for that book are

23   completely different from any of the instructions I showed you

24   previously.

25             The reason for that is that he's explaining in detail

1    the trivia component of the book as opposed to the hangman

2    component.

3            That's the second and third paragraphs of those

4    instructions.

5            Let's put up the Blindauer instructions.

6            Here's Mr. Blindauer's book, called Hollywood Hangman,

7    which is also one of the accused books in this case.

8            Once again, you can see that there is a trivia

9    component to the book.  The entire second paragraph of these

10   instructions explains the trivia component of the book, and so,

11   once again, completely different from anything that Sterling

12   used in the books published under Mr. Ward's name.

13           Now, as for the Jack Ketch books, well, it's true that

14   the instructions in those books are the same as the

15   instructions in some of the hangman books that Sterling had put

16   out under Mr. Ward's name, but there is a reason for that.

17           As you will hear, Sterling believed it had the perfect

18   right to do that, since those instructions were written by

19   Sterling, and once again, those instructions look nothing like

20   any instructions Mr. Ward ever wrote for his New Zealand books

21   or anything else.

22           So at the end of the day, after you hear all the

23   evidence, and you can sit down and look carefully at the

24   instructions we have been talking about, there's only one

25   conclusion we believe you can draw, that is, Mr. Ward did not

1    write the instructions in the Sterling books.  All he ever

2    contributed to those books were the game words.

3          Instead, it was Sterling who wrote the instructions on

4    how to play this game, which looked nothing like any

5    instructions Mr. Ward ever wrote for his New Zealand books or

6    anything else.

7          In fact, as I mentioned earlier, he objected to those

8    instructions.  And since Mr. Ward didn't write any of the

9    instructions that appear in the Sterling books, he is not the

10   author of the instructions and he can't be considered to be the

11   copyright owner of them.

12         If he doesn't own the copyright in the instructions

13   that appear in the Sterling books, then there aren't any

14   circumstances under which my clients can be said to have

15   infringed that copyright, and that is the end of the story and

16   the end of that claim, and that's what we think you will have

17   no choice but to conclude when you hear the evidence.

18         Now I want to just very briefly touch on one other

19   subject.  It is an issue that I have to talk to you about

20   because we are here at the beginning of the case, and it is an

21   issue that we trust you won't ever have to get to in this case

22   after you hear all the evidence and after judge Furman

23   instructs on you on the law, and that is the issue damages.

24         But Mr. Ward is making a claim of damages in this

25   case, so at this point in the case I need to talk to you about

1    that.

2          Like most court cases, there are two parts to this

3    case, the part on which is called liability and the part on

4    damages.

5          In this case if you decide, as we believe the evidence

6    will show, that Mr. Ward didn't write the instructions that

7    appear in the hangman books that Sterling put out under his

8    name, and even if he had, that my clients didn't infringe those

9    instructions, that's it.  Game over.  You will not be asked to

10   consider the issue of damages.

11         But in the unlikely event that you were to find

12   infringement, then you would have to consider what damages, if

13   any, Mr. Ward might be entitled to.

14         We think to the extent you even get to the point of

15   considering that issue, that after you hear all the evidence,

16   and keeping in mind that the only portion of the accused books

17   that could have possibly infringed any rights owned by Mr. Ward

18   is the single page of instructions in those books -- that's

19   right.  One page out of 96.  So we think you will find that

20   Mr. Ward has suffered no damages that in any way relate to

21   those instructions.  That's right.  I said no damages.

22         It's very important that you keep in mind what I just

23   said.  The question here is not what damages Mr. Ward may have

24   suffered as a result of the sale of these five books that he's

25   complaining about.  The question is what damage, if any, did

1   Mr. Ward suffer that's related to the single page of

2   instructions that appear in those five books.

3           The testimony that you will hear in this trial is that

4   the instructions are of little to no value at all to the

5   purchasers of these books.  They barely even look at them.

6           What the evidence will show is that people buy these

7   books why?  Because they want to play the games.  They don't

8   buy these books for the instructions.

9           In fact, as you will hear from the Sterling witnesses,

10  if you're familiar with the game of hangman, which most people

11  who buy these books presumably are, you can figure out how to

12  play this game in a matter of minutes even without the

13  instructions.

14          You will be able to test this out for yourself when

15  you retire for your deliberations.  Just play one practice

16  game, and you will know how to play it.

17          Of course, as you will hear from the Sterling

18  witnesses, even if you read the instructions as a first-time

19  purchaser of one of these books, you will never have to read

20  them again, because even if you end up purchasing ten more

21  books, it's the same hangman game you already how to play.

22          Apparently you are going to hear some testimony from

23  Mr. Ward about the's damages he claims to have suffered as a

24  result of the sale of these five books, even though he won't be

25  able to articulate to you in dollars and cents what those

1     damages are.

2            Instead you will hear some vague testimony that he's

3     been hurt in some unquantified way, that this has somehow

4     affected his livelihood.

5            By the way, even though he waited three years to bring

6     this lawsuit and he's been free to sign with another publisher

7     for all three of those years, and to put some context to all of

8     this, as you will hear from ones of Sterling witnesses,

9     Sterling sold a grand total of approximately 31,000 units of

10     the five accused books, with sales in the neighborhood of about

11     $70,000 and profit of less than $8,000.  That's right, Sterling

12     made less than $8,000 on the sale of these five books.

13            As you will hear, if Mr. Ward had been the author of

14     these five books, which he wasn't, the most he would have

15     received in royalties would have been around $10,000.

16            But remember that's not even the issue here.  The

17     issue is not what damages, if any, Mr. Ward suffered as a

18     result of Sterling's sale of the five books as a whole.  The

19     issue is what damages, if any, did Mr. Ward suffer as a result

20     of Sterling's use of the instructions in those books.

21            And aside from the fact that, as you have seen in at

22     least two of the five books, the books authored by Mr. Heaney

23     and Mr. Blindauer, the instructions look nothing at all like

24     the instructions Mr. Ward claims to have written.

25            The answer is that the instructions have no value to

1    any of the hangman books put out by Sterling.  So the evidence

2    is going to show you that Mr. Ward suffered zero damages, that

3    is, he suffered no monetary loss whatsoever as the result of my

4    client's use of the instructions in the five accused books.

5              So remember this as you are listening to the evidence.

6    The question is not how much money, if any, Mr. Ward lost as

7    the result of the sale of the five books, which he won't be

8    able to quantify for you anyway.  The question is how much

9    money Mr. Ward lost as the result of Sterling's use of the

10   instructions in those five books.

11             So that in the unlikely event that you find that

12   Mr. Ward is the author of the instructions that appear in the

13   hangman books that Sterling put out under his name, which as

14   the evidence will show he was not, and that the instructions in

15   the five accused books infringed his alleged copyright in the

16   instructions that appear in the books put out under his name,

17   which the evidence will show they didn't, nevertheless, as the

18   evidence will also show, Mr. Ward lost no money as a result of

19   Sterling's use of these instructions in the accused books.

20             So I hope I have been able to simplify this case for

21   you here today, and I want to thank you again for your

22   attention and your service and I look forward to speaking to

23   you again at the end of the case.

24             Thanks.

25             THE COURT:  Thank you very much, Mr. Ederer.

1           Mr. Janay, please call your first witness.

2           MR. JANAY:  Plaintiff calls Mike Ward to the stand.

3           THE COURT:  Mr. Ward, if you can make your way right

4    here, please.

5     MIKE WARD,

6         the Plaintiff herein,

7         having been duly sworn, testified as follows:

8           THE COURT:  Speak about that far from the microphone,

9    please.

10          Can you spell and state your name, please.

11          THE WITNESS:  Sometimes I have a bit of difficulty

12   with accents, so I can hear you reasonably well.

13          THE COURT:  OK.  But can you just state your name and

14   spell it.

15          THE WITNESS:  Oh, my name is Mike Ward.  I am an

16   author and I come from New Zealand.

17          THE COURT:  Mr. Ward.

18          All right.  I think we know how it is spelled.

19          Mr. Janay, why don't you proceed.

20          You can use the podium.

21          MR. JANAY:  Oh.

22   DIRECT EXAMINATION

23   BY MR. JANAY:

24   Q.  Good afternoon, Mr. Ward.

25          You have traveled halfway around the world to bring

1    this case to court.  Can you explain why you have done this.

2              MR. EDERER:  Objection, your Honor.

3              THE COURT:  Sustained.

4              THE WITNESS:  Am I allowed to review my notes?

5              THE COURT:  You are not allowed to refer to your

6    notes, and I sustain the objection.  So ask your next question,

7    please.

8    BY MR. JANAY:

9    Q.  Mr. Ward, could you explain the background of how you came

10   up with the creation of scratch hangman books.

11             THE WITNESS:  Again, your Honor, am I allowed to refer

12   to my notes?

13             THE COURT:  You are not.

14             THE WITNESS:  Pardon?

15             THE COURT:  You are not.

16             THE WITNESS:  I am not allowed to?

17             THE COURT:  Mr. Janay has asked you a question.  You

18   can answer the question.

19             THE WITNESS:  It is very difficult without referring

20   to my notes because there is a lot of technical details that I

21   have written down to jog my memory.  To do it without having a

22   look at my documents is going to be very difficult.  That's why

23   I would ask the Court if I am allowed to access my notes.

24             THE COURT:  Mr. Ward, counsel has asked you a

25   question.  You can answer the question in whatever way you

1    think is appropriate.

2           If counsel has another question or counsel think it's

3    proper to show you something, then he will do that.  But answer

4    the question, please.

5           THE WITNESS:  I am not allowed?

6           THE COURT:  Just answer the question, please.

7           THE WITNESS:  Barry, can you state it again.

8    BY MR. JANAY:

9    Q.  Can you now explain the background of how you came up with

10   the creation of the scratch hangman series.

11   A.  The best I could probably explain is how I came up with the

12   idea in the first place.  I have always been a writer.  Most of

13   my life and one day the editor of a local newspaper came to me

14   and asked me if I wanted to contribute to the crossword.

15          I said, yes, I would give it a go.  That ran for about

16   20 years.  They came back again and said that what I should do

17   is produce a puzzle book, because of the popularity of the

18   crosswords were quite good.  This I did and unfortunately it

19   turned out to be a disaster and I lost money on the venture.

20   Upon --

21          MR. EDERER:  Your Honor, objection.

22   A.  -- analyzing.

23          MR. EDERER:  Move to strike.  It is not responsive.

24          THE COURT:  Overruled.  Mr. Janay, ask your next

25   question, please.

F7snwar2                    Ward - direct

1          MR. JANAY:  I don't think he answered the question

2     there.

3          THE COURT:  You have to ask a question so that he can

4     answer.  I don't want to ask a question that elicits a

5     45-minute answer.  That is not the way this is supposed to

6     work.  All right.

7          Ask him a question and he can answer it and you can

8     ask another question if you like.

9     BY MR. JANAY:

10    Q.  Mr. Ward, when did you excrete the scratch hangman series?

11    A.  Sorry?

12    Q.  When did you excrete the scratch hangman series?

13    A.  That was straight after I analyzed the crossword books and

14    found out why it actually was a disaster.

15          It was at that time that I thought that there must be

16    another style of puzzle book that nobody else has thought of

17    that would give me the ability to create, get copyright

18    protection so that nobody else could take away my creation.

19    Q.  Around what year was that?

20    A.  Yeah.

21          So after quite a while --

22          THE COURT:  Mr. Ward.

23    A.  -- investigating different things --

24          THE COURT:  Mr. Ward.

25    A.  -- I came --

1           THE COURT:  Mr. Ward, am I correct you have a little

2    trouble hearing.

3           Is that correct?

4           Do you have trouble hearing?

5           THE WITNESS:  Sometimes with the accents I do.  It's

6    the New York accent that I find sometimes difficult.  It is the

7    same people might find it hard to hear my accent.  When if they

8    came to New Zealand, they might find it hard to understand us

9    down there.  It is more the accent than anything.

10          THE COURT:  You need to listen to the question that

11   the lawyer asked you and just answer that question.  So he just

12   asked you when you came up with the idea for the scratch and

13   solve books.  The answer is approximately what year?  You don't

14   have to then give more information.  If he wants you to give

15   more information, he'll ask you another question.

16          All right.  So make sure you listen carefully and just

17   answer the question that you are being asked, Mr. Janay.

18   BY MR. JANAY:

19   Q.  Mr. Ward, when did you come up with the scratch hangman

20   series?

21   A.  What year?

22   Q.  Yes.

23   A.  1994 is when I registered for a government date stamp in

24   New Zealand.

25          MR. EDERER:  Objection, your Honor.

F7snwar2                    Ward - direct

1             THE COURT:  Overruled.

2    Q.  OK.  That is fine.

3    A.  Yes.

4    Q.  That's when you registered.

5    A.  Carry on?

6    Q.  That leads me to my next question.  What steps did you take

7    to protect the scratch hangman series?

8             MR. EDERER:  Objection.

9             THE COURT:  Sustained.

10   A.  What date did I start the scratch series?

11   Q.  You don't have to answer that.

12   A.  Basically is that what you are asking?

13            THE COURT:  Mr. Ward.

14            MR. JANAY:  That question is stricken.

15   A.  It is a pity you can't come a bit closer, and then I can

16   hear you real good.

17            MR. JANAY:  I will speak louder into the microphone.

18            THE COURT:  Why don't you move the podium maybe a foot

19   or two forward.  Hopefully Juror No. 6 will be able to see

20   anyway.

21            THE WITNESS:  That might be better.  That is the

22   volume, is it?

23   BY MR. JANAY:

24   Q.  Mr. Ward, the instruction page to the scratch hangman books

25   are at issue in this case.

1          Can you explain your involvement in the creation of

2     the instruction page and the relevance of the instruction page

3     to the scratch hangman books?

4          MR. EDERER:  Objection.

5          THE COURT:  Sustained as to form.

6     A.  I was the author --

7          THE COURT:  Mr. Ward, if I just sustain an objection,

8     you don't answer.

9          OK.  The jury will disregard that answer.

10    BY MR. JANAY:

11    Q.  Mr. Ward, can you explain your involvement in the creation

12    of the instruction page of the scratch hangman books?

13    A.  I was the author of it.  I created the instruction page.  I

14    wrote it initially myself.  I created it.  Therefore, I was the

15    author at the outset.

16    Q.  Can you explain the significance or importance of the

17    instruction page to the scratch hangman books.

18    A.  Yes.  The instruction page is an integral part of a puzzle

19    book.  If you had a puzzle book and you didn't have the

20    instruction page, what use would the puzzle book be?

21         It's the same as if you had a set of machinery that

22    was operated by a code and you had the machinery, but you

23    didn't have the code.  Therefore, the code would be valuable.

24         Therefore, a book without the instruction page is of

25    no value at all.  Therefore, the value of the instruction page

1    would be the integral price of the whole book.

2    Q.   The instruction page for when -- I'm sorry.  Let me go

3    back.  How did you come to know of the defendant Sterling

4    Publication?

5    A.   Because they started advertising online, and I came across

6    it.  I think it was Barnes & Noble, Amazon online, sites like

7    this.

8    Q.   Once you learned of Sterling Publications, what next?

9              What happened next?

10             MR. EDERER:  Objection.

11   A.   It didn't make sense, that question.

12             Could you ask it again.

13             THE COURT:  Counsel, can you fix a time.

14             Can you get the witness to identify when we are

15   talking about.

16             MR. JANAY:  OK.

17   BY MR. JANAY:

18   Q.   Mr. Ward, why don't you give us a time line from when you

19   created -- briefly give us a time line from when you created

20   the scratch hangman books in New Zealand to the time that you

21   introduced them to Sterling Publications.

22             MR. EDERER:  Objection.

23             THE COURT:  I will allow it.  Overruled.

24   A.   I realized that it is very hard to get into a publication

25   of the U.S.  I sold a quarter of a million books locally before

1  I approached Sterling to see if they wanted to publish the book

2  over here.

3              (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

1    Q.  And you did sell a quarter of a million books in New

2    Zealand, is that what you're testifying?

3    A.  Yes, in my manuscript I got a letter from my distributor

4    confirming the fact that that was the case.

5    Q.  By "manuscript," are you referring to a particular exhibit?

6    A.  On the last page before the volume right there.

7              MR. JANAY:  Defendant's Exhibit 2 is being offered

8    into evidence.  I didn't want to duplicate the exhibit?

9              THE COURT:  You haven't given it to the witness.  The

10   witness hasn't identified it.  I don't know what it is.  That

11   is not the proper way to do it.  If you want to proceed, you

12   may, but certainly right now it is not introduced.

13   BY MR. JANAY:

14   Q.  Mr. Ward, I would like to hand you a document and I would

15   like you to explain what the document is.

16             THE COURT:  Go back to the podium.

17   A.  Yes, that was the last page.

18             THE COURT:  Mr. Ward, do you recognize that document?

19             THE WITNESS:  Yes.

20             THE COURT:  What is it?

21             THE WITNESS:  That is the letter from my New Zealand

22   distributor acknowledging I sold a quarter of a million copies.

23             THE COURT:  What is the document as a whole, the whole

24   document?

25             THE WITNESS:  Do you want me to read it?

1           THE COURT:  I don't want you to read it.  What is the

2    whole document?  Not that page.  What is the whole document?

3           THE WITNESS:  The whole document?

4           THE COURT:  Look at the front, please, sir.

5           THE WITNESS:  Is a letter from my --

6           THE COURT:  Look at the first page, please.

7           THE WITNESS:  Sorry.  The first page is the

8    manuscript.  This is the most important document that is --

9           THE COURT:  Mr. Ward, tell me what this is generally.

10          THE WITNESS:  This is the initial offer plus the

11   format that I seek to --

12          THE COURT:  Would you like to offer Exhibit 2?

13          MR. JANAY:  Yes, I would.

14          THE COURT:  Any objection?

15          MR. EDERER:  It is our document, your Honor, he is

16   offering our exhibit into evidence.

17          THE COURT:  I understand.

18          MR. EDERER:  Of course, there is no objection.

19          THE COURT:  Admitted.

20          (Defendant Exhibit 2 received in evidence)

21          MR. JANAY:  Is it possible to get their exhibit on the

22   screens for the jury, your Honor?

23          THE COURT:  Mr. Janay, unless you have made

24   arrangements to do that, the answer is no.

25   BY MR. JANAY:

```
 1  Q.  Mr. Ward, why don't you explain the significance of that
 2  document.
 3            MR. EDERER:  Objection.
 4  A.  The manuscript --
 5            THE COURT:  Overruled.
 6  A.  -- basically is exactly the same as what an author would
 7  write and submit to a publisher.  Image you're writing a book
 8  and you send it to the publisher.  The publisher accepts it,
 9  which means appearing for publication, then it is published.
10            So this manuscript here is basically my initial
11  writing that I submitted to the publisher.  The manuscript had
12  the instructions of what to do.
13            For instance, I see the samples, samples of the --
14            THE COURT:  Mr. Ward, hold on, please.
15            MR. EDERER:  I object to showing of the exhibit.  It
16  is not --
17            THE COURT:  It is not being shown.  Mr. Janay, ask
18  your next question, please.
19  BY MR. JANAY:
20  Q.  So, Mr. Ward, this manuscript you provided to whom?
21  A.  I seem to at this time to Francis Heaney, Sterling
22  publisher.  Francis Heaney was the person that was accepting
23  manuscripts at that time, but I think in the meantime he has
24  left the company.
25  Q.  Okay.
```

1  A.  So the position of Francis Heaney is near taken over by

2  Peter Gordon, who is the editorial director at Sterling.

3  Q.  Is there anything else of significance to the manuscript

4  you submitted to Sterling?

5  A.  The manuscript is like an initial author's writing,

6  explains what the puzzle book entailed, and also put the layout

7  of the unique style of publication.

8          I put in the instruction page to him to play the game

9  which is different to the New Zealand books that I produced,

10  and also on the last page is a letter from my distributor in

11  New Zealand acknowledging the fact that a quarter of a million

12  copies were sold.  It was how, how unique it was.

13  Q.  Thank you.

14          Did Sterling ever respond to your proposal?

15  A.  Yes, there is a letter that was published in the New York

16  Times where he acknowledged the time-frame it took.

17          MR. EDERER:  Objection.

18          THE COURT:  Sustained.  Mr. Ward, just answer the

19  question.  Did Sterling ever respond to that letter?

20          THE WITNESS:  Yes.

21          THE COURT:  Okay.  When?  When?

22          THE WITNESS:  Immediately.

23          THE COURT:  And how?

24          MR. JANAY:  I would like to introduce Exhibit 3, your

25  Honor, to --

1          THE COURT:  Sustained.  That is not how it works.  How

2   did they respond?

3          THE WITNESS:  By e-mail.

4          THE COURT:  You may ask your question.

5          MR. JANAY:  I couldn't hear what he said.  I am sorry.

6          THE COURT:  By e-mail.

7   BY MR. JANAY:

8   Q.  Mr. Ward, I am going to present to you a document and I

9   would like you to explain if that is the e-mail you just

10  referred to in your testimony?

11  A.  Yep.

12         MR. JANAY:  Plaintiff's Exhibit 3 is being offered for

13  evidence, your Honor.

14         THE COURT:  Mr. Janay, you have to hand him the

15  exhibit.  You say do you recognize this and what is it and then

16  you can offer it if there is a basis to do so.

17         THE WITNESS:  Yes.

18  BY MR. JANAY:

19  Q.  Mr. Ward, do you recognize this document?

20         THE COURT:  Back to the podium, please.  Do you

21  recognize that document, Mr. Ward?

22         THE WITNESS:  Yes, this is a document from Peter

23  Gordon.

24         THE COURT:  Just yes or no, do you recognize that?

25         THE WITNESS:  Yes.

1      THE COURT:  What is it?

2      THE WITNESS:  It is a letter from Peter Gordon at

3  Sterling, who states that he is the --

4      THE COURT:  No, no, no, Mr. Ward.  Don't read it.  Is

5  this an e-mail Mr. Gordon sent to you?

6      THE WITNESS:  Yes.

7      THE COURT:  Is this the e-mail in response to your

8  solicitation about the book?

9      THE WITNESS:  Yes.

10      THE COURT:  Do you offer it?

11      MR. JANAY:  Yes, your Honor.

12      THE COURT:  Any objection?

13      MR. EDERER:  No, your Honor.

14      THE COURT:  Admitted.

15      (Plaintiff Exhibit 3 received in evidence)

16  BY MR. JANAY:

17  Q.  Mr. Ward, what is the significance of -- in your own words,

18  what did Sterling, how did Sterling respond in that e-mail to

19  your proposal?

20      THE COURT:  Sustained.

21      MR. JANAY:  Let me rephrase it.

22  A.  The actual response.

23  BY MR. JANAY:

24  Q.  Mr. Ward, Exhibit 3 which you're holding is the e-mail from

25  Sterling you just testified to, correct?  What are some key

1    details in that e-mail?

2    A.   Their response was --

3              MR. EDERER:  Objection.

4              THE COURT:  Sustained.

5              THE WITNESS:  I --

6              THE COURT:  Sustained.  Mr. Ward, please stop.  Mr.

7    Janay, go ahead.

8    BY MR. JANAY:

9    Q.   In the e-mail that you received from Mr. Gordon, did they

10   acknowledge anything regarding the rights to the works?

11             MR. EDERER:  Objection.

12             THE COURT:  Sustained.

13             THE WITNESS:  He stated --

14             THE COURT:  Hold on, Mr. Ward.  Mr. Ward --

15             THE WITNESS:  They stated --

16             THE COURT:  Mr. Ward, if I say "sustained," you can't

17   answer the question.  Thank you.

18   BY MR. JANAY:

19   Q.   Mr. Ward, in the e-mail response did Sterling acknowledge

20   they received your proposal?

21   A.   Yes.

22   Q.   Anything further?

23   A.   They --

24             MR. EDERER:  Objection.

25   A.   -- they actually --

1           THE COURT:  Overruled.

2           THE COURT:  Hang on.

3           THE JURY:  We can't see it.

4           THE COURT:  Ladies and gentlemen, let me just explain.

5       If a document is admitted into evidence and it is

6  properly to be shown to you at this time, it will be on your

7  screens.  If not, it is not going to be on your screens.  At

8  the end of the case during your deliberations you will receive

9  all of the evidence admitted at trial.  At some point you will

10 certainly see any evidence admitted at trial.  Until then, it

11 is sort of up to the circumstances whether you do or don't see

12 it.  So, Mr. Janay, next question.

13          MR. JANAY:  I would like to have this admitted into

14 evidence, Exhibit 3.  There were no objections.

15          THE COURT:  It is in evidence.

16          MR. JANAY:  I would like the jury to be able to see

17 it.

18          THE COURT:  You do not display what is on your screen.

19          Next question.  You are welcome if you want to publish

20 it to the jury and you want to have them look at it briefly, I

21 am happy to let you show them the actual document.

22          MR. JANAY:  That is exactly what I would like to do,

23 your Honor.

24          THE COURT:  Not on the screen.

25          MR. JANAY:  You mean hand it to the jury?

1              THE COURT:  Yes.

2              MR. JANAY:  At this time?  Okay.

3              And the Defense Exhibit 2?

4              THE COURT:  We have moved on.  Just Plaintiff's

5    Exhibit 3, please, give to Juror No. 1.  He can hand it down

6    the line and we'll proceed.

7    BY MR. JANAY:

8    Q.  Were there any follow-up communications with Sterling after

9    the e-mail that we have just discussed, Plaintiff's Exhibit 3?

10   A.  You might have to say that again.  I have the volume

11   different now.

12   Q.  Did you have any follow-up discussions with Peter Gordon

13   after the e-mail that has been admitted as Plaintiff's Exhibit

14   3?

15   A.  Yes.

16   Q.  What did those discussions entail?

17   A.  Those discussions, obviously we are talking about the book.

18   They were keen to -- there is now the New York Times that he

19   had --

20              MR. EDERER:  Objection, your Honor.

21              THE COURT:  Sustained.  Mr. Ward, just describe the

22   communications that you had with him, okay?  You have mentioned

23   the New York Times a couple of times.  Don't talk about that.

24   Just answer the question, okay?

25              What was the --

1              THE WITNESS:  He cited documentation from them.

2              MR. JANAY:  Your Honor, I would like to approach the

3     witness.

4              THE COURT:  You may.

5              (Pause)

6     BY MR. JANAY:

7     Q.  Mr. Ward, I have just handed you a piece of paper which is

8     designated as Plaintiff's Exhibit 4.  Can you explain what that

9     document is.

10    A.  This is e-mail from Peter Gordon, at Sterling Publishing,

11    with an offer because they wanted to sign up for the Hangman

12    publication.

13    Q.  What did that offer entail?

14             MR. EDERER:  Objection.

15    A.  They initially wanted to sign up --

16             THE COURT:  Sustained.  Are you offering the exhibit,

17    Mr. Janay?

18             MR. JANAY:  I am, your Honor.

19             THE COURT:  Any objection?

20             MR. EDERER:  I am going to object to the relevance of

21    the document, your Honor.

22             THE COURT:  Overruled.  It is admitted.

23             (Plaintiff Exhibit 4 received in evidence)

24             THE COURT:  May I see counsel at sidebar for a moment,

25    please.

1        (At the sidebar)

2            THE COURT:  This is excruciating and I am rapidly

3    losing my patience.  Among other things, you're in violation of

4    the court's standing order in regarding use of electronic

5    devices in the courtroom.  While I permitted you to leave a

6    laptop, the standing order says you may not use wireless to

7    access the internet.  Amony other things, your Facebook page is

8    on my screen.  In addition, you're accessing documents.

9            If you were not adequately prepared to display

10   documents to the jury, that is your problem and not my problem.

11   You better shut off the wireless right now and I don't want you

12   to spend time on the internet.  If I see it again, you will be

13   fined.  Thank you.

14           (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2          MR. JANAY:  Okay, so back to Plaintiff's Exhibit 4,

3    which is being offered into evidence.

4          THE WITNESS:  This --

5          THE COURT:  Hold on, Mr. Ward.  There is no question.

6    What is the question?

7          MR. JANAY:  I am offering Exhibit 4 into evidence.  I

8    am waiting to hear further instruction or if there is an

9    objection.

10          THE COURT:  I admitted it over objection.

11    BY MR. JANAY:

12    Q.  Now, Mr. Ward, can you just explain to me what the document

13    in your hands is.

14    A.  This is an e-mail sent to me from Peter Gordon, the

15    editorial director at Sterling, dated 9th of July, 2004, where

16    he goes Hi, Mike.  Here is your offer.  He wanted to sign up

17    for four books, and then they wanted to continue doing two

18    books thereafter every six months indefinitely.

19          MR. JANAY:  Thank you.  I'll publish that to the jury,

20    your Honor.

21          THE COURT:  You may.  (Pause)

22          I know, ladies and gentlemen, it is not on the screen.

23    Unfortunately, that is what it is.  I am allowing Mr. Janay to

24    show you the exhibits that have been introduced, and that's

25    just the way it is going to be at the moment.  Mr. Janay, next

1   question.

2   BY MR. JANAY:

3   Q.  Mr. Ward, you've referenced a New York Times article on a

4   few occasions in your testimony.  Can you elaborate a little

5   bit further on that?

6            THE COURT:  Sustained.

7            MR. JANAY:  I'd like to show to the witness

8   Plaintiff's Exhibit 7.

9            THE COURT:  You may approach.

10  BY MR. JANAY:

11  Q.  Mr. Ward, I've just handed you a document marked

12  Plaintiff's Exhibit 7.  Can you explain that document?

13           MR. EDERER:  Objection.

14  A.  This was an interview --

15           THE COURT:  Overruled.  Just explain what the document

16  is, please.  Just what is the document briefly?

17           THE WITNESS:  The document is an interview with Peter

18  Gordon with the New York Times.

19           THE COURT:  Go ahead.

20  BY MR. JANAY:

21  Q.  Does that document reference anything concerning a Scratch

22  Man book?

23  A.  Yes.

24           MR. EDERER:  Objection.

25           THE COURT:  Sustained as to form.

1          MR. JANAY:  I have to rephrase the question.

2          THE WITNESS:  When --

3          MR. JANAY:  Mr. Ward, please.

4   BY MR. JANAY:

5   Q.  The document that you're holding, what is the significance

6   of that document?

7   A.  The significance --

8          MR. EDERER:  Objection.

9          THE COURT:  Sustained.  Sustained.

10         THE WITNESS:  The significance --

11         MR. JANAY:  Wait, Mr. Ward.

12  BY MR. JANAY:

13  Q.  Mr. Ward, can you please explain what that document is and

14  how it relates to what you believe this case is about?

15         MR. EDERER:  Objection.

16         THE COURT:  Sustained.

17  A.  Yes, I am trying to do this.

18         THE COURT:  Sustained.  Sustained.

19  BY MR. JANAY:

20  Q.  Mr. Ward, is that a copy of a New York Times article in

21  your hand?

22  A.  Yes.

23         MR. EDERER:  Objection.

24         THE COURT:  Sustained.

25  A.  It is in the --

1              (Pause)

2    BY MR. JANAY:

3    Q.  Mr. Ward, can you please relate to the jury what the

4    contents of that article are.

5              MR. EDERER:  Objection.

6              THE COURT:  Sustained.

7    BY MR. JANAY:

8    Q.  Mr. Ward, does this article from the New York Times

9    reference someone from New Zealand --

10             MR. EDERER:  Objection.

11             THE COURT:  Sustained.  Why don't you move on to the

12   next line, Mr. Janay.

13             MR. JANAY:  I'd like to pass that, publish that to the

14   jury, your Honor.

15             THE COURT:  It is not in evidence, Mr. Janay.  Next

16   line of questioning, please.

17             MR. JANAY:  I am offering it into evidence.

18             THE COURT:  I am not allowing it into evidence.  Next

19   line of questioning, please.

20             MR. JANAY:  Can we sidebar?

21             THE COURT:  No.  Next line of questioning, please.

22   BY MR. JANAY:

23   Q.  Mr. Ward, did Peter Gordon ever make a public statement

24   concerning the Scratch Man series books you --

25             MR. EDERER:  Objection.

F7SJWAR3                     Ward – direct

1          THE COURT:  Sustained.  Sustained.

2          MR. JANAY:  I would like to introduce Exhibit 6.

3          THE COURT:  You may approach the witness.

4          (Pause)

5     BY MR. JANAY:

6     Q.  Mr. Ward, I have just handed you a document that is marked

7     Plaintiff's Exhibit 6.  Can you explain what this document is.

8     A.  This is an e-mail I received from Peter Gordon on June

9     17th, 2009, where he stated --

10          MR. EDERER:  Objection.

11          THE COURT:  That is it.  Next question.

12    BY MR. JANAY:

13    Q.  What was the subject line of that e-mail?

14          THE COURT:  Sustained.

15    A.  The current --

16          THE COURT:  Sustained.

17          MR. JANAY:  I'd like to offer Plaintiff's Exhibit 6

18    into evidence, your Honor.

19          THE COURT:  Any objection?

20          MR. EDERER:  Yes, your Honor, objection to relevance.

21          THE COURT:  Overruled.  It is admitted.

22          (Plaintiff Exhibit 6 received in evidence)

23    BY MR. JANAY:

24    Q.  Now may I ask Mr. Ward, what does the subject line of that

25    e-mail read?

1    A.   The subject line reads:  One million 200, 259.

2    Q.   Does the body of that e-mail explain why that subject

3    matter, the subject line is there?

4    A.   Yes, he stated that these were him and he sold books of

5    mine that had sold on that date.

6    Q.   Is there anything else in those documents that you'd like

7    to testify to?

8              MR. EDERER:  Objection.

9              THE COURT:  Sustained.

10             THE WITNESS:  Significant --

11             THE COURT:  Sustained.

12   BY MR. JANAY:

13   Q.   What is the date of that e-mail?

14   A.   What?

15   Q.   What is the date of the e-mail, Mr. Ward?

16   A.   June 17th, 2009.

17   Q.   When was it that you started your relationship with

18   Sterling?

19   A.   They started the Volume I in 2005.

20   Q.   So --

21   A.   Four years.

22   Q.   -- in four years there were 1 million copies of Scratch &

23   Solve Hangman sold?

24             THE COURT:  Sustained.

25             MR. EDERER:  Thank your Honor.

1           THE COURT:  To be clear, it is a one-page document

2     that is in evidence.

3           MR. JANAY:  That can't be right.

4           THE COURT:  Sir?  The first page is in evidence.  I

5     have not allowed a second page into evidence.

6           MR. JANAY:  Thank you for clarifying.  Plaintiff would

7     like to admit the second page into evidence.

8           THE COURT:  Denied.

9           MR. JANAY:  I'd like to know the basis for the denial.

10          THE COURT:  No.  Proceed.

11          MR. JANAY:  Okay.  I'd like to publish the first page

12    of the exhibit to the jury.

13          THE COURT:  You have summarized or he has summarized

14    the entirety of it, so I think it is okay, we don't need to

15    distract the jury any more.  Next question.

16          MR. JANAY:  I don't believe it is a distraction to the

17    jury, your Honor, and thank you.

18          THE COURT:  It is denied.  Please don't comment or

19    respond.

20          MR. JANAY:  I would like to present Plaintiff's

21    Exhibit 5 to the witness, your Honor.

22          THE COURT:  You may approach.

23    BY MR. JANAY:

24    Q.  Mr. Ward, I just handed you a document, and it is marked

25    Plaintiff's Exhibit 5.  It is an e-mail.  Can you tell he who

1    that e-mail is from and to?

2    A.  (Pause)

3    Q.  Can you tell me who the e-mail is from and who it is to?

4    A.  It is from Peter Gordon again to me, the subject Hangman

5    books.

6    Q.  What is it dated?

7    A.  Dated September the 24th, 2008.

8    Q.  Do you recall receiving this e-mail?

9    A.  Yes.

10   Q.  Can you summarize what the e-mail states?

11              MR. EDERER:  Objection.

12              THE COURT:  Sustained.

13              MR. JANAY:  I would like to publish this e-mail to the

14   jury.

15              THE COURT:  Are you offering it?

16              MR. JANAY:  I am offering it.

17              THE COURT:  Any objection?

18              MR. EDERER:  Yes, your Honor, its relevance.

19              THE COURT:  Overruled.  It is admitted.

20              (Plaintiff Exhibit 5 received in evidence)

21              THE COURT:  And you may publish it.

22   BY MR. JANAY:

23   Q.  Mr. Ward, by this point in 2008 you had a multitude of

24   dealings with Sterling.  Can you explain if there was any kind

25   of back-and-forth process with the creation of the books?

1            THE COURT:  Sustained as to form.

2    A.  Is --

3            THE COURT:  Sustained.

4            MR. JANAY:  I have to rephrase the question.

5    BY MR. JANAY:

6    Q.  It is apparent from, Mr. Ward, it is apparent from the

7    documents that are now in evidence that you have had a

8    relationship with Sterling Publications.  Can you explain to

9    the jury the details of that relationship including whether

10   there was a back-and-forth between you and the editors at

11   Sterling?

12           MR. EDERER:  Objection.

13           THE COURT:  Sustained.

14   BY MR. JANAY:

15   Q.  Mr. Ward, can you briefly describe your relationship with

16   the defendant Sterling between 2004 and 2008.

17           MR. EDERER:  Objection.

18           THE COURT:  Overruled.  You you may answer that.

19   A.  Can I answer this now?

20   Q.  Yes, you can.

21   A.  The goodwill between Sterling and myself was high in the

22   beginning.  The manuscript initially seen, I gave them approval

23   to hold to the format if they so desired.

24           MR. EDERER:  Objection, your Honor.

25           THE COURT:  Just briefly describe the relationship

1    between you and Sterling from 2004 to 2008.  We don't want a

2    detailed description of each and every communication, just an

3    overview of your relationship.

4                THE WITNESS:  Understood.  I was doing that.  I was

5    stating that I gave them leeway to change formats if they

6    liked.  However, the sole final approval came from me.

7                MR. EDERER:  Objection, your Honor.

8                THE COURT:  Overruled.

9                MR. EDERER:  I move to strike.

10               THE COURT:  Overruled.

11               THE WITNESS:  And they did make some changes which I

12   approved.  The main change they made was that with my New

13   Zealand books, I had copyrighted it with teen chances of,

14   before you have been hung on the puzzle book.

15               With Peter Gordon, he elected to high that number to

16   5.  Therefore, with me being the author, I had to come up with

17   a longer ways to compensate for shorter chances that they had

18   in the U.S. books.

19               So there was a lot of to-ing and fro-ing, and even

20   with the words, it was the words I described the answers, but a

21   lot of them were longer ones to compensate for the changes that

22   they wanted to make, and I approved.

23               THE COURT:  All right.  Next question.

24   BY MR. JANAY:

25   Q.  Mr. Ward, is it fair to say that you approved of all of the

1    changes that were made to the original manuscript?

2              THE COURT:  Sustained.

3              MR. EDERER:  Objection.

4              MR. JANAY:  You can't answer that.

5              THE COURT:  Sustained.

6    BY MR. JANAY:

7    Q.  Mr. ward, can you explain the approval process of changes

8    to your original manuscript and their ultimate publication in

9    the Scratch & Solve series?

10             MR. EDERER:  Objection.

11             THE COURT:  Overruled.

12   A.  Sterling made the drafts, and I approved them and then I

13   approved them for publication.  The facility happened for 40

14   titles and sales were well over 2 million.

15   Q.  I didn't understand the last thing you said.  Can you

16   please repeat it.

17             MR. EDERER:  Objection.

18             THE COURT:  Why don't you ask your next question,

19   please.  Ask your next question.

20   BY MR. JANAY:

21   Q.  You stated that Sterling would send you a draft, but what

22   was that original draft based on?

23   A.  The original draft was based on my manuscript.  You see, a

24   manuscript is what an author supplies to a publisher.

25             MR. EDERER:  Objection, your Honor; unresponsive.

1           THE COURT:  Overruled.

2    A.   Once Sterling received my manuscript, it is up to them to

3    edit it how they see fit.  They were editing means to prepare

4    for publication.  This they did.

5           THE COURT:  All right.  Thank you, Mr. Ward.

6           Next question.

7    BY MR. JANAY:

8    Q.   Between 2004 and 2008, approximately how many edits to your

9    manuscript do you recall there being made?

10          THE COURT:  Counselor, are we talking about one

11   particular manuscript or multiple manuscripts?

12          MR. JANAY:  He is referring to the --

13          THE COURT:  I am not asking what he is referring to.

14   What is your question referring to?

15          MR. JANAY:  To the edits to the manuscript for his

16   work between 2004 and 2008.  I am trying to establish the

17   back-and-forth process.

18          THE COURT:  Why don't you clarify the question.  I

19   think it is totally unclear whether there is one manuscript or

20   multiple manuscripts.  You referenced multiple books, so if you

21   could clarify, that would be helpful.

22   BY MR. JANAY:

23   Q.   Mr. Ward, sticking solely to the instructions that are

24   found in the Scratch & Solve Hangman books, do you recall edits

25   to those instructions between you and Sterling?

1              MR. EDERER:  Objection, your Honor.

2              THE COURT:  Overruled.

3    A.  Yes, the instructions that I supplied with my manuscript

4    were used in the majority of the cases to the instruction page

5    in the U.S. Hangman books.  It is a pity I can't refer to my

6    notes because I --

7              THE COURT:  Mr. Ward, stop.  Just answer the question,

8    please.

9              THE WITNESS:  Do you want me to specifically state the

10   differences between New Zealand and U.S. books?

11   BY MR. JANAY:

12   Q.  No.  What I am asking you to explain to the jury is your

13   involvement in the creation of the instructions to the scratch

14   Hangman books that were published by Sterling.

15   A.  Okay.  I supplied Sterling my manuscript initially.

16   Included in the manuscript was the instruction page which they

17   edited for the U.S. books.  They then always came back to me,

18   requiring me approval to the editorial changes which I did.

19             MR. EDERER:  Objection, your Honor.

20             THE COURT:  Overruled.  Go ahead.  You may finish.

21   Please wait till the end of the answer.  You may finish.

22   BY MR. JANAY:

23   Q.  You can finish.

24   A.  Ha?

25   Q.  You can finish explaining.

1    A.  This process was carried on for 40 titles in my name and my

2    name only, and it was only until the --

3           THE COURT:  Mr. Ward, just stop there.  Thank you.

4    Mr. Janay, your next question.

5           MR. JANAY:  I'd like to present Plaintiff's 8 to the

6    witness, your Honor.

7           THE COURT:  You may approach.

8           (Pause)

9    BY MR. JANAY:

10   Q.  Mr. Ward, I just handed you a document.  Do you recognize

11   this document?

12   A.  Yes.

13   Q.  Can you explain what this document includes.

14   A.  This is a letter form, dated October the 14th, 2013, from

15   Mr. Tony Romano, who is the manager of the Royal Accounting

16   Division of Sterling Publishing.

17          THE COURT:  Is it a letter to whom?  Who is it a

18   letter to?

19          THE WITNESS:  Ha?

20          THE COURT:  To whom is the letter addressed?

21          THE WITNESS:  To me.

22          THE COURT:  Did you receive this letter?

23          THE WITNESS:  Yes.

24          THE COURT:  Are you offering the exhibit?

25          MR. JANAY:  I am.

 1            THE COURT:  Any objection?

 2            MR. EDERER:  Yes.

 3            THE COURT:  Overruled.  It is admitted.

 4            (Plaintiff Exhibit 8 received in evidence)

 5            MR. JANAY:  Your Honor, I would like to publish this

 6     letter to the jury.

 7            THE COURT:  You may.  You may approach and hand it to

 8     Juror No. 1.

 9            (Pause)

10     BY MR. JANAY:

11     Q.  Now, Mr. Ward, that letter that I just handed to you,

12     Plaintiff's Exhibit No. 8, did it have any sales figures on it?

13     A.  Yes, they acknowledged at that time that they sold 1.5, I

14     think over 1.5 books in my name.

15     Q.  Did they acknowledge they were continuing to sell those

16     books in that letter?

17     A.  No, I don't think.  If I have a --

18            THE COURT:  The jury is looking at it.  I speaks for

19     itself.  Next question.

20     BY MR. JANAY:

21     Q.  Mr. Ward, between 2008 and 2013, did your relationship with

22     your publisher Sterling change at all?

23            MR. EDERER:  Objection.

24            THE COURT:  Sustained.

25            MR. JANAY:  Let me rephrase.

1   BY MR. JANAY:

2   Q.  How many books per year did you author and Sterling

3   published between 2004 and 2008, approximately?

4   A.  There was a document in the evidence that has the total

5   number of the books sold by me and also by the defendants.

6           THE COURT:  Mr. Ward, approximately how many books did

7   you publish with Sterling between 2004 and 2008 per year?  Do

8   you know the answer to that question?

9           THE WITNESS:  It wasn't regular numbers per year.  It

10  fluctuated.  It is all on the schedule.

11          THE COURT:  Just can you answer that question yes or

12  no?

13          THE WITNESS:  I can't by memory.

14          THE COURT:  Next question, Mr. Janay.

15  BY MR. JANAY:

16  Q.  Overall, how many books did you author and Sterling

17  published between 2004 and 2013?

18  A.  40.

19  Q.  When did you first learn of the book Trivia Hangman?

20  A.  Approximately 18 months or so after it was first published.

21  You see, what happened is that I had to go --

22          THE COURT:  Mr. Ward, when did you first learn of a

23  book called Trivia Hangman?  Just give us an approximate time.

24          THE WITNESS:  18 months after it was first published.

25          THE COURT:  Do you know when that was?  Do you know

1   when that was?

2               THE WITNESS:  No, but it is on the schedule.

3               THE COURT:  Next question.

4               MR. JANAY:  I would like to approach the witness and

5   provide Plaintiff's Exhibit 18.

6               THE COURT:  You may approach.

7               (Pause)

8   BY MR. JANAY:

9   Q.  Mr. Ward, I have just handed you a document.  Do you see

10  Trivia Hangman on that document?

11              MR. EDERER:  Objection.

12              THE COURT:  Sustained.

13              MR. JANAY:  I am sorry.  I'd like to introduce

14  Plaintiff's Exhibit 18.

15              THE COURT:  Denied.

16              (Pause)

17  BY MR. JANAY:

18  Q.  Mr. Ward, did you prepare the document that is in your

19  hand?

20  A.  I compiled this document.

21              MR. JANAY:  Again I would like to offer Plaintiff's

22  Exhibit 18 into evidence, your Honor.

23              THE COURT:  Denied.

24  BY MR. JANAY:

25  Q.  Mr. Ward, do you recognize any of the titles found on

1   Plaintiff's Exhibit 18?

2           MR. EDERER:  Objection.

3           THE COURT:  Sustained.

4   BY MR. JANAY:

5   Q.  Mr. Ward, are you the author of any of the titles listed on

6   Exhibit 18?

7           MR. EDERER:  Objection.

8           THE COURT:  Sustained.

9           MR. JANAY:  Your Honor, I would like you to state for

10  the record the reason for denial of this exhibit.

11          THE COURT:  No.  Next question.  At the break we can

12  perhaps discuss it.  Next question.

13  BY MR. JANAY:

14  Q.  Mr. Ward, the 40 titles you just testified to that Sterling

15  had published and you authored, did they occur between what

16  years?

17  A.  The last part of your question?

18  Q.  What years did the 40 titles that you authored and Sterling

19  published occur between?

20  A.  They --

21          THE COURT:  Mr. Ward, please put the document to the

22  side and don't look at the document.  Just answer the question.

23          THE WITNESS:  They commenced in 2005 and terminated,

24  from memory, 2013, without looking at the document.

25  BY MR. JANAY:

1  Q.  And were the number of titles you published consistent, on

2  an annual basis for the number of titles you authored

3  consistent on an annual basis that Sterling published?

4          THE COURT:  Sustained.

5  A.  Yes.

6  BY MR. JANAY:

7  Q.  Back to the title Trivia Hangman, do you know who the

8  author of Trivia Hangman was listed as?

9  A.  Yes, Francis Heaney.

10  Q.  Do you know who Francis Heaney is?

11  A.  Francis Heaney is an employee of Sterling, and Francis

12  Heaney was one of the chaps that was compiling my scratch

13  Hangman books.

14  Q.  What do you mean compiling your scratch Hangman books?  Can

15  you elaborate?

16          MR. EDERER:  Objection.

17          THE COURT:  Overruled.

18  A.  "Compiling" means making them up, designing them, getting

19  hold of me to pick the weeds, I explain the answers, then

20  edited the answers to give me so he was an integral team member

21  to do with the creation of my scratch Hangman titles.  He was

22  part of the team.

23  BY MR. JANAY:

24  Q.  As a team member, do you recall working with Mr. Heaney on

25  any of the instructions to the scratch Hangman books?

F7SJWAR3                    Ward - direct

1    A.  There has been various e-mails between Mr. Heaney and

2    myself concerning a whole range of matters to concealing my

3    scratch Hangman title.  He came to me for approval --

4            MR. EDERER:  Objection.

5    A.  -- of changes which I approved.

6            THE COURT:  Overruled.

7    BY MR. JANAY:

8    Q.  Mr. Ward, are you familiar with the title called Hollywood

9    Hangman?

10   A.  Hollywood Hangman is one of my books.

11   Q.  I said Hollywood Hangman?

12   A.  I am sorry?  Hollywood, yes.  Actually, yes, Hollywood

13   Hangman, that was published by Patrick Blindauer, who had the

14   same position as --

15           THE COURT:  Mr. Ward, are you familiar with the book

16   Hollywood Hangman, yes or no?

17           THE WITNESS:  Yes.

18           THE COURT:  Thank you.  Next question.

19   BY MR. JANAY:

20   Q.  Do you know who wrote Hollywood Hangman?

21   A.  Patrick Blindauer.

22   Q.  Did you have a relationship with Mr. Blindauer?

23   A.  I had the same relationship with Mr. Blindauer as I did

24   with Francis Heaney.

25   Q.  Do you recall working with Mr. Blindauer on the

 1  instructions to any of your claimed Scratch and Hangman books?

 2  A.  I worked with Heaney and Blindauer on the total book, not

 3  just the instructions.

 4  Q.  I am sorry, what do you mean the total book?

 5  A.  The total format.  They had to come to me for approvals.

 6          MR. EDERER:  Objection, your Honor.

 7          THE COURT:  Overruled.

 8  BY MR. JANAY:

 9  Q.  Mr. Blindauer, the same question this time for your

10  relationship with Peter Gordon?

11  A.  Peter --

12          MR. EDERER:  Objection.

13          THE COURT:  Sustained as to form.

14  BY MR. JANAY:

15  Q.  Mr. Ward, for the 40 titles which you are listed as author

16  of the Scratch Hangman series, did you work with a gentleman

17  named Peter Gordon?

18  A.  Yes.

19  Q.  In what capacity did you work with him as?

20  A.  Peter Gordon was the main person that I dealt with at

21  Sterling.  He was the person who originally accepted my

22  proposal.

23  Q.  Do you recall working with Mr. Gordon on anything regarding

24  the instruction pages found in the Scratch Hangman books?

25  A.  Yes, I supplied the instruction pages for the U.S. Scratch

1    Hangman titles in my manuscript.  Peter Gordon then edited

2    these instruction pages.  Peter Gordon's job is editor

3    director, so he is in charge of editing.

4              THE COURT:  Counsel, it is 3:15.  We are going to take

5    our afternoon break at this time.

6              Ladies and gentlemen, I am going to give you a few

7    minutes to use the facilities and stretch your legs and the

8    like.  It is 3:15.  I want to start promptly at 3:30, so please

9    be ready to go a couple of minutes before then.

10             Again I recommend you line up in your order now, and

11   because it is a short break, please don't leave the jury room

12   or the jury room area.  Two reminders:

13             One, keep an open mind.  You heard very little

14   evidence.  You have not heard all of the evidence in this case.

15             Number two, do not discuss this case with each other

16   or anyone else.  With that -- and also I ask if you could

17   actually just pass the exhibits that have been handed to you up

18   and you can leave them on the banister right in front of the

19   jury box, that would be great -- with that, you're excused and

20   I'll see you in 15 minutes.

21             (Jury excused)

22             THE COURT:  You may now step down.  The jury is out of

23   the room.  You may be seated.  You can step down, Mr. Ward.

24             Now, Mr. Janay, I just don't know where to begin.

25   Number one, as I said at sidebar, you're not permitted under

1    the standing order of this Court to use internet in this

2    courtroom, and so in watching you access things from Google

3    drive --

4            MR. JANAY:  I shut it down.

5            THE COURT:  I understand.  I was explaining what I did

6    earlier.  If I see that, I am not going to allow you to use

7    your electronic devices or bring them into the courthouse, and

8    you may be fined.

9            MR. JANAY:  Your Honor --

10           THE COURT:  Hang on, Mr. Janay.  You wait, okay?

11           Number two, it is evident to me you have not done the

12   most basic preparation of your witness.  Mr. Ward is the

13   plaintiff in this case.  He shouldn't be learning for the first

14   time upon taking the stand that he is not permitted to bring

15   exhibits up to the stand with him.  He shouldn't have to

16   refresh his recollection with respect to the most basic

17   questions that pertain to this case.

18           It is your responsibility as a lawyer to prepare the

19   witness to explain what testimony means in this Court, to

20   explain what he can and can't do in a courtroom in this

21   country.

22           Number three, you don't know how to formulate even the

23   most basic question or get anything into evidence.  Half the

24   things I have not allowed into evidence is because you haven't

25   laid a foundation for them.  You haven't authenticated them.

1   You haven't asked him a question what it is.  I am not going to

2   let things into evidence like that, nor am I going to

3   repeatedly instruct you how to ask a question, how to lay a

4   foundation, how to refresh his recollection, when it is proper

5   to refresh his recollection.

6           It is incumbent for you to know those things.  You

7   consider yourself lucky I allowed you to publish any of those

8   things to the jury.  It was only to the sympathy to the jury

9   which has no idea what is going on.  It is incumbent for you to

10  have arrangements to show things to the jury using things are

11  in compliance with the court's standing order or to have

12  multiple copies of your exhibits you can hand out to the jury.

13          After today I won't allow this to go on because it is

14  not the way this happens and it is not the way this works.  Is

15  there something you would like to say?

16          MR. JANAY:  There is a lot I would like to say.

17          THE COURT:  Pick your battles and choose the most

18  important thing then.

19          MR. JANAY:  Number one, with regards to the internet,

20  I did shut it off immediately upon you notifying me here, fine.

21  Your standing order is acknowledged.  Whether these orders are

22  rational at all, I'll digress from answering.

23          Number two, I was here yesterday to get everything set

24  up and proper and learn how to publish the exhibits which I

25  have on my computer on my local hard drive so that I could show

1   them to the jury.  It was not working yesterday, and so I

2   showed up early this morning, earlier this morning so that we

3   could address that as well and I did.

4        I thought everything was resolved.  However, now I am

5   not able to publish my exhibits, so I mean I am one person, one

6   human being who is working on this case against six or however

7   many people part of defendants' team.

8        I have had problems communicating with my mildly deaf

9   client who lives on the other side of the ocean, and he does

10  have a legitimate case, but it is evident to me that you would,

11  rather than facilitate a fair trial, would rather punish the

12  plaintiff and plaintiff's counsel.

13       THE COURT:  Mr. Janay, I think there is absolutely no

14  evidence or basis of my doing anything other than trying to

15  give everybody in this case a fair trial.  If I am enforcing

16  the rules of evidence by not allowing into evidence something

17  that has not been properly authenticated, it is only because my

18  job is to enforce the rules of evidence.

19       I am not biased against your case.  I have no view

20  whether you case has merit or not.  If you haven't complied

21  with the standing orders of the court, don't know how to ask a

22  question, don't know how to admit an exhibit and haven't

23  adequately prepared your client, and you didn't tell me until

24  9:46 this morning that he had a hearing problem or take any

25  steps to try and address that and make sure it wouldn't be an

1    ongoing issue in this case, it is not my problem and not a

2    function of me being unfair.  I am giving everybody in this

3    case a fair trial and it is my job to enforce the --

4              MR. JANAY:  Are there any accommodations that can be

5    made for my client's hearing?

6              THE COURT:  That is up to you to explore and it was up

7    to you to explore before 9:46 this morning.  I actually don't

8    know the answer to that question because I have never

9    confronted this.  If you had asked in advance of the trial and

10   given me any notice it, I would have been happy to do it, not

11   to mention, not to mention your client has not testified that

12   he has a hearing problem and it is quite obvious that he can,

13   in fact, hear.

14             He has articulated his principal problem is with the

15   accents we use in this country and that makes it difficult.

16   That is not something that can be addressed.  As far as I know,

17   there is nothing like a New Zealand to English interpreter.  I

18   don't think it exists.

19             We are adjourned until 3:30.  Please be ready a minute

20   before.  Please take the opportunity to talk to Mr. Ward about

21   what it means to testify in this country and what you can and

22   can't do and what he can and can't do.

23             THE CLERK:  All rise.

24             (Recess)

25             THE COURT:  You may be seated.  Mr. Ward, if you can

F7SJWAR3                    Ward - direct

1    come back, please.  Mr. Janay, what exactly is it that is on

2    your computer now that you're not on the internet?

3              (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Is it a PDF of all of the exhibits?

2          MR. JANAY:  Yes.

3          THE COURT:  Can you speak into the microphone, please.

4          MR. JANAY:  It is a PDF of all the exhibits, which are

5    searchable, so I just have to type in the letters, the word

6    exhibit and number and then it pulls up.

7          THE COURT:  All right.  We will take it a step at a

8    time, but if you able to pull it up, and it doesn't take a lot

9    of time and waste the jury's time and you are able to pull up a

10   particular exhibit and I can confirm that is what it actually

11   is, I will allow you to display it on the screen and we will

12   save the jury some time and heartache.

13         It's not really how it's supposed to be done, and I am

14   a little concerned that these are not the actual exhibits with

15   stickers, but I will visually inspect and make sure that it is

16   the same exhibit and I will take your representation that it

17   is.

18         MR. JANAY:  Your Honor, if I may, I was here yesterday

19   to hopefully square all of this away at 2:30, and we couldn't

20   get the screens working.  So I came here at 8:30 this morning,

21   8:45 this morning with the same thing, and then a man from IT

22   showed me how to publish to the jury.

23         This screen is completely blank right now, but I don't

24   know what else to say.  I tried.

25         THE COURT:  I told you to have a backup just in case

F7snwar4                    Ward - direct

1    the technology didn't work.  We'll get the jury in and proceed.

2           MR. EDERER:  Your Honor, if I could just raise one

3    issue briefly.

4           THE COURT:  Very quickly.

5           MR. JANAY:  I do have the backup hard copies.

6           THE COURT:  Yes, sir.

7           MR. EDERER:  Your Honor, just so you know, Mr. Gordon,

8    who is the next witness, who is here, actually would prefer not

9    to swear, but to affirm.

10           I just want to mention that to the Court.

11           THE COURT:  All right.

12           MR. EDERER:  If that's OK.

13           THE COURT:  That is of course OK, and I appreciate

14    your alerting me to it.

15           Ms. Barnes will get the jury.

16           (Continued on next page)

17

18

19

20

21

22

23

24

25

F7snwar4                    Ward - direct

1          (Jury present)

2          THE COURT:  Welcome back, ladies and gentlemen.

3          Mr. Janay, you may proceed.

4          MR. JANAY:  Your Honor, may I have the court reporter

5     just read back the last five sentences or so?

6          THE COURT:  No.

7          MR. JANAY:  No?

8          THE COURT:  Ask your next question, please.

9     BY MR. JANAY:

10    Q.  Mr. Ward, you testified that you submitted a manuscript to

11    Mr. Gordon.

12          Can you explain what followed.

13    A.  Can I explain what?

14    Q.  What followed from that?

15          MR. EDERER:  Objection.

16          THE COURT:  Overruled.

17          MR. JANAY:  I'm sorry.

18          Actually let me clarify.

19    BY MR. JANAY:

20    Q.  Can you explain your relationship with Peter Gordon from

21    the time you submitted the manuscript until 2013.

22          MR. EDERER:  Objection.

23          THE COURT:  Sustained.

24    A.  Peter Gordon --

25          THE COURT:  No, sustained.

1          MR. JANAY:  Sorry.

2          THE COURT:  If I sustain the objection means you do

3    not answer.

4          THE WITNESS:  OK.

5    BY MR. JANAY:

6    Q.  Mr. Ward, can you explain your relationship with Mr. Gordon

7    after you submitted the manuscript to him?

8    A.  Peter Gordon was the main person that I dealt with at

9    Sterling Publishing.  I dealt directly with the other

10   defendants, Patrick Blindauer and Francis Heaney, but Peter

11   Gordon was the editorial director.  He was the main person that

12   liaised with me.

13          His duty was to edit the documentation which I sent

14   him, which he did, which considering the instruction page, he

15   edited the instruction page that I sent him in my manuscript

16   which had a legitimate copyright on the manuscript, and it also

17   had an ISBN, which is an international standard book number.

18          MR. EDERER:  Objection.

19          THE COURT:  I will stop you there, Mr. Ward.

20          Next question.

21   BY MR. JANAY:

22   Q.  Mr. Ward, you said that Mr. Gordon edited your work.  Was

23   that after you entered into a contract with Sterling?

24   A.  Yes.

25   Q.  I would like to introduce Plaintiff's Exhibit 20 and then

1    direct the witness to the 13th page of that exhibit.

2              THE COURT:  Mr. Janay, you may approach the witness.

3    BY MR. JANAY:

4    Q.  Mr. Ward, I just handed you a document that on the front

5    page is listed as Plaintiff's Exhibit 20.  There is

6    approximately 13 pages into that document, is that correct?

7    A.  Yes.

8    Q.  What does the page that you are holding show?

9              MR. EDERER:  Objection.

10             THE COURT:  Sustained.

11   A.  It is a contract --

12             THE COURT:  Sustained.

13             Counsel, I don't think that you have given the witness

14   Exhibit 20.

15             MR. JANAY:  Exhibit 20 is the --

16             THE COURT:  It is not in evidence.  I am looking at

17   what he is holding, and it is not Exhibit 20.  That is the

18   first problem.

19             MR. JANAY:  Your Honor, Exhibit 20 has an exhibit to

20   it.  It's defendant's answer and Exhibit A --

21             THE COURT:  Counsel, do not engage in colloquy in

22   front of jury.

23             Go ahead and ask your next question.

24             MR. JANAY:  I'm sorry.

25   BY MR. JANAY:

F7snwar4                    Ward - direct

1    Q.  Mr. Ward, if you could place these pages back in order.

2    A.  This one?

3    Q.  Yes.  Mr. Ward, do you recognize that document?

4    A.  I am not quite sure if I have seen this before.

5         THE COURT:  Next question.

6    Q.  Mr. Ward, if you go through the pages of that document, do

7    you see a page marked Exhibit A?

8    A.  Exhibit A?

9    Q.  OK.  The page following Exhibit A, do you recognize that

10   page?

11   A.  This is the last page.

12        THE COURT:  Counsel, why don't you --

13        MR. JANAY:  May I approach, your Honor.

14        THE COURT:  Why don't you retrieve the exhibit, find

15   the pages that you want to ask him about those pages, please.

16   A.  You are talking about that?

17   Q.  Yes, Mr. Ward.

18   A.  I thought that was the document, because you gave me both.

19   OK.  I've got it now.

20   Q.  Mr. Ward, do you recognize that document?

21   A.  Yes.

22   Q.  What is that document?

23   A.  It is the contract between Sterling and myself.

24   Q.  Do you know what a preamble to a contract is?

25   A.  Yes.  It is dated October 14, 2004.

F7snwar4                    Ward - direct

1            MR. EDERER:  Objection.

2    Q.  OK.  That's when the contract is dated.

3            THE COURT:  Overruled.

4    Q.  Do you know what a preamble to a contract is was the

5    question.

6    A.  Yes.

7    Q.  OK.  Does that preamble --

8    A.  Yes.

9            MR. EDERER:  Objection.

10            THE COURT:  Sustained.

11    BY MR. JANAY:

12    Q.  Who are the contracting parties?

13    A.  Yes.

14    Q.  Who are the contracting parties?

15    A.  The contracting party is between Sterling Publishing and

16    myself.  Sterling Publishing is referred to as the publisher.

17    I am referred to as the author.

18    Q.  OK.

19    A.  It goes on to say --

20            THE COURT:  Mr. Ward stop there, please.

21    BY MR. JANAY:

22    Q.  Does that contract define the work?

23            MR. EDERER:  Objection, your Honor.

24            It is not in evidence.

25            THE COURT:  Sustained.

F7snwar4                    Ward - direct

1        MR. JANAY:  Yes.  I would like to offer Exhibit 20 in

2    evidence and everything following Exhibit A within Exhibit 20

3    to the end.

4        THE COURT:  Any objection?

5        MR. EDERER:  Your Honor.

6        THE COURT:  Any objection?  Yes or no?

7        MR. EDERER:  Yes.

8        THE COURT:  The basis?

9        MR. EDERER:  I think there is an exhibit in our book

10   that is just the contract.  I don't know that there needs to be

11   any division of an exhibit which consists of our answer in this

12   case.

13       THE COURT:  Can you just point me to what that is?

14       MR. EDERER:  Yes.  D-4.

15       MR. JANAY:  I am fine introducing Defense 4.

16       THE COURT:  You need to have the witness authenticate

17   it?

18       Mr. Ward I'm showing you what is marked as Defendants'

19   Exhibit 4.

20       Do you recognize that document?

21       Do you recognize that document?  Yes or no?

22       THE WITNESS:  No, I don't.  Yeah.  I think that's been

23   amended.

24       THE COURT:  All right.  I am going to allow

25   Plaintiff's Exhibit 20 in, but only the pages that Mr. Ward

1   identified, namely, the pages after Exhibit A.

2           I will ask you later to re-mark those pages and those

3   pages alone as Plaintiff's Exhibit 20 so there's no ambiguity.

4   You may proceed.

5           Ladies and gentlemen, if or when you see this exhibit,

6   you are going to see that at the very top there is some writing

7   that says "Case 1:13," and then there are some numbers and

8   letters.  You just should ignore that.  That's not part of the

9   original document itself.  It's just something that when things

10  are filed in a case in this court they are essentially

11  automatically added by the computer.  That's just something

12  relating to the litigation and is not relevant for your

13  consideration.

14          You may proceed.

15  BY MR. JANAY:

16  Q.  I'm sorry.  Mr. Ward, is the work defined in that contract?

17  A.  Yes.

18  Q.  What is the work defined as?

19  A.  The work is defined as that myself, which is the author,

20  and Sterling will publish --

21          THE COURT:  Mr. Ward, you can stop.

22          The exhibit speaks for itself.  The next question.

23  BY MR. JANAY:

24  Q.  Mr. Ward, I want to refer you down to paragraph enumerated

25  as 2 in that contract, which starts out with "copyright."

1            I want you to explain your understanding of that

2    paragraph.

3            MR. EDERER:  Objection, your Honor.

4            THE COURT:  Sustained.

5            MR. JANAY:  Your Honor, I would like to publish

6    Exhibit 20 to the jury.

7            THE COURT:  Granted.

8            Just the first page for now.  We are displaying it on

9    the screens, Mr. Janay.

10   BY MR. JANAY:

11   Q.  Mr. Ward, under this contract, was Sterling obligated to

12   obtain copyrights on your behalf?

13   A.  Yes.

14   Q.  Did they in fact obtain copyrights on your behalf?

15   A.  Yes.

16   Q.  For what content did they obtain copyrights on your behalf?

17           MR. EDERER:  Objection, your Honor.

18           THE COURT:  Sustained.

19   A.  Well --

20           THE COURT:  Sustained.

21           MR. JANAY:  Sustained.  OK.

22   BY MR. JANAY:

23   Q.  Did you understand the scope of the copyright to include

24   the entire text of the works?

25   A.  Yes.

F7snwar4                    Ward - direct

1           MR. EDERER:  Objection.

2           THE COURT:  Sustained.

3    BY MR. JANAY:

4    Q.  Did you have any discussions with Sterling employees

5    concerning the obtaining of copyrights in the works outside of

6    this contract?

7    A.  No.  Only during this contract.

8    Q.  Only during that contract.  What did you envision Sterling

9    would do as part of their obligations under that contract?

10          MR. EDERER:  Objection.

11          THE COURT:  Sustained.

12   BY MR. JANAY:

13   Q.  What did you anticipate Sterling would do to perform their

14   obligations under the contract?

15          MR. EDERER:  Objection.

16   A.  Their obligation would be --

17          THE COURT:  Mr. Ward, there is an objection.  I will

18   overrule it and I will allow the witness to answer.

19          You may proceed.

20          You may proceed.  What was your understanding of what

21   Sterling was required to do?

22          THE WITNESS:  I understood Sterling was to obtain

23   copyright protection for me in the U.S.  Because of the fact --

24          THE COURT:  Just stop there, Mr. Ward.  Next question.

25   BY MR. JANAY:

F7snwar4                    Ward - direct

1    Q.  Further along in the document it says, "The author shall

2    take all steps necessary to protect the copyright, its

3    renewals, and all rights pertaining to the work."

4          I'm sorry.  Did you hear me?

5    A.  Do you want me to explain what work consists of?

6    Q.  No.  Further along in the paragraph enumerated as "2.

7    Copyright," the document states, "The author shall take all

8    steps necessary to protect the copyright, its renewals, and all

9    rights pertaining to the work."

10   A.  Yes.

11   Q.  Did you, in fact, do that?

12         MR. EDERER:  Objection.

13         THE COURT:  Overruled.

14   A.  It is up to Sterling to renew the copyrights because these

15   are U.S. publications.  It is their responsibility.

16   Q.  Did you initiate this action to protect the copyrights?

17         MR. EDERER:  Objection.

18         THE COURT:  Sustained.

19   BY MR. JANAY:

20   Q.  Mr. Ward, can you explain the progeny of this lawsuit as it

21   relates to the contract that is in front of you right now?

22         MR. EDERER:  Objection.

23         THE COURT:  Sustained.

24   A.  This is --

25   Q.  You can't answer that.

F7snwar4                    Ward - direct

1    A.  OK.

2              MR. JANAY:  Just the first page published to the jury.

3              THE COURT:  It is up.

4              MR. JANAY:  OK.  That is all I need.

5              Exhibit 25 to present to the witness?

6              THE COURT:  You may approach.

7    BY MR. JANAY:

8    Q.  Mr. Ward, I just handed you a document that's labeled

9    Plaintiff's Exhibit 20.

10   A.  Yes.

11             THE COURT:  25, I believe, counsel.

12             MR. JANAY:  I'm sorry.  Exhibit 25.

13   BY MR. JANAY:

14   Q.  Do you recognize these documents?

15   A.  Yes.

16   Q.  Can you explain what these documents are of?

17             MR. EDERER:  Objection, your Honor.

18             THE COURT:  Overruled.

19   A.  These are printouts from Sterling Publishing's website of

20   various scratch hangman books.

21   Q.  And those scratch hangman books, who is the author listed

22   as of?

23             THE COURT:  Sustained.  Are you offering the exhibit?

24             MR. JANAY:  I am offering the exhibit?

25             THE COURT:  Any objection.

F7snwar4                    Ward - direct

1          MR. EDERER:  Yes, your Honor.

2          THE COURT:  Overruled.  It is admitted.

3          (Plaintiff's Exhibit 25 received in evidence)

4   BY MR. JANAY:

5   Q.  I'm sorry.  Mr. Ward, you just testified that Plaintiff's

6   Exhibit 25 is a printout from the Sterling website of scratch

7   hangman books, correct?

8   A.  Yes.

9   Q.  Who is listed as the author of those scratch hangman books?

10  A.  Yes, I am the author.  That is what Sterling --

11         THE COURT:  That's all.  Mr. Janay will ask you

12  another question.

13         MR. JANAY:  I would like to just publish the entirety

14  of Exhibit 25 to the jury.

15         THE COURT:  We are not going to sit here as you scroll

16  through each page, so I will let you display the first page and

17  the jury will get it in their deliberations later.

18         MR. JANAY:  That's fine, your Honor.

19         Thank you.

20  BY MR. JANAY:

21  Q.  Mr. Ward, you recognize all of these titles contained in

22  paragraph 25 as that of your own?

23         THE COURT:  Mr. Janay, if you want me to display it to

24  the jury, you have to put page 1 on the screen.

25         MR. JANAY:  Oh, I apologize, your Honor.

F7snwar4                    Ward - direct

1              Is that OK?

2              THE COURT:  It is displayed.

3              MR. JANAY:  Maybe make it a little larger?  Should I

4    make it larger?

5              THE COURT:  That is up to you.

6              MR. JANAY:  Yes, I will make it larger.

7              That's good.

8    BY MR. JANAY:

9    Q.  So, Mr. Ward, you do recognize the title listed?

10   A.  I recognize the titles that they have put on their own

11   site.  However, that is not the full range.  There is not 40

12   titles here.

13             MR. JANAY:  OK.  I would like to present Exhibit 26 to

14   the plaintiff.

15             THE COURT:  You may approach.

16   BY MR. JANAY:

17   Q.  Mr. Ward, I just handed you a document that is labeled

18   Plaintiff's Exhibit 26.

19             Do you recognize this document?

20   A.  I haven't seen it before.

21   Q.  You have not seen that document before?

22   A.  I would like to know what source it came from.

23             THE COURT:  The next question, Mr. Janay.

24             MR. JANAY:  You can put that aside, Mr. Ward.  You can

25   put it to the side.

1           THE WITNESS:  Yes.

2    BY MR. JANAY:

3    Q.  Mr. Ward, by what source it came from, I am not following

4    you.  Are you talking about which --

5           THE COURT:  Sustained.

6           Mr. Ward, do you recognize that document?  Yes or no?

7           THE WITNESS:  I do now, because it is from the Barnes

8    & Noble site.

9           THE COURT:  Do you recognize it?

10          THE WITNESS:  Yes.

11          THE COURT:  What is it?  What is it?

12          THE WITNESS:  Oh --

13          THE COURT:  Just a general description of what it is,

14   please, sir.

15          THE WITNESS:  Yes, it is a general description of

16   various hangman books.

17   BY MR. JANAY:

18   Q.  I'm sorry.  It is a general description of the hangman

19   books?

20   A.  Yes.

21   Q.  I'm sorry.  Can you specify what hangman books you're

22   referring to?

23   A.  Well, first of all, it is a copy from Barnes & Noble's

24   website.  Barnes & Noble own Sterling.

25          Now, on this page it has, "Meet the author."

F7snwar4                    Ward - direct

1            MR. EDERER:  Objection.

2            THE COURT:  Mr. Ward, just --

3            MR. JANAY:  This is being offered into evidence.

4            THE COURT:  Do you know when these website printouts

5    were made?

6            Do you know when these date from?

7            THE WITNESS:  Where they came from?

8            THE COURT:  Where they came from, when they date from?

9            THE WITNESS: Yes.

10           It's quite simple.  It's coming from the Barnes &

11   Noble --

12           THE COURT:  When?

13           THE WITNESS:  Online website that sells my books

14   online.

15           THE COURT:  When?

16           THE WITNESS:  Over the years.  It relates to many of

17   the titles.  It is the description of what -- about the author

18   and many, many titles.

19           THE COURT:  Any objection?

20           MR. EDERER:  Yes, your Honor.

21           THE COURT:  Overruled.  I will allow it into evidence.

22   It is admitted.

23           (Plaintiff's Exhibit 26 received in evidence)

24   BY MR. JANAY:

25   Q.  I'm sorry.  Mr. Ward, this document has been admitted into

F7snwar4                      Ward - direct

1    evidence.  I would like you to just explain to the jury how

2    that document came about.

3            MR. EDERER:  Objection, your Honor.  There's no -- I'm

4    sorry.

5            THE COURT:  Sustained.

6    BY MR. JANAY:

7    Q.  Mr. Ward, did you print out these documents ever?

8    A.  No.

9    Q.  Mr. Ward, did you ever send these documents to anyone?

10   A.  No.  These documents are quite simple.  They are written by

11   Sterling.  When that says --

12           THE COURT:  Mr. Ward, please stop.

13           Mr. Janay, ask your next question.

14   BY MR. JANAY:

15   Q.  Mr. Ward, you testified that this is a document on the

16   Barnes & Noble website.  Does it show who the author of Scratch

17   & Solve Hangman books are?

18           MR. EDERER:  Objection, your Honor.

19           THE COURT:  Overruled.

20   A.  Yes.

21   Q.  Who does it list as the author?

22   A.  Pardon?

23   Q.  Who does it list as the author?

24   A.  Myself.

25   Q.  OK.  And Barnes & Noble is a defendant in this action?

F7snwar4                    Ward - direct

1   A.   Purely because they own Sterling Publishing.

2            THE COURT:  Just yes or no, Mr. Ward.

3            THE WITNESS:  Yes.

4            MR. JANAY:  Thank you.

5            I would like to publish this exhibit to the jury.

6            THE COURT:  I will allow one page.  You can pick your

7   page.

8            MR. JANAY:  The first page, your Honor.

9            THE COURT:  All right.

10           MR. JANAY:  I only have a few more exhibits left.

11           THE COURT:  You have to put it to the first page if

12  you want me to put it on the jury's screens.

13           MR. JANAY:  That's fine.  OK.

14  BY MR. JANAY:

15  Q.   So, Mr. Ward, this document you testified lists you as

16  author.

17           Does it say anything else related to you which was

18  found on the defendant Barnes & Noble's website?

19           THE COURT:  Sustained.

20  A.   Yes.

21           THE COURT:  The exhibit speaks for itself.  Go ahead.

22           MR. JANAY:  Yes, your Honor.

23           I offer Exhibit 28 to the witness, your Honor.

24           THE COURT:  You may approach.

25  BY MR. JANAY:

F7snwar4                      Ward - direct

1    Q.  Mr. Ward, I just handed you a document that's labeled

2    Plaintiff's Exhibit 28.  Do you recognize this document?

3    A.  Yes.

4    Q.  What is this document of?

5    A.  It is a part printout from the copyright office

6    acknowledging copyright of my various scratch hangman titles in

7    the U.S.

8    Q.  Mr. Ward, did you obtain these copyrights?

9    A.  No.

10   Q.  Who obtained these copyrights in your name?

11   A.  Sterling obtained these copyrights on my behalf because

12   that was what was written on the contract.  They were

13   dutybound, contractually bound to obtain these copyrights in my

14   name.

15   Q.  Do you recall whether Sterling said they would limit the

16   copyright application to anything?

17           MR. EDERER:  Objection, your Honor.

18           THE COURT:  Overruled.

19   A.  There was no limitation early on --

20           THE COURT:  Do you recall whether anyone from Sterling

21   ever said the they would limit the copyright registration to

22   anything.  Yes or no?

23           THE WITNESS:  No.

24   BY MR. JANAY:

25   Q.  And in your understanding what was the scope of the

F7snwar4                    Ward - direct

1   copyright that Sterling obtained on your behalf?

2           MR. EDERER:  Objection, your Honor.

3           THE COURT:  Sustained.

4   BY MR. JANAY:

5   Q.  Mr. Ward, did you believe that the copyrights obtained by

6   Sterling extended to the instructions page?

7           MR. EDERER:  Objection.

8           THE COURT:  Sustained.

9   BY MR. JANAY:

10  Q.  Mr. Ward, of those 40 titles -- of the copyright

11  registrations that you have, did you contribute to the

12  instructions found in the book --

13  A.  Did I what?

14  Q.  Did you contribute to the instructions of the books that

15  those 40 registrations are for?

16  A.  Most definitely.

17          MR. EDERER:  Objection, your Honor.

18          THE COURT:  Overruled.

19          MR. JANAY:  I didn't hear his response, your Honor.

20          THE COURT:  Most definitely.

21          MR. JANAY:  Most definitely.  Thank you.

22          I would like to publish Exhibit 28 to the jury, both

23  pages, your Honor.

24          THE COURT:  It's not in evidence.

25          MR. JANAY:  I would like to offer it in evidence.

F7snwar4                    Ward - direct

1          THE COURT:  Any objection.

2          MR. EDERER:  Yes, you Honor.

3          THE COURT:  Basis?

4          MR. EDERER:  Foundation, authentication, relevance.

5          THE COURT:  Why don't you ask a few more questions for

6     foundation, Mr. Janay.

7          MR. JANAY:  OK.

8     BY MR. JANAY:

9     Q.  Mr. Ward, to your knowledge, is this a printout from a U.S.

10    governmental website?

11         THE COURT:  Sustained.

12    A.  Yes.

13         THE COURT:  Sustained.  The jury will disregard that

14    answer.

15    BY MR. JANAY:

16    Q.  Mr. Ward, were you responsible for the creation of this

17    document that is labeled Exhibit 20 -- what is it?  26, I

18    believe?

19         THE COURT:  28.

20         MR. JANAY:  I'm sorry.  28.

21    A.  Do you want me to explain what it is?

22    Q.  No.  I want you to explain whether you are responsible for

23    having created that document?

24    A.  These are various copyright acknowledgements.

25         MR. EDERER:  Objection.

F7snwar4                        Ward - direct

1          THE COURT:  Mr. Ward, were you involved in creating

2     the document that you have in your hand?  Did you have any

3     involvement in creating it?  Yes or no?

4          THE WITNESS:  That is a difficult question.  The

5     contract stated --

6          THE COURT:  Mr. Ward.

7          MR. JANAY:  Mr. Ward.

8          THE WITNESS:  I'm answering it in my way.

9          THE COURT:  No, Mr. Ward.

10          THE WITNESS:  The contract states --

11          THE COURT:  That's not the way it works.  Just yes or

12     no.

13          Were you involved in creating the document that you

14     have in your hand of Plaintiff's Exhibit 28?  Yes or no?  Did

15     you play any role in creating that document?

16          THE WITNESS:  This is a government document.  I

17     couldn't create it myself.  This comes from the copyright

18     office, the U.S. copyright office.

19          THE COURT:  All right.  Next question.

20     BY MR. JANAY:

21     Q.  Mr. Ward, have you seen that document before?

22     A.  Yes.

23     Q.  Did your attorney show you that document before?

24          MR. EDERER:  Objection, your Honor.

25          THE COURT:  Sustained.

F7snwar4                    Ward - direct

1    BY MR. JANAY:

2    Q.  You just testified that this is a document from the

3    copyright, from a government office?

4    A.  From the U.S. copyright office.

5    Q.  The U.S. government copyright office, yes.

6            How do you know that?

7    A.  Because it's got it at the bottom.

8    Q.  Would someone have had to search for your name on a

9    copyright office database?

10           MR. EDERER:  Objection, your Honor.

11   A.  Obviously, yes.

12           THE COURT:  Sustained.

13   Q.  Is it your testimony that this document represents a list

14   of your authored works on file with the copyright office?

15   A.  Yes.

16           MR. EDERER:  Objection, your Honor.

17           THE COURT:  Sustained as to form.

18   BY MR. JANAY:

19   Q.  Mr. Ward, is the list you're holding in your hands an

20   accurate list of U.S. copyrighted works in your name?

21           THE COURT:  Sustained.

22           MR. JANAY:  Your Honor, I would like to introduce this

23   into evidence as a government document that --

24           THE COURT:  The objection is sustained.

25           MR. JANAY:  OK.

F7snwar4                    Ward - direct

1    Q.  Mr. Ward, do you recognize any of the titles found on that

2    document?

3    A.  Yes.

4              MR. EDERER:  Objection, your Honor.

5              THE COURT:  Sustained.

6    BY MR. JANAY:

7    Q.  Mr. Ward, did Sterling obtain the copyright registrations

8    for 40 titles on your behalf?

9              THE COURT:  Sustained.

10   A.  Yes, sir.

11             THE COURT:  Sustained.

12             MR. JANAY:  OK.

13             I have no further questions regarding that document

14   apparently.  I am just going to go straight to Plaintiff's

15   Exhibit 32.  I would like to introduce to the plaintiff.

16             THE COURT:  You may approach.

17             Mr. Ward, you can put that to the side.

18   BY MR. JANAY:

19   Q.  Mr. Ward, I just handed you a document.  Can you very

20   briefly state what that document is.

21             THE COURT:  First, Mr. Ward, do you recognize that

22   document?

23             THE WITNESS:  Yes.

24             THE COURT:  What is it?

25             THE WITNESS:  An e-mail from Peter Gordon, the

1  editorial director at Sterling, directly to me.

2              THE COURT:  Who is it addressed to?

3              To you?  It is addressed to you?

4              THE WITNESS:  Yes.

5              THE COURT:  Did you receive that e-mail?

6              THE WITNESS:  I have seep this before, yes.

7              THE COURT:  Did you receive the e-mail?

8              THE WITNESS:  Yes.

9              THE COURT:  What is the date of the e-mail?

10             THE WITNESS: 02/17/2005.  So that would have been the

11  17th of February, 2005.

12             THE COURT:  What is the general subject of the e-mail?

13             What is the general topic of the e-mail?  What does it

14  relate to?

15             THE WITNESS:  Hmm?

16             THE COURT:  What does the e-mail relate to?  What is

17  the subject matter?

18             THE WITNESS:  The e-mail is an answer to my previous

19  e-mail to Peter Gordon.  I asked Peter Gordon various

20  questions, and he responded to them.

21             THE COURT:  All right.

22             Your e-mail to Mr. Gordon, is that displayed on this

23  document as well?

24             THE WITNESS:  Yes, it's straight underneath.

25             THE COURT:  All right.

F7snwar4                    Ward - direct

1          Mr. Janay.

2          MR. JANAY:  Exhibit 32 is offered for evidence, your

3    Honor.

4          THE COURT:  Any objection?

5          MR. EDERER:  Yes, your Honor.  There are multiple

6    documents as part of the same exhibit.  He hasn't identified

7    the other documents.

8          THE COURT:  How many pages is this document that

9    you're offering?

10         MR. JANAY:  I will get there.  Exhibit 32 is a

11   three-page document, your Honor.

12         THE COURT:  Can you please lay a foundation for the

13   entirety of the document.

14   BY MR. JANAY:

15   Q.  Mr. Ward, you testified that this was an e-mail, correct?

16   A.  Again?

17   Q.  You testified that this Plaintiff's Exhibit 32 is an

18   e-mail?

19   A.  It is an e-mail, yeah.

20   Q.  Who is the e-mail from and who is it to and is anyone

21   copied on that e-mail?

22   A.  Well, what --

23         MR. EDERER:  Objection.

24   A.  -- documents, the e-mails they are exchanged with people.

25         THE COURT:  The objection is overruled.

1    A.  My e-mail --

2            THE COURT:  Mr. Ward, if there is an objection, you

3    have to wait until there is a ruling.

4            THE WITNESS:  Yes.

5            THE COURT:  I will tell you what.  I am going to allow

6    the first two pages of the document in as Exhibit 32.

7            You may proceed.

8            MR. JANAY:  OK.

9    BY MR. JANAY:

10   Q.  The third page of the document that you have in front of

11   you, Mr. Ward, is that also an e-mail?

12   A.  Yes.

13   Q.  Do you see who that e-mail is to and who it is from?

14   A.  It's from myself to Peter Gordon and the response from

15   Peter Gordon to myself answering questions that I asked him.

16   Q.  I'm sorry.  It's regarding questions that you asked him.

17           Was this e-mail from after you had already signed the

18   contract with Sterling?

19   A.  I would have to have a look at the contract date.

20   Q.  OK.  I'll just withdraw that question.

21           THE WITNESS:  The contract should be somewhere handy.

22           THE COURT:  Mr. Ward --

23           THE WITNESS:  I think it was --

24           THE COURT:  Mr. Ward, wait for the question, please.

25           THE WITNESS:  Yes.

1    BY MR. JANAY:

2    Q.  Mr. Ward, were these e-mails part of the back and forth

3    that you had with Peter Gordon concerning the creation of the

4    scratch hangman works?

5    A.  Most definitely, because they affected what work I had to

6    supply Sterling.

7    Q.  How did they affect what work you had to supply Sterling?

8    A.  In New Zealand with my scratch hangman book there were a

9    total of ten wrong answers that be would be selected before the

10   hangman grid could be complete.

11          In the U.S. Peter Gordon elected that there should

12   only be five wrong guesses -- even though he put up here six, I

13   had to correct him about that, that there's only five, not six.

14          However, the main emphasis I put on of noting that he

15   wanted to have a different style, a different format was the

16   fact that, because I was the author as well as the owner, I had

17   to supply answers to all the scratch hangman titles in the U.S.

18          So, therefore, going from ten in New Zealand down to

19   five in the U.S. you had to come up with longer answers to

20   compensate for shorter time that they had to get finished by

21   the game to get home.

22   Q.  Thank you.  Did the number of wrong guesses that a player

23   would get affect the instructions?

24   A.  Yes.  I bought a couple of scratch hangman books.  It is a

25   pity we can't give them to the jury for them to have a look at

1    to play the game to be acquainted with what we are talking

2    about.

3            THE COURT:  Mr. Ward, just answer the question,

4    please.

5            Did the number of incorrect answers that would lead

6    the person to get hanged affect the instructions in the book?

7            Yes or no?

8            THE WITNESS:  In New Zealand they had ten chances --

9            THE COURT:  Yes or no.  Yes or no.

10           Did it affect the instructions in the book.

11           THE WITNESS:  There's five wrong answers in the U.S.;

12   ten in New Zealand.

13           THE COURT:  Did that change affect the instructions

14   for the book?

15           THE WITNESS:  No.

16           THE COURT:  OK.  Mr. Janay, do you want to offer the

17   third?

18           THE WITNESS:  Except for the fact of course that we

19   had to say, you know, there was less numbers.  But the way to

20   play the game was exactly the same.  It didn't affect the

21   instructions one piece.

22           THE COURT:  Mr. Janay, did you want to offer page 3 of

23   Exhibit 32?

24           MR. JANAY:  I do, your Honor.  I would like to lay the

25   foundation a little bit more, if possible to avoid objection.

F7snwar4                    Ward - direct

1          THE COURT:  OK.

2          MR. JANAY:  OK.

3     BY MR. JANAY:

4     Q.  Mr. Ward, did the e-mails between you and Mr. Gordon

5     involve different versions of the hangman game?

6     A.  Different formats?

7     Q.  Versions.

8     A.  Oh, version.  We say versions different.

9          Are you talking about the format or the answers?

10    Q.  My question was were there going to be more than one

11    versions of the scratch hangman game?

12          MR. EDERER:  Objection.

13          THE COURT:  Overruled.

14    A.  Yes.  Obviously it was -- they wanted that to be a series.

15    And they did 40 titles.

16    Q.  And were there different instructions for different

17    versions?

18    A.  Initially, there was an instruction for the earlier books,

19    and then there was slightly changed for later books.

20    Q.  I will stop you right there.  Slightly changed for later

21    books.  Who made those changes?

22    A.  That was between both of us.

23    Q.  OK.

24    A.  They would make some changes and ask for my approval and I

25    would give it.  And in some cases, I suggested changes and they

1    implemented it.

2              MR. JANAY:  OK, yes.  I would like to introduce the

3    third page from Exhibit 32 into evidence, your Honor.

4              THE COURT:  Any objection?

5              MR. EDERER:  No, your Honor.

6              THE COURT:  Admitted.

7              (Plaintiff's Exhibit 32 received in evidence)

8    BY MR. JANAY:

9    Q.  Mr. Ward, you have testified that you contributed to the

10   instructions of the scratch hangman books, is there anything

11   specific that you would like the jury to know regarding your

12   contributions?

13             MR. EDERER:  Objection.

14             THE COURT:  Sustained.

15   A.  The main --

16             MR. JANAY:  You can't answer that.

17             THE COURT:  Sustained.

18   BY MR. JANAY:

19   Q.  Mr. Ward, explain your contribution to the instructions of

20   the scratch hangman books briefly, please.

21   A.  The initial instructions of my New Zealand books were

22   amended in the manuscript.  The manuscript is what I sent Peter

23   Gordon and it was the basis of a contract between Sterling and

24   myself where I was the publisher and the owner or the author

25   and the proprietor, which means owner.

1          Secondly --

2          THE COURT:  Mr. Ward just answer the question, which

3     is what was your contribution to the instructions of the

4     scratch hangman books?

5          THE WITNESS:  First of all, it was the manuscript that

6     they edited to create the instruction page for the U.S. titles.

7          There were various areas where they copied exactly

8     from my manuscript.

9          MR. JANAY:  OK.

10         THE WITNESS:  The one difference between my

11    instruction page and the U.S. instruction page was the use of

12    clip art.

13         They elected some clip art, whereas I suggested

14    another style of clip art.  So there was to and fro between

15    selecting the clip art for the answer, for the wrong answer

16    under the scratch printing, but they can't say that they

17    selected the clip art because I approved it, even though I said

18    to them those are alternatives.

19         Then later on they elected to get rid of their own

20    clip art and have a big heavy cross as a wrong answer on the

21    U.S. books.  That was obtained specifically directly from my

22    manuscript that I initially sent them.

23         Secondly, we had problems with the scratch-off

24    printing becoming hard if they are left in the sun.

25         So I instructed Sterling to put a paragraph in the

F7snwar4                    Ward - direct

1    instruction page to reflect this, to warn the players not to

2    leave the book in the sun, which they did.  They complied with

3    my request.

4    BY MR. JANAY:

5    Q.  So you contributed significantly to the instructions,

6    correct?

7              MR. EDERER:  Objection, your Honor.

8              THE COURT:  Sustained.

9              MR. JANAY:  OK.

10             I would like to now introduce Defense Exhibit 14,

11   pages 1 through 5.

12             THE COURT:  You are requesting permission to approach

13   the witness.  It is granted.

14   BY MR. JANAY:

15   Q.  Mr. Ward, do you recognize the documents in front of you?

16   A.  Yes.

17   Q.  What are they?

18   A.  It is a printout of a title called Trivia Hangman.

19   Q.  Who is the listed author of Trivia Hangman?

20   A.  The listed author is an employee of Sterling's called

21   Francis Heaney.

22   Q.  The same Francis Heaney you testified about earlier?

23   A.  Yes.  The one who used to create and compile my 40 U.S.

24   titles.

25   Q.  I would like to introduce Defense Exhibit 12, pages 1

1  through 5?

2              THE COURT:  14?

3              MR. JANAY:  14, 1 through 5.

4              THE COURT:  Any objection?

5              MR. EDERER:  First of all, your Honor, it's six pages.

6              THE COURT:  He's only offering the first five.

7              Any objection?

8              MR. JANAY:  I can offer all six.

9              MR. EDERER:  No objection.  I mean, we have the book.

10             THE COURT:  He is offering the document here.

11             Can you look at the sixth page, Mr. Ward.

12             Mr. Ward, can you look at sixth page.

13             MR. JANAY:  I'll get the sixth page.

14             I didn't think that it was relevant.

15             THE COURT:  Do you recognize that page as well?

16             THE WITNESS:  Yes.

17             THE COURT:  What is it?

18             THE WITNESS:  It is a printout of an internal page of

19  Francis Heaney's Trivia Hangman title.

20             THE COURT:  Defendant's Exhibit 14 is admitted.

21             (Defendant's Exhibit 14 received in evidence)

22  BY MR. JANAY:

23  Q.  Mr. Ward, turning to that exhibit --

24             MR. JANAY:  Can we publish this to the jury, your

25  Honor?

1           THE COURT:  Do you have it on your computer.

2           MR. JANAY:  I do not.

3           THE COURT:  Counsel, as a courtesy, can you call it up

4    so that we can show it to the jury.

5           Defense Exhibit 14.

6           MR. JANAY:  I believe it is page 4, the instructions

7    on that.  No, the instructions.

8           THE COURT:  It's page 5.

9           MR. JANAY:  5.

10          Yes, this is labeled introduction.  Sorry.

11   BY MR. JANAY:

12   Q.  Mr. Ward, on page 5 of the exhibit in front of you --

13   A.  Yes.

14   Q.  -- do you recognize anything familiar?  Correct?

15   A.  That is the instruction page of Francis Heaney's Trivia

16   Hangman.

17   Q.  Is anything in that document your work?

18   A.  Most definitely.

19   Q.  Can you explain?

20   A.  OK.  When a manuscript is sent to a publisher, the

21   publisher elects the manuscript, in this case the written word

22   the text, which means the instruction page.

23          What Francis Heaney has done is he's amended or edited

24   the work that was sent in the original manuscript.  That is

25   exactly the same as an author writing up a book, sending it to

F7snwar4                          Ward - direct

 1 | a publisher, the publisher editing it and then claiming

 2 | ownership.  That is illegal.

 3 |             THE COURT:  Mr. Ward, can you just identify what in

 4 | here is your work?  That is the question.

 5 |             THE WITNESS:  This is the instruction page to the

 6 | Trivia Hangman.

 7 |             THE COURT:  Mr. Janay's question was can you identify

 8 | what you contributed to the text on this page?

 9 |             THE WITNESS:  I felt like I answered it insomuch as I

10 | supplied the source of the hangman game, which came into the

11 | instruction page.  It developed from there.

12 |             THE COURT:  OK.  Meaning you supplied the idea or you

13 | supplied the text?

14 |             THE WITNESS:  Pardon?

15 |             THE COURT:  You supplied the idea or you supplied the

16 | text that appears on this page?

17 |             THE WITNESS:  I supplied the source.

18 |             THE COURT:  What does that mean?  Can you elaborate?

19 |             THE WITNESS:  The source of all the work was my

20 | initial manuscript.

21 |             THE COURT:  OK.  Are there words on this page that

22 | came from your manuscript?

23 |             THE WITNESS:  Yes.

24 |             THE COURT:  Can you identify those words?

25 |             THE WITNESS:  Yes.

1          Because they edited from it my source.

2          THE COURT:  Can you identify the words from your

3   manuscript that appear on this page?

4          THE WITNESS:  I don't feel that I need to be specific

5   when the law states that you cannot edit somebody else's work.

6          THE COURT:  The jury will disregard that last bit of

7   the answer.  It's obviously, as I told you, my role to instruct

8   you what the law is and says.

9          You may proceed, Mr. Janay.

10  BY MR. JANAY:

11  Q.  Mr. Ward, I would like to refer your attention back to

12  what's marked as Defense Exhibit 2 for you to compare, which

13  this is the document I believe you're referring to as your

14  manuscript, to compare to --

15         THE COURT:  Sustained.

16         MR. JANAY:  I would like to refer back to Exhibit 2 to

17  show my client.

18         THE COURT:  If you would like to show him Exhibit 2,

19  it is in evidence.  You may show it to him.

20         THE WITNESS:  Yes.

21  BY MR. JANAY:

22  Q.  Mr. Ward is Defense Exhibit 2 the document that you are

23  referring to as your manuscript?

24  A.  Yes.

25  Q.  Are there instructions on that document for how to play the

1  hangman game?

2  A.  Yes.  There is the explanation of how to play the hangman

3  game of the manuscript that I sent initially to Sterling

4  Publishing.

5  Q.  Are there contents on Defense Exhibit 2 that are the same

6  or similar to the contents found on Defense Exhibit 14?

7  A.  The message is the same.

8            MR. EDERER:  Objection, your Honor.

9            THE COURT:  Overruled.

10  Q.  What do you mean that the message is the same?

11  A.  Because this is the source of how to play the game.

12  Q.  OK.

13  A.  Publishers have got the right to edit it however they

14  wish --

15            THE COURT:  Sustained.

16            Mr. Ward, again you may not state what you believe the

17  law is.  You can just simply answer Mr. Janay's question.

18            You may proceed, Mr. Janay.

19  BY MR. JANAY:

20  Q.  Mr. Ward, the last time I'll ask:  Is the content found on

21  Defendants' Exhibit 2 similar to the content found on defense

22  Exhibit 14?

23            MR. EDERER:  Objection.

24            THE COURT:  Sustained.

25  BY MR. JANAY:

1   Q.  Defense Exhibit 14, which you have seen, is it your

2   testimony that you have contributed to that?

3   A.  Yes.  Because they obtained it from my source.

4           MR. EDERER:  Objection.  Nonresponsive.

5   A.  If they didn't know --

6           THE COURT:  The objection is overruled.  Mr. Janay

7   move on to the next line of questioning.  I think we have

8   exhausted this one.

9           MR. JANAY:  OK.

10          Defendants' Exhibit 17 is offered.  I would request

11  the same courtesy from defense counsel.

12          THE COURT:  Mr. Janay, you have to approach the

13  witness and take certain steps first.

14  BY MR. JANAY:

15  Q.  Mr. Ward, I just handed you a document that's labeled

16  Defense Exhibit 17.

17          Do you have that document in front of you now?

18  A.  Yes.

19  Q.  Do you recognize that document?  Can you please explain

20  what that document is?

21  A.  It is the details relating to --

22          THE COURT:  Mr. Ward.

23  A.  Patrick Blindauer --

24          THE COURT:  Can you just identify what Defense Exhibit

25  17 is?

1          What is Defense Exhibit 17?

2          THE WITNESS:  I was explaining what it is.

3          THE COURT:  It doesn't require a whole lot of

4    explanation.

5          What is it?

6          THE WITNESS:  Yes.  I know what it is.

7          THE COURT:  What is it?

8          THE WITNESS:  It is Patrick Blindauer's edition of a

9    Scratch & Solve Hollywood Hangman, which is based on the

10   description of the whole series.

11         MR. EDERER:  Objection.

12         THE COURT:  Overruled.

13   BY MR. JANAY:

14   Q.  Mr. Ward in thumbing through the pages of Defense Exhibit

15   17, do you see an instruction page on there?

16         THE COURT:  Counsel, are you offering Defense Exhibit

17   17?

18         MR. JANAY:  I am offering Defense Exhibit 17 into

19   evidence.

20         THE COURT:  Any objection?

21         MR. EDERER:  No, your Honor.

22         THE COURT:  Admitted.

23         (Defendants' Exhibit 17 received in evidence)

24         MR. JANAY:  I request that it be published to the

25   jury, your Honor, and that defense counsel please extend the

F7snwar4                    Ward - direct

1    courtesy.

2            THE COURT:  With my thanks, if defense counsel could

3    display it, I would appreciate that.

4    BY MR. JANAY:

5    Q.  Mr. Ward, in thumbing through those pages, do you come

6    across the instructions?

7    A.  Yes.

8    Q.  And what page number is that?

9    A.  I think it's 3.  He hasn't got it on here.

10           MR. JANAY:  The third page of the exhibit if we could

11   get it up.

12   Q.  This is what you're referring to as the instructions,

13   correct?

14   A.  Pardon?

15   Q.  The page that starts with, "How to Play Hangman" that you

16   just said is page 3, is that the instructions?

17   A.  Yes.

18   Q.  Did you create these instructions?

19   A.  Insomuch as they have been amended from my initial

20   manuscript.

21           MR. EDERER:  Objection, your Honor.

22   A.  Now let's put this into perspective --

23           THE COURT:  Overruled.

24   A.  Nobody knew about scratch hangman.  It was only from my

25   creation that they jumped on the bandwagon and then developed

F7snwar4                          Ward - direct

1    their own themes.  They sourced it from me.  The source came

2    from the manuscript.

3    Q.  Would you just go into the significance of the instructions

4    that you see on Exhibit 14?

5              MR. EDERER:  Objection.

6              THE COURT:  Sustained.

7    A.  The significance of the instructions for Hollywood

8    Hangman --

9              THE COURT:  Sustained.

10              THE WITNESS:  OK.

11    BY MR. JANAY:

12    Q.  Mr. Ward, is there anything that you notice that is

13    significant about the instructions contained on Defense Exhibit

14    17?

15              MR. EDERER:  Objection.

16              THE COURT:  Overruled.

17    A.  Well, my heading was how to play hangman.  I believe at the

18    very beginning the heading's very similar.  The content of the

19    how to play Hollywood Hangman is practically the same as to how

20    to play my scratch hangman books.

21              They also have a bold cross to indicate the wrong

22    answer, which they obtained off my manuscript.  But, of course,

23    if they didn't steal the idea of --

24              THE COURT:  Sustained.

25              THE WITNESS:  -- my format --

1          MR. EDERER:  Objection, your Honor.

2          THE WITNESS:  -- they wouldn't have created it.

3          THE COURT:  Sustained.  The jury will disregard that

4    answer.

5          You may ask the next question, Mr. Janay.

6          MR. JANAY:  I would like clarification on which part

7    is stricken.

8          THE COURT:  The whole thing.

9          MR. JANAY:  The whole thing?

10          THE COURT:  Yes.

11          MR. JANAY:  OK.

12   BY MR. JANAY:

13   Q.  Mr. Ward, just please particularize as best you can your

14   contributions to the instructions page found on Defense Exhibit

15   17, the Patrick Blindauer book.

16   A.  What everybody is forgetting is there are two issues here.

17   One is copyright infringement.  The other --

18          THE COURT:  Mr. Ward.

19          MR. EDERER:  Objection, your Honor.

20   A.  -- editing.

21          THE COURT:  Mr. Ward, just answer the question.

22          What were your contributions to the instructions that

23   appear on this.

24          THE WITNESS:  I am --

25          THE COURT:  I don't want you to describe your

1   understanding of copyright law or your rights as you perceive

2   them.

3               What were your contributions?  What words on this page

4   did you contribute to the instructions?

5               THE WITNESS:  My contribution to this page of the

6   instructions was my initial manuscript, which Patrick Blindauer

7   edited to suit his own ends.

8               MR. JANAY:  OK.

9               THE WITNESS:  That was the source.

10              MR. EDERER:  Objection as nonresponsive.

11              THE COURT:  Overruled.

12              MR. JANAY:  Thank you.

13              Your Honor, I would like to introduce Defense Exhibits

14  19 through 21.

15              THE COURT:  Mr. Janay, again, you need to just ask

16  permission to approach the witness, lay a foundation, and then

17  you can offer as appropriate.  But I don't want to remind you

18  again.

19  BY MR. JANAY:

20  Q.  Mr. Ward, I just handed you a stack of documents that are

21  labeled Defense Exhibits 19, 20 and 21.

22  A.  Yes.  I have cited all these three items before.

23  Q.  Excuse me?

24              THE COURT:  Do you recognize those documents?

25              THE WITNESS:  I cited to this documentation of the

1    three titles that are in here.

2    BY MR. JANAY:

3    Q.   You recognize those documents?

4    A.   Yes.

5    Q.   What are those documents?

6    A.   The documents are an adaptation of my scratch hangman

7    books, three titles, by Jack Ketch, who is an unknown person.

8              MR. EDERER:  Objection.

9              Nonresponsive, your Honor.

10             THE COURT:  Overruled.

11             MR. JANAY:  I'm sorry.

12   BY MR. JANAY:

13   Q.   Jack Ketch you said is an unknown person.  You have never

14   heard that name before.

15   A.   The reason I am saying he is an unknown person is that

16   there was nothing in the U.S. copyright office --

17             THE COURT:  Sustained.

18   A.   -- showing copyright of these books.

19             THE COURT:  Sustained.

20   BY MR. JANAY:

21   Q.   Mr. Ward, in Exhibit 19 I would like you to flip over until

22   you see an instruction page.

23             THE COURT:  Mr. Janay, are you offering --

24             MR. JANAY:  I'm offering 19 through 21 into evidence,

25   your Honor.

1          THE COURT:  Any objection?

2          MR. EDERER:  No, your Honor.

3          THE COURT:  Admitted.

4          (Defendants' Exhibits 19, 20 and 21 received in

5     evidence)

6     A.  Yes, I have seen this before.

7          MR. JANAY:  I would like to publish this to the jury,

8     your Honor.

9          THE COURT:  What is "this"?

10         MR. JANAY:  Exhibit 19, Defense Exhibit 19.

11         THE COURT:  With my thanks, if the defense could

12    arrange to display 19.

13         Do you want page 3?

14         MR. JANAY:  Page 3, your Honor.

15         Actually -- yes.  Page 3.

16    BY MR. JANAY:

17    Q.  Mr. Ward, if you could turn to the third page of Exhibit

18    19.  Thank you.

19         Do you recognize that document?

20    A.  Most certainly.  It's the same as mine.

21    Q.  The same as your what, Mr. Ward?

22    A.  Previous 40 scratch hangman titles word for word.

23    Q.  Word for word.  Thank you.

24         Now, if you could go to Exhibit 20 and explain to me

25    what you see on the cover and then on the instruction page.

1   A.   Yes.   There are three scratch hangman titles here by Jack

2   Ketch, which were part of the series of more scratch hangman

3   titles that they intended to publish in the future.

4              THE COURT:   Sustained.

5   A.   The instruction page --

6              THE COURT:   Mr. Ward, just answer the question.

7              Look at Defense Exhibit 20.   Do you recognize what

8   Defense Exhibit 20 is?

9              THE WITNESS:   Yes.

10             THE COURT:   What is it?

11             THE WITNESS:   It is the instruction pages for the

12  three subsequent books.   I can name the books if you like,

13  Science Hangman, Spelling Bee Hangman and Geography Hangman.

14  BY MR. JANAY:

15  Q.   Are all those instructions identical?

16  A.   Identical to what?   To each other?

17  Q.   Yes.

18  A.   All the instruction pages on these three titles are

19  identical.

20  Q.   OK.   And you testified earlier -- what was your level of

21  contribution -- or what, if any, was your contribution to those

22  instruction pages?

23  A.   Harping back to the original manuscript, Sterling created

24  the instruction page --

25             THE COURT:   Mr. Ward --

1   A.  -- from my manuscript.  These instruction pages --

2           MR. EDERER:  Objection, your Honor.

3   A.  -- are exactly the same word for word that were used in my

4   scratch hangman title.

5           MR. JANAY:  OK.  Thank you.  That is all regarding

6   these.  Then on to my last exhibit.

7   BY MR. JANAY:

8   Q.  Mr. Ward, I just handed you a document.

9   A.  Yes.

10  Q.  Do you recognize this document?

11  A.  Yes.

12          THE COURT:  Counsel, what is it marked?

13          MR. JANAY:  It is Plaintiff's Exhibit 33, your Honor.

14  BY MR. JANAY:

15  Q.  Mr. Ward, turning to the covers of the books in Plaintiff's

16  Exhibit 33, which books are these?

17  A.  The two titles that are shown here, the first one is Tough

18  Hangman for Your Backpack, which is one of my titles that I am

19  the owner of.  The second one is of Science Hangman of the

20  Mysterious Jack Ketch.

21          MR. JANAY:  I would like to publish this to the jury,

22  your Honor.

23          THE COURT:  It is not in evidence.

24          MR. JANAY:  Introduce it into evidence, your Honor.

25          THE COURT:  Any objection?

F7snwar4                      Ward - direct

1              MR. EDERER:  Yes, your Honor.

2              THE COURT:  Basis?

3              MR. EDERER:  Foundation.  Authentication.

4              THE COURT:  Overruled.  I will allow it.  It is

5      admitted.

6              (Plaintiff's Exhibit 33 received in evidence)

7              MR. JANAY:  OK.  Can the jury see it?

8              THE COURT:  If you are requesting permission to

9      publish on the screen, it is granted.

10     BY MR. JANAY:

11     Q.  Again, Mr. Ward, the covers you see here, can you explain

12     them real quick now that the jury can see them.

13             THE COURT:  I think they speak for themselves.

14     A.  These --

15             THE COURT:  Next question.

16             MR. JANAY:  All right.

17             Turning to the next page, Which, too, is being offered

18     for publication to the jury.

19             THE COURT:  Granted.

20     BY MR. JANAY:

21     Q.  Do you recognize what the next page on that exhibit is?

22     A.  Yes.

23     Q.  What is it?

24     A.  The top page is the instructions of one of my scratch

25     hangman books.

1                The bottom instruction page is a plagiarized

2    version --

3                MR. EDERER:  Objection, your Honor.

4                THE COURT:  Sustained.

5    A.  -- of my --

6                THE COURT:  Sustained.  The jury will disregard.

7    A.  -- scratch hangman book, word for word.

8    Q.  I'm sorry.  So is it your testimony that there is an

9    identical copy of the instructions?

10               MR. EDERER:  Objection.

11               THE COURT:  Sustained.

12   A.  It is identical.

13               THE COURT:  Mr. Ward.

14   A.  Every single word.

15               THE COURT:  Mr. Ward, if I sustain an objection, you

16   don't answer the question.

17               THE WITNESS:  OK.  I didn't hear that.  I'm sorry.

18               THE COURT:  What is the page displayed at the bottom

19   of the page that you are looking at?

20               What is that from?

21               THE WITNESS:  The top instruction page is from Tough

22   Hangman for Your Backpack, which is one of my titles.  The

23   second instruction page at bottom of the page is for the Jack

24   Ketch title, Science Hangman.

25               THE COURT:  Thank you.

1          THE WITNESS:  I have a --

2          THE COURT:  Let's leave it there.

3          Next question.

4    BY MR. JANAY:

5    Q.  Mr. Ward, for your Tough Hangman title, with those

6    instructions, did you ever give the defendant permission to use

7    the instructions on the later book?

8    A.  I don't even know who --

9          MR. EDERER:  Objection.

10   A.  -- the defendant is.

11         THE COURT:  Sustained.

12   A.  Jack Ketch is a mysterious name.

13         THE COURT:  I sustained the objection.

14         You may proceed.

15   BY MR. JANAY:

16   Q.  Mr. Ward, it is your testimony -- or please clarify for the

17   jury whether it is your testimony that you are the author and

18   creator of these instructions --

19         MR. EDERER:  Objection, your Honor.

20   Q.  -- on Exhibit 32.

21         THE COURT:  The objection is overruled.

22   A.  I am the author and proprietor.

23         THE COURT:  Ladies and gentlemen, I am going to

24   interrupt for a moment.  Some of the terms that Mr. Ward is

25   using, "author," those have colloquial meanings.  Obviously,

1    you might use the word in everyday speech if someone writes

2    something or the like.

3              It also has a technical meaning under the copyright

4    law which I will be instructing you about later.  One of the

5    questions that you may be asked to answer in this case is

6    whether in fact Mr. Ward owns the copyright at issue, owns a

7    copyright with respect to the works that are at issue in this

8    case.

9              That is going to be your decision to make based on the

10   evidence that you have seen and heard here.  So while he's

11   using some words like "proprietor," "owner," "author" and the

12   like, and allowing him to do that, you should understand that

13   it ultimately your decision to make whether he actually does

14   own any copyright with respect to the works at issue.

15             You may proceed, Mr. Janay.

16   BY MR. JANAY:

17   Q.  Mr. Ward, to the best of your recollection, the

18   instructions to the Tough Hangman book contained in Exhibit 33,

19   what was the date of their creation, or the date of the

20   copyright registration, rather?

21   A.  It's a pity we can't have the schedule back again --

22             MR. EDERER:  Objection, your Honor.

23   A.  -- because it is spelled out on that.

24             THE COURT:  The objection is overruled.

25             Just, do you know the date of the copyright

F7snwar4                    Ward - direct

1   registration with respect to that work?

2             THE WITNESS:  Not offhand.

3   BY MR. JANAY:

4   Q.  Mr. Ward, do you know if it was before or after the date of

5   Jack Ketch's Science Hangman?

6   A.  Before.

7   Q.  OK.  Thank you.

8             Mr. Ward, my final question.

9             I would just like to give, generally ask you if there

10  is anything else you would like to say regarding your creation

11  of the instructions to the scratch hangman books.

12            MR. EDERER:  Objection.

13            THE COURT:  Sustained.

14            MR. JANAY:  OK.

15  A.  I --

16  Q.  You can't answer that.

17  A.  OK.

18  Q.  Looking back at Exhibit 33 and the instruction page in

19  particular, I would like you to simply explain your involvement

20  in the creation of both of those works.

21            THE COURT:  Sustained.  Asked and answered.

22  A.  The contract --

23            THE COURT:  Sustained.

24  Q.  Mr. Ward, is there anything else you would like to add

25  regarding --

1              THE COURT:  Sustained.

2    Q.  -- contribution to the instructions?

3              THE COURT:  Sustained.

4              MR. JANAY:  Asked and answered?

5              THE COURT:  Sustained.

6              MR. JANAY:  OK.  I have no further questions, your

7    Honor.

8              THE COURT:  Cross-examination.

9              THE WITNESS:  Step down?

10             THE COURT:  No, you stay there.

11             MR. EDERER:  Your Honor, may I just move the podium

12   back so that I can refer to my exhibits?

13             THE COURT:  You may, although if you could make sure

14   you speak loudly clearly and directly at Mr. Ward to help

15   ensure that he hears you, that would be helpful.

16   CROSS EXAMINATION

17   BY MR. EDERER:

18   Q.  Good afternoon, Mr. Ward.

19             You testified that you published a number of hangman

20   books in New Zealand before working with Sterling, correct?

21   A.  Yes.

22   Q.  When you first approached Sterling about the possibility of

23   publishing hangman books in the U.S., you sent them a letter

24   with what you characterized earlier as your manuscript,

25   correct?

A.  The manuscript came later.

          MR. EDERER:  Your Honor, it may be helpful if we

brought our defense exhibit book --

          THE COURT:  That's fine.

          MR. EDERER:  -- up to Mr. Ward so we don't have to

hand them individually.

          THE COURT:  You can certainly try it that way.

          MR. EDERER:  We will give it a try.

          THE COURT:  Let's give it a shot.

          Mr. Ward, just wait until counsel asks you to turn to

something in there and then you may do so.  But for now just

hold on.

BY MR. EDERER:

Q.  Mr. Ward, if you turn to Exhibit D-2 in your binder.  Tab

2.

A.  No. 2?

Q.  No. 2.

          I believe this document you testified earlier is the

initial proposal letter that you sent to Sterling back in 2004,

correct?

A.  Correct.

          MR. EDERER:  I believe D-2 is in evidence, your Honor.

          THE COURT:  It is.

BY MR. EDERER:

Q.  This letter has attached to it some pages from one of your

1  New Zealand books, correct?

2  A.  Yes.

3  Q.  If you turn to the third page of the exhibit, that is a

4  page that is an excerpt from one of your New Zealand hangman

5  books, is that correct?

6  A.  No.

7  Q.  That is not correct?

8  A.  I said samples of the format are enclosed.

9  Q.  These pages that are attached to this letter were not pages

10  that you used in any of your New Zealand books?

11  A.  You are trying to twist things here.

12            MR. EDERER:  Sorry, your Honor.

13            THE COURT:  Do you want this -- hold on Mr. Ward.

14            Do you want it published to the jury?

15            MR. EDERER:  Yes.

16            THE COURT:  Just make sure you ask so that I know.

17            MR. EDERER:  OK.  I apologize, your Honor.

18            THE COURT:  All right.  It may be published.

19            Mr. Ward, if you could answer that last question,

20  please.

21  Q.  The question I believe, Mr. Ward, was whether or not what

22  we see on the third page of this exhibit are anything that was

23  taken from any of your New Zealand hangman books?

24  A.  Yes.

25  Q.  OK.

1   A.  It was some stuff.  Not all of it.

2   Q.  OK.  But some of it, right?

3   A.  Not the instruction page.

4   Q.  OK.  The instruction page was something that you created to

5   send to Sterling, is that right?

6   A.  Yes.  The instruction page for my New Zealand books, I can

7   show the jury.  I've gotten these here in a book here.

8   Q.  My question, Mr. Ward, is what is the instruction page that

9   we see on this exhibit?  Where did that come from?

10  A.  Me.

11  Q.  OK.  So you prepared that, correct?

12  A.  I was the author.

13  Q.  Is that what you were referring to in your earlier

14  testimony as your manuscript?

15  A.  I was the author of the instruction page that I supplied

16  Sterling of the manuscript.

17          THE COURT:  Mr. Ward, is this document what you were

18  referring to as your manuscript?

19          THE WITNESS:  The manuscript is the initial offer I

20  made to Sterling combining the instruction page, the format,

21  and the letter from my New Zealand distributor.

22  Q.  OK.  Mr. Ward, did you --

23  A.  I was --

24  Q.  Did you write the instructions that we see on the third

25  page of this exhibit.  Did you write these instructions?

1   A.  Yes.

2   Q.  OK.  Now, a few months later you entered into your first

3   publishing agreement with Sterling, correct?

4   A.  Yes.

5   Q.  Then before publishing any hangman books in the U.S.,

6   Sterling put together proofs of the hangman books that they

7   were going to publish under your name, is that right?

8   A.  For my approval.

9   Q.  My question is, did Sterling put together proofs of the

10  hangman books they were going to publish under your name?  Yes

11  or no?

12  A.  Yes.

13  Q.  OK.  Can you turn to tab 5 of your binder.

14  A.  Tab 5.

15  Q.  This is a document that's been marked for identification as

16  Defendants' Trial Exhibit 5.

17          Do you have that?

18  A.  Yes.

19  Q.  Can you identify the first page of that exhibit?

20          THE COURT:  Mr. Ederer, since you are permitted to

21  lead on cross-examination, maybe you could ask the question in

22  a different manner.

23          MR. EDERER:  Sure.  I will do that, your Honor.

24  BY MR. EDERER:

25  Q.  Mr. Ward, is it not the case that the first page of that

1   exhibit is an e-mail from Mr. John Woodside of Sterling to you

2   on February 16, 2005?

3   A.  Yes.

4   Q.  Is that right?

5   A.  Yes.

6   Q.  You recall receiving that e-mail?

7   A.  Yes.

8   Q.  Attached to that e-mail are four PDF attachments, correct?

9   A.  Yes.

10  Q.  And the four PDF attachments are the proofs of the first

11  four hangman books that Sterling was proposing to put out under

12  your name, correct?

13  A.  Yes.

14          MR. EDERER:  Your Honor, move admission of Defendants'

15  D-5.

16          THE COURT:  Any objection?

17          MR. JANAY:  No, your Honor.

18          THE COURT:  Admitted.

19          (Defendants' Exhibit 5 received in evidence)

20  BY MR. EDERER:

21  Q.  Mr. Ward, later on these proofs became the first four

22  hangman books that Sterling published under your name, correct?

23  A.  Yes.

24  Q.  Now let's take a look at the proofs that Mr. Woodside sent

25  you back in February of 2005.

F7snwar4                    Ward - cross

1          So let's look at the page, if you look at the lower

2     right-hand corner it's No. 2355.

3     A.   That's the instruction page?

4     Q.   Yes.   It's the instruction -- it's the cover page for

5     Scratch & Solve Hangman 1, the proof of that book.

6     A.   Yes.

7     Q.   Do you have that?

8               THE COURT:  Let me interrupt for one moment.

9               Ladies and gentlemen, what Mr. Ederer is referring to

10    is a number on the bottom corner there.  It says D-E-F-S and

11    then there are some numbers after that.  It also says on the

12    other side confidential.

13              That's something called a Bates stamp.  Basically it's

14    something that is attached to the document when a case is in

15    court, just to assist the parties and the Court for that matter

16    in keeping track of documents and identifying it.

17              So that's something that is affixed after the fact.

18    It is not original.

19              With that proviso, Mr. Ederer may refer to it just for

20    everybody's convenience.

21              MR. EDERER:  Thank you, your Honor.

22              May I show the jury that page of the exhibit?

23              THE COURT:  You may.

24              MR. EDERER:  Can we put it up.

25              Thank you.

1    BY MR. EDERER:

2    Q.  Mr. Ward there was the proof that Mr. Woodside sent you of

3    the first page of what was going to be Scratch & Solve Hangman

4    No. 1 back in 2005, correct?

5    A.  This is the Scratch & Solve Hangman No. 1, Mike Ward.

6    Q.  Right.

7    A.  Is that the page you're referring to?

8    Q.  Yes.  If you turn to the next page, the page that has the

9    No. 2356 at the bottom, that is the proof of the instructions

10   page on the right-hand side?

11   A.  Yes.

12   Q.  For what later became Scratch & Solve Hangman No. 1,

13   correct?

14   A.  Yes.

15   Q.  So that was the proof that Mr. Woodside sent you of the

16   instructions page that Sterling had put together, right?

17   A.  No.

18   Q.  Sterling didn't put that together?

19   A.  You are twisting the answer.

20   Q.  OK.

21   A.  What I'm saying --

22   Q.  Mr. Ward.

23   A.  I am answering your question.  I'm answering your question.

24   Q.  Mr. Ward, please.

25   A.  Please, give me the courtesy to answer your question.

1    Q.  Mr. Ward.

2              THE COURT:  Mr. Ward.

3              MR. EDERER:  I'm sorry, your Honor.

4              THE COURT:  Counsel and Mr. Ward, let me explain how

5    this works.  He gets to ask you questions, and they can be

6    questions --

7              THE WITNESS:  Do I get to answer?

8              THE COURT:  They can be questions that ask for a yes

9    or a no answer, in which case it you give a yes or no answer.

10             If it requires clarification, your lawyer will have an

11   opportunity to get up afterwards and ask additional questions.

12             You may then have an opportunity to explain, but you

13   must listen to the question and answer the question.

14             So the question is, is this -- Mr. Ederer, why don't

15   you ask the question again.

16   BY MR. EDERER:

17   Q.  Mr. Ward, are you looking at right-hand side of page 2356,

18   the instructions from the proof of the first Scratch & Solve

19   Hangman book that was sent to you by Sterling?  Are you looking

20   at that right now?

21   A.  Yes.  These were sent to me by Sterling.

22   Q.  Did you write the words that appear on that instruction

23   page?  Yes or no?

24   A.  I am not going to answer yes or no to your questions.

25             MR. EDERER:  Your Honor, may I please have an answer.

1  A.  This is something like, Have you stopped hitting your wife

2  yet?

3           Whether it is yes or no, it is completely misleading.

4  I would rather give a correct, honest answer to your questions

5  because you are twisting things.  Things are twisted in a

6  certain way.

7           MR. EDERER:  Your Honor, it is a simple question.

8           THE WITNESS:  It makes the answer convoluted.

9           THE COURT:  Mr. Ward, did you write any of the words

10 that appear on that page?  Yes or no?

11          THE WITNESS:  The majority of them I did.

12          THE COURT:  Thank you.

13 BY MR. EDERER:

14 Q.  Which words on that page did you write?  I will withdraw

15 that question.

16          Can you point me to a document, Mr. Ward, that shows

17 that you wrote the words that appear on that page?  What

18 document can you point me to?

19 A.  The manuscript.

20 Q.  So the manuscript is the document you were referring to

21 earlier as part --

22 A.  The manuscript.

23 Q.  As D-2, correct?

24 A.  The manuscript is called the original offer plus format.

25          THE COURT:  Let me just clarify.

1              When you were referring to the manuscript, are you

2      referring to the document that is in evidence as Defense

3      Exhibit 2.

4              THE WITNESS:  Yes.

5              THE COURT:  Yes or no?

6              THE WITNESS:  Yes, yes.  It's listed as Sterling's

7      offer plus format.

8              THE COURT:  Yes or no?

9              THE WITNESS:  Yes.

10             THE COURT:  Is that what you are referring to as the

11     manuscript, Defense Exhibit 2?

12             THE WITNESS:  Yes.

13             THE COURT:  Thank you.

14             MR. EDERER:  Your Honor, if I could, we have a

15     demonstrative that shows the instructions page from the

16     manuscript, Defense Exhibit 2, and the instructions page that

17     we are looking at from Defense Exhibit 5.

18             Can we put them side by side?

19             THE COURT:  Are you proposing to ask the question to

20     Mr. Ward?

21             MR. EDERER:  Yes.  I would like to show that to

22     Mr. Ward.

23             THE COURT:  All right.

24     BY MR. EDERER:

25     Q.  Mr. Ward, you have on your screen on the left-hand side the

F7snwar4                    Ward - cross

1     instructions from the manuscript that you submitted to

2     Sterling, correct?

3     A.  I can't confirm that until I have a look at the manuscript.

4     Q.  Take your time, look at Exhibit D-2 and tell me --

5     A.  Your --

6     Q.  -- whether the approved instructions --

7     A.  You are confusing --

8     Q.  Mr. Ward, please.

9              THE COURT:  Mr. Ward.

10    A.  -- the New Zealand book --

11             THE COURT:  You have to wait until Mr. Ederer finishes

12    his question before you start speaking.

13             OK.  Mr. Ederer, would you like this displayed to the

14    jury?

15             MR. EDERER:  Yes, please, your Honor.

16             THE COURT:  Granted.

17    Q.  Mr. Ward --

18             MR. EDERER:  I'm sorry, your Honor.

19             THE COURT:  Mr. Ward, why don't you look at Defense

20    Exhibit 2 in the binder.

21             THE WITNESS:  Yes.  Uh-huh.  Here we are.

22             THE COURT:  Is what is displayed on the left side of

23    the screen the same as what is on the page you are looking at

24    from Defense Exhibit 2?

25             THE WITNESS:  I'm --

F7snwar4                    Ward - cross

1           THE COURT:  Yes or no?

2           THE WITNESS:  I am getting a bit suspicious of what

3     you're bringing out.

4           THE COURT:  Mr. Ward.

5           THE WITNESS:  There's --

6           THE COURT:  There is a simple question.  You have

7     looked at the instructions that are included in Defense Exhibit

8     2.  You are looking at what is on the left side of the screen.

9           Are those the same?

10          THE WITNESS:  I can't answer that.  This left-hand

11    side screen is different.  It says Ward's New Zealand book.

12          THE COURT:  All right.  Disregarding the blue label on

13    the top.

14          THE WITNESS:  Yes.  If I disregard that, because the

15    manuscript was different from the books.

16          THE COURT:  Understood?

17          THE WITNESS:  So the instruction on the left-hand side

18    is the same as my manuscript.

19    BY MR. EDERER:

20    Q.  Is the instruction on the right-hand side the same as

21    appears in Exhibit D-5, which was the proof that was sent to

22    you by Sterling?

23    A.  Yes.

24    Q.  Is it your testimony, sir, that there are any of the words

25    that are on the left-hand of that slide that are the same as

1  the words on the right-hand side of that slide?  If that's the

2  case show me which ones they are?

3  A.   This proof of Scratch & Solve Hangman 1 was not the final

4  instruction page for the books.

5          THE COURT:  Mr. Ward, answer the question.  Counsel is

6  asking you about the page on the right-hand side.

7          THE WITNESS:  I have to say no.

8          THE COURT:  Thank you.

9          Mr. Ederer, we are going to end there for today.

10          MR. EDERER:  Thank you, your Honor.

11          THE COURT:  Because it's 1 minute after 5 and I like

12  to honor my promises.

13          Ladies and gentlemen, we are going to stop for the

14  day.

15          As I mentioned to you earlier, tomorrow we are just

16  going to sit in the morning, so we will finish at noon and

17  we'll just take one break in the morning and get as much done

18  as we can.

19          I would ask you to please, please, please be here

20  promptly by 9 so that we can start exactly on time at 9:15.

21  Again, I will have some breakfast for you as well as coffee

22  and.

23          I also remind you that we can't start until all eight

24  of you are here, so please don't inconvenience one another and

25  please get here on time.

1          Is this a question about the schedule sir?

2          JUROR NO. 3:  Yes.

3          What is the earliest we can get here?  When will the

4     jury room be open?

5          THE COURT:  That is a good question.  Hang on.

6          My deputy advises me 8 a.m.

7          THE WITNESS:  OK.

8          THE COURT:  She is in charge of that part.

9          JUROR NO. 3:  OK.

10          THE COURT:  If you have questions of that sort,

11     Ms. Barnes will escort you to the jury room in a moment.  You

12     can ask her.

13          I have two reminders for you you are probably already

14     familiar with.

15          Number one, keep an open mind.  You have heard some of

16     the evidence in this case but not all of it, and you should

17     continue to keep an open mind.

18          Number two, please do not discuss or communicate about

19     the case with anyone.  I just remind you, you can tell friends

20     family, employer, that you are a juror in a civil case, but

21     please don't tell them anything beyond that.

22          With that, I wish you a very pleasant evening.  You

23     can leave your jury books in the jury room where they will be

24     secured, and we will see you tomorrow morning promptly at 9:15.

25          Thank you.

1          (Jury not present)

2          THE COURT:  You may be seated.

3          Mr. Ward, you may step down.

4          You may step down.

5          THE WITNESS:  OK.

6          THE COURT:  All right.

7          Anything we need to discuss?

8          Mr. Janay?

9          MR. JANAY:  No, your Honor.

10         THE COURT:  Mr. Ederer?

11         MR. EDERER:  No, your Honor.

12         THE COURT:  All right.

13         Please be here no later than 9 o'clock.  If there is

14    anything that we need to discuss before the jury comes out, you

15    can tell Ms. Barnes or Ms. Atkins at that time and I will come

16    immediately down and we can address it so that we can start

17    promptly at 9:15.

18         Obviously Mr. Ward will need to be here to take the

19    stand, and you should presumably have your next witnesses ready

20    as well.

21         I wish you a pleasant evening, and we will see you

22    tomorrow morning.  Thank you.

23         MR. JANAY:  Can we leave the books here?

24         THE COURT:  You may not because I have -- you may

25    actually.  I don't have any other matters this evening.

F7snwar4                    Ward – cross

1               So that's fine.

2               (Adjourned to Wednesday, July 29, 2015, at 9 o'clock

3       a.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

MIKE WARD

Direct By Mr. Janay  . . . . . . . . . . . . . .48

Cross By Mr. Ederer  . . . . . . . . . . . . . 149

PLAINTIFF EXHIBITS

Exhibit No.                                      Received

3   . . . . . . . . . . . . . . . . . . . . . .62

4   . . . . . . . . . . . . . . . . . . . . . .66

6   . . . . . . . . . . . . . . . . . . . . . .72

5   . . . . . . . . . . . . . . . . . . . . . .75

8   . . . . . . . . . . . . . . . . . . . . . .82

25   . . . . . . . . . . . . . . . . . . . . . 108

26   . . . . . . . . . . . . . . . . . . . . . 111

32   . . . . . . . . . . . . . . . . . . . . . 126

33   . . . . . . . . . . . . . . . . . . . . . 144

DEFENDANT EXHIBITS

Exhibit No.                                      Received

2   . . . . . . . . . . . . . . . . . . . . . .58

14   . . . . . . . . . . . . . . . . . . . . . 129

17   . . . . . . . . . . . . . . . . . . . . . 135

19, 20 and 21   . . . . . . . . . . . . . . . 141

5   . . . . . . . . . . . . . . . . . . . . . 154